IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 05-337 (PLF) |
| v. : | |
| : | |
| WESAM AL DELAEMA, : | |
| also known as : | |
| WESAM KHALAF CHAYED DELAEME, : | |
| : | |
| Defendant. : | |

### GOVERNMENT'S MOTION FOR DNA AND HAIR SAMPLES

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this Motion to collect DNA and hair samples from the defendant. In support of this Motion, the United States relies on the following points and authorities:

### INTRODUCTION

1.      On September 9, 2005, a U.S. District Court Grand Jury sitting in the District of Columbia returned the Indictment in the instant case, Criminal Number 05-337, charging the defendant WESAM AL DELAEMA, also known as WESAM KHALAF CHAYED DELAEME (hereinafter, "the defendant"), an Iraqi-born Dutch national, with the following charges: (1) Conspiracy to Murder a United States National Outside the United States, a conspiracy alleged to have taken place from in or about October 2003, until on or about May 2, 2005, in violation of Title 18, United States Code, Section 2332(b); (2) Conspiracy to Use a Weapon of Mass Destruction, in violation of Title 18, United States Code, Section 2332a(a); (3) Conspiracy to Maliciously Damage or Destroy U.S. Government Property by Means of An Explosive, in violation of Title 18, United States Code, Sections 844(f) and (n); (4) Possession of a Destructive Device During a Crime of Violence and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United

States Code, Sections 924 (c) and 2; (5) Conspiracy to Possess a Destructive Device During a Crime of Violence, in violation of Title 18, United States Code, Section 924(o); and (6) Teaching or Demonstrating the Making or Use of an Explosive with Intent to Further a Crime of Violence and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Sections 842(p) and 2 (collectively, the "Charges").  That same day, September 9, 2005, Magistrate Judge Facciola issued a warrant for the defendant's arrest on the Charges.

2.    In September 2005, the United States filed a formal extradition request in the Netherlands, seeking to bring the defendant here to face the Charges set forth in the Indictment.  That extradition request was subsequently granted by a Dutch court and approved by the Dutch Ministry of Justice.  In December 2006, the extradition decision was upheld on appeal in the Netherlands.

3.    On Saturday, January 27, 2007, the defendant, who had been incarcerated in the Netherlands since on or about May 2, 2005, was brought to the United States, pursuant to the extradition request.  Agents of the Federal Bureau of Investigation ("FBI") executed Magistrate Judge Facciola's arrest warrant and transported the defendant to the Washington Field Office of the FBI, in Washington, D.C., for booking and processing.  The defendant's arraignment on the Indictment is scheduled for today, January 29, 2007.

4.    For the reasons detailed below, there is probable cause to believe that, from buccal (oral) swabs and hair samples that may be collected from the defendant, there exists evidence of the Charges.  The United States proposes to take the samples sought herein in an entirely non-intrusive manner.  Specifically, the United States seeks to take (1) "buccal," or cheek swabs from the inside of defendant's mouth; (2) combed head hair; and (3) a limited number of plucked or pulled head hairs.

**FACTS SUPPORTING PROBABLE CAUSE**

**Background Regarding the Prosecution of the Defendant**

5.      On May 2, 2005, the Dutch National Police Agency (KLPD) executed a search warrant on the defendant's residence, located at Lupinestraat 26, in Amersfoort, in the Netherlands. Among the items seized in the search were several videotapes showing the defendant traveling to, and in, Iraq. FBI agents subsequently reviewed the items seized, including the above-referenced tapes. On one of the tapes, identified as evidence number KA2.III.1.7, tape #2, segments that are date-stamped October 30, 2003, show several individuals through a night vision lens wearing hoods that conceal their faces. The individuals on the tape identify themselves as "*Mujahideen* of Fallujah," and they make anti-American statements for the camera. One of the individuals, although masked, has been identified as the defendant through burns and bandages on his right hand and by voice recognition by KLPD translators. Additionally, after his May 2, 2005, arrest in the Netherlands, the defendant admitted that he is that person in the video. The defendant is wearing a distinct jacket and a t-shirt on the video.

6.      In one of the video segments on KA2.III.1.7, tape #2, date-stamped October 30, 2003, the defendant, identified by his jacket, t-shirt, and burned and bandaged hand, makes the following statement for the camera (in Arabic): "We will show you, in a short while, the site where we hide the mines and how the operation is conducted. The operation will be carried out, if Allah wills, today, and if they [the Americans] come. This is not the first operation we carry out. We have executed several operations and most of them were successful. The American Army wouldn't admit to casualties. Their casualties have gone beyond your imagination. In Fallujah alone, they lost hundreds. Thanks be to Allah, all this happened with His help and blessing. We will continue this

struggle and keep our promise, God willing, until the liberation of Iraq is achieved."

7.      In a subsequent segment on KA2.III.1.7, tape #2, bearing the same date stamp of October 30, 2003, the camera is focused on an artillery shell in the ground. An associate of the defendant explains on camera how the shell has been rigged to explode, and how it can be detonated by remote control when American vehicles drive past. The defendant, again identified by his burned and bandaged hand, and jacket, is then seen touching the artillery shell in the ground. From the video, it is apparent that the defendant's fingers make direct contact with the artillery shell. As he touches the artillery shell, the defendant states, "God willing, they'll pass by here today," referring to American vehicles.

### Background Regarding the Terrorist Explosive Device Analytical Center and DNA

8.      In or around September 2003, the FBI established the Combined Explosive Exploitation Cell ("CEXC") in Iraq. CEXC was set up to document, collect, and process evidence recovered from detonations of Improvised Explosive Devices ("IEDs") in Iraq, and to serve as a repository for physical evidence recovered from such sites. Beginning in approximately October 2003, CEXC began sending physical evidence collected from IED sites in Iraq to the FBI laboratory in Quantico, Virginia, for additional exploitation. By mid-December 2003, the U.S. Government explosives community, including the FBI, the Department of Defense, and the Bureau of Alcohol, Tobacco, and Firearms, collectively formed the Terrorist Explosive Device Analytical Center ("TEDAC"). Located at the FBI Laboratory in Quantico, Virginia, the TEDAC acts as a single inter-agency focal point to coordinate and manage the unified effort of law enforcement, intelligence and military assets as it relates to terrorist IEDs, and to technically and forensically exploit all IEDs of interest to the United States government, worldwide.

9.      Today, the TEDAC functions as a repository for all items of physical evidence recovered from IED crime scenes. The items that TEDAC receives include: raw intelligence and information, IEDs, component hardware, electronics, and other physical items from terrorist organizations worldwide. TEDAC conducts a full range of forensic and technical analysis on such items, utilizing analytical protocols that include photography, latent fingerprint analysis, trace evidence (hair and fiber), DNA, electronic and cryptographic analysis, and tool marks.

10.     There are two sources of DNA used in forensic analyses. Nuclear DNA (nDNA) is typically analyzed in evidence containing blood, saliva, body tissue, and hairs that have tissue at their ends. Mitochondrial DNA (mDNA) is typically analyzed in evidence containing naturally shed hairs and hair fragments. When DNA evidence is transferred by direct or secondary (indirect) means, it remains on surfaces by absorption or adherence. In general, liquid biological evidence is absorbed into surfaces and solid biological evidence adheres to an object. Current DNA tests are so sensitive that they can type the DNA found in samples containing only a few cells. Merely touching an object may leave enough DNA material that a forensic analysis will be able to match the object to the person who touched it.

11.     TEDAC maintains databases that catalogue its forensic findings, including trace evidence and DNA databases that contain DNA profiles extracted from terrorist IEDs and associated physical evidence. TEDAC further maintains the capability to compare a DNA profile extracted from a known suspect's buccal (oral) swab samples, with the TEDAC database of DNA profiles extracted from physical evidence recovered from IED sites. Similarly, TEDAC maintains the capability to compare hair samples from a known suspect with trace hair evidence recovered from IED sites. By conducting these analyses, TEDAC is able to determine whether a known sample,

collected from a known suspect, matches samples recovered from a terrorist IED and profiled in the TEDAC database. TEDAC reported its first DNA match between two hairs from different IEDs in August, 2004.

## APPLICABLE LEGAL PRINCIPLES

12. The compulsory extraction of a biological sample from a criminal defendant "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." Schmerber v. California, 384 U.S. 757, 767 (1966). In this context as with other searches, "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Id. at 768. Schmerber recognized that the "ordinary requirements of the Fourth Amendment [such as the existence of probable cause] would be the threshold requirements for conducting" the kind of surgical search and seizure implicated by the extraction of blood. Winston v. Lee, 470 U.S. 753, 759, 760 (1985). In addition, Schmerber – which involved blood extraction, a procedure clearly more intrusive than the procedures we propose here – "considered a number of other factors in determining . . . 'reasonableness,'" including the "extent to which the medical procedure may threaten the safety or health of the individual" and the "extent of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." Id. at 761. "Weighed against these individual interests is the community's interest in fairly and accurately determining guilt or innocence," which is "of great importance." Id. at 762. Schmerber noted that the blood procedure in that case was "commonplace in these days of periodic physical examination" and that "for most people the procedure involves virtually no risk, trauma, or pain." 384 U.S. at 771.

13. The procedures we intend to employ to collect DNA and hair samples from the

defendant are equally commonplace and far less invasive than those addressed by the Court in Schmerber. The buccal (oral) swab takes moments, involves no risk to health, "no risk, trauma, or pain," and can be conducted at the medical clinic at the jail or in virtually any other sanitary area. Likewise, the collection of a hair sample is a quick, safe, routine and minimally invasive procedure. Neither procedure is surgical in nature, and neither poses a threat to defendant's "dignitary interests in personal privacy and bodily integrity." Id. at 761.

**CONCLUSION**

14.     Based on all of the foregoing facts and circumstances, there is probable cause to believe that hair from the defendant, and the defendant's DNA profile, which may be extracted from buccal (oral) swab samples collected from the defendant, may contain evidence of the Charges, more specifically, evidence of the defendant's participation in the handling, use, and/or detonation of explosive devices, resulting in injury and/or death to United States nationals in Iraq. The United States therefore respectfully requests authority to take buccal (oral) swab samples and hair samples from the defendant. Any buccal (oral) swab and hair sample taken pursuant to the court order requested herein will be taken in accordance with FBI protocols governing the collection and maintenance of known samples of biological material.[1]

---

[1] On Friday, January 26, 2007, the United States presented an application for a search warrant for defendant's DNA and hair samples, along with a supporting affidavit, to Magistrate Judge Deborah Robinson, in anticipation of defendant's arrival on Saturday, January 27. The affidavit set forth the same facts set forth supra in paragraphs 5 - 11. Although Magistrate Judge Robinson did not take issue with the affidavit's statement of probable cause, she declined to sign the warrant because she believed that, in light of defendant's post-indictment status, the United States was legally required to proceed by seeking a court order at arraignment. But see United States v. Hubbard, — F. Supp.2d —, 2007 WL 133355, at *4 (D. Kan. Jan. 16, 2007) (denying motion to suppress fruits of DNA search warrant, where search warrant was obtained and executed post-indictment, after defendant's right to counsel had attached).

WHEREFORE, the United States respectfully requests that the Court grant this Motion. A proposed Order is attached.

                              Respectfully submitted,

                              JEFFREY A. TAYLOR
                              United States Attorney

By:        /s/
                              GREGG A. MAISEL
                              Assistant U.S. Attorney
                              D.C. Bar # 447-902
                              National Security Section
                              555 4th Street, N.W., Rm. 11-450
                              Washington, D.C. 20530
                              (202) 514-7746

                                  /s/
                              MATTHEW P. COHEN
                              Assistant U.S. Attorney
                              D.C. Bar #469-629
                              National Security Section
                              555 4th Street, N.W., Rm. 11-439
                              Washington, D.C. 20530
                              (202) 514-7427

## CERTIFICATE OF SERVICE

      I hereby certify that a true and accurate copy of the foregoing Motion was served by hand in open court on Robert Tucker, defense counsel for Wesam Al Delaema, this 29th day of January, 2007.

                                                                            /s/
                                        GREGG A. MAISEL
                                        Assistant U.S. Attorney