IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR. NO. 05-337 (PLF) |
| | : | |
| WESAM AL DELAEMA, | : | |
| | : | |
| Defendant. | : | |

## MOTION TO SUPPRESS

Counsel for the defendant moves the Court to enter an order suppressing from evidence (1) statements made by Mr. Delaema to the Dutch authorities on May 2, 2005, May 11, 2005, and May 31, 2005 and (2) all evidence derived from wiretaps on Mr. Delaema's cellular telephone and those of his associates from September 10, 2004 until May 2, 2005.[1] Mr. Delaema submits that admission of these statements against him would violate his rights under the Due Process and Self-Incrimination clauses of the Fifth Amendment. Admission of the wiretap evidence

---

[1] Mr. Delaema's residence in the Netherlands was searched on May 2, 2005 and May 9, 2005. It is not clear from the documents which the defense presently has whether a judicial official authorized the search after a finding of probable cause. The documents do indicate that a magistrate accompanied the law enforcement officers to the residence and was present at the commencement of the searches. For at least one of the searches, the magistrate left the premises and returned at the conclusion of the search. Irrespective of whether the search was authorized beforehand by a judicial official upon a finding of probable cause, Mr. Delaema has not made an independent claim that the fruits of these searches should be suppressed on Fourth Amendment grounds because of the Supreme Court's decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (protections of Fourth Amendment available only to the "people of the United States," which excludes aliens who have not otherwise established substantial connections with this country). That said, depending on how the evidence develops, Mr. Delaema reserves the right to argue that the evidence seized as a result of these searches should be excluded as fruits of other illegal conduct.

1

would violate his rights under the Federal Wiretap Statute, enacted in Title III of the Omnibus

Crime Control and Safe Streets Act of 1968 and codified at 18 U.S.C. §§ 2510-2519.

Because their factual narratives are interrelated, Mr. Delaema presents each of his

suppression claims in this motion.  Part I sets out the factual investigation conducted by the

Dutch and U.S. authorities as counsel presently understands the investigation.  Counsel is in the

process of making additional discovery requests and it is expected that the government will likely

set out additional relevant facts in response to this motion.  Part II discusses the motion to

suppress Mr. Delaema's statements.   Part III addresses the issues raised by the wiretaps.

## I.  FACTUAL BACKGROUND[2]

A.  Initiation of the Investigation and the Subsequent Wiretaps

A review of documents that counsel have been provided in discovery and those

independently obtained in the Netherlands indicates that as early as August 2004, the Dutch

government received information that Wesam Delaema had allegedly traveled to Iraq on various

occasions after the United States' invasion of that country in 2003.   The first reference which

counsel has located indicates that the Dutch National Police received a fax on August 27, 2004,

from the  Director of the Dutch Military Intelligence and Security Service reporting that on

August 12, 2004, the latter received information from a "reliable" source that Mr.  Delaema

"may" have been involved in actions against coalition troops in Iraq and also "may" have been

---

[2]The factual allegations herein relating to the progress of the investigation in this case
primarily come from two sources: (1) materials provided by the government in discovery and (2)
materials independently obtained by defense counsel from the Netherlands.  Upon learning that
the defense had obtained these latter documents, the government shared its translations of those
documents with the defense.  That said, it does not appear that the defense has all relevant
documents and additional specific requests will be forthcoming.

involved in the kidnaping and murder of the American, Nicholas Berg, on or around May 11,

2004.  Neither the National Police Report nor the underlying intelligence report set out any facts

suggesting why the informant was considered "reliable" or the basis of the conclusion that Mr.

Delaema "may" have been involved in the cited activities.  The Dutch National Police received a

second fax on August 27, 2004, from the Deputy Head of the General Intelligence and Security

Service, referencing information that Mr. Delaema had traveled with some regularity to Iraq, via

Syria, in order to fight in Iraq and die as a martyr.  Like the other intelligence report, the source

and basis for this information were not provided.   The relationship between the two faxes is not

known at this time.  Nor does the defense presently know whether the two faxes were actually

reporting information from the same source.

According to an FBI memorandum provided counsel, sometime in August 2004, the

Dutch National Police Agency informed the FBI that they had information that Mr. Delaema was

involved in actions against the coalition troops in Iraq.  Specifically, the Dutch police informed

the FBI that they heard that Mr. Delaema, a native of Iraq but a Dutch naturalized citizen, was

traveling from the Netherlands to Iraq through Syria, where he obtained weapons.  The Dutch

police also reported that they had received information that Mr. Delaema was involved in the

murder of an American citizen, Nicholas Berg, whose beheading by presumed members of al-

Qaeda in Iraq had been videotaped and distributed on the internet on or about May 11, 2004.[3]

Based on this information, the FBI and the Dutch began a joint investigation of Mr. Delaema's

activities.

_____

[3]The defense at this time does not know the source of this information received by the
Dutch police.

Shortly thereafter, on September 8, 2004, the Dutch Public Prosecutor issued to T-Mobile an Order to Provide Information concerning telephone traffic on Mr. Delaema's cell phone since January 1, 2004.  It appears that this Order was issued on the basis of information provided by a Dutch police officer, who applied for the Order.  The application for this Order recited the information set out above, namely the unsupported speculation that Mr. Delaema "may" have been involved in the above activities.  This application also set out that on May 11, 2004, images of Mr. Berg, accompanied by five masked individuals who participated in his killing, were shown worldwide on the internet and recited that Mr. Delaema had been identified as one of the masked individuals, based on his "posture and bearing."  The report also states that Mr. Delaema "poured gasoline on himself and set himself on fire" during a protest against the United States on May 2, 2003.   The report did not set out the bases of the latter two pieces of information.

On September 10, 2004,  the Public Prosecutor issued an Order authorizing a wiretap on Mr. Delaema's cell phone.[4]  The order recited that it was issued on the basis of an Official Report dated September 1, 2004.  Counsel does not have that report, but assumes that it references the above information that had been received by the Dutch National Police.  The initial wiretap order was valid for a period of thirty days.  Every thirty days thereafter a new wiretap order was issued for an additional thirty days until Mr. Delaema's arrest on May 2, 2005.  Each of the later wiretap applications from the police referenced the original order of September 30, 2004, and included references to excerpts of intercepted conversations in the immediate preceding 30 days period.  Thus, all of the applications flowed directly from the allegations in the initial application relating

---

[4]The Dutch also placed wiretaps on various phones used by Mr. Delaema's friends and associates.

to Mr. Delaema's supposed identification as one of the five masked men depicted in the Berg video, as well as the allegation that Mr. Delaema allegedly doused himself with gasoline at a protest against the United States in May 2003.  Neither of these allegations were true, as the Dutch police well knew.

All of the wiretap orders were issued by a prosecutor rather than a judicial official.  None contained any language instructing the police to limit their interceptions to conversations relevant to the purpose of the investigation or to adopt any procedures minimizing the intrusion into privacy occasioned by unlimited monitoring of Mr. Delaema's phone calls.  It is clear from a review of thousands of pages of wiretaps provided in discovery that all conversations on the tapped phones, whether related to the basis of the investigation or not, were listened to and recorded.  For example there are several conversations between Mr. Delaema and his girlfriends where the nature of the calls is entirely innocent.  The interception of these conversations could have been terminated in the early stages after their innocent nature had been established but the transcripts of some of them go on for over ten pages.  Other calls relate to escort services and prostitutes while others reference work-related matters.  From what counsel can tell in reviewing the intercepts, no attempt was made to limit the intrusion into Mr. Delaema's personal life to matters germane to the investigation, and indeed, as set out above, the prosecutor issuing the intercept order gave no instructions to do so.   In addition, none of the wiretap applications recited any facts suggesting that other methods of investigations were implausible or unavailable. In short, the Dutch prosecutor, on the basis of the flimsiest uncorroborated and unspecified information, issued an order that, in effect, resulted in the interception of all of Mr. Delaema's conversations on his cell phone for a period in excess of eight months.

The FBI and the Dutch National Police coordinated their joint investigation of Mr. Delaema and the evidence suggests that information from these Dutch wiretaps, which were illegally obtained and conducted under the laws of the United States, was promptly passed on to FBI agents. During the course of their joint investigation, the Dutch National Police informed the FBI that they suspected that Mr. Delaema was one of the five individuals who appeared with Mr. Berg when he was executed and who are shown in the video released on the internet. However, as early as December 2004, and perhaps even sooner, the FBI informed the Dutch that the United States and Coalition Forces in Iraq had in custody individuals believed to have been involved in the Berg murder, that they had sources who had identified those in the photograph and that based on this and other information, it was unlikely that Mr. Delaema was one of the individuals depicted. Indeed, an FBI memorandum provided the defense in discovery reports that all present at the joint Dutch-FBI meeting agreed that it was unlikely that Mr. Delaema was one of the individuals depicted in the internet video.

A FBI 302 memorandum dated March 28, 2005, specifically addressed the same issue and again reported the agency's belief that Mr. Delaema is not one of the individuals depicted in a video of Mr. Berg's murder. This memorandum suggests that this conclusion was based, in part, on CIA and NSA sources. It is believed that this memorandum, which merely corroborated what the FBI had orally informed the Dutch National Police as early as December 2004, was sent to the Dutch in formal response to an official inquiry made several months previously. This memorandum, coupled with the reference therein to the CIA and NSA sources and the importance likely attached by U.S. law enforcement and military authorities to the murder of the American, Nicholas Berg, implies that the United States' civilian and/or military agencies were

involved in the Dutch investigation from an early date. Regardless, the FBI again unequivocally told the Dutch police that its investigation led it to conclude that Mr. Delaema was not one of the individuals depicted in the video showing the killing of Mr. Berg. The wiretaps applications of the Dutch police and the orders issued by the Dutch prosecutor give no indication that this information was communicated to the Dutch prosecutor.

B. The Arrest and Interrogation of Mr. Delaema and the Search of his Apartment

As discussed immediately below, the Dutch authorities arrested Mr. Delaema in his apartment on May 2, 2005, and on that same day executed a search of his apartment.

The events surrounding Mr. Delaema's arrest began at approximately 5 a.m on May 2, 2005. Without knocking or otherwise announcing themselves or their purpose, Dutch law enforcement authorities broke down the door of Mr. Delaema's apartment. At the time he was asleep, unclothed, with his wife in the bedroom of the apartment. Numerous Dutch officers, armed with and brandishing rifles, pistols and other weapons, flooded into the apartment, rushed into the bedroom and, with his wife screaming, forcibly removed Mr. Delaema from the bed, forcing him face down onto the floor. While officers forcibly restrained him, Mr. Delaema was struck several times in the side and back. Mr. Delaema was thereafter taken to the local police precinct and later that day transferred to a police station in Amsterdam, where he underwent questioning. Mr. Delaema was not represented by counsel during this initial questioning and was not advised that anything he said could be used against him. Mr. Delaema requested an attorney but none was provided. Finally, Mr. Delaema was not told that the Dutch authorities were working with U.S. agents in investigating his alleged involvement in illegal activities in Iraq.

After the questioning Mr. Delaema was returned to his cell where he was kept for several days isolated from his family.  He was allowed no visitors and was not permitted telephonic contact with his family or friends.  During this period, despite the cold, he was only given a thin piece of cloth, resembling a hospital gown, to cover himself.

Nine days later, on May 11, 2005, Mr. Delaema was again interrogated by Dutch authorities.  At this time Mr. Delaema was being detained at the time in a Dutch correctional facility in Krimpen.  He was taken from the Krimpen facility to Amstelveen Police Station for the interrogation.  Mr. Delaema was advised that he did not have to answer questions, but again did not have an attorney present during this interrogation, was not told he had any right to have an attorney present and again was not told that his statements could be used against him or that the Dutch authorities were cooperating and sharing information with the U.S. authorities.

On May 31, 2005, Mr. Delaema was once again brought from the prison to the Amstelveen Police Station for questioning.  On this occasion he did have an attorney present. Mr. Delaema was not, however, told that anything he said could be used against him or that the Dutch authorities were working with U.S. authorities.   The transcript of the interrogations provided in discovery reveal that Mr. Delaema was disjointed, rambling and confused at times during the questioning.  At other times he was overwrought and weeping, describing the "bad difficulty in his brain," and remarking that the interrogators were "making [him] such a wreck."[5]

## II.  SUPPRESSION OF MR. DELAEMA'S STATEMENTS

The defense contends that the statements elicited from Mr. Delaema during these

---

[5]In the questioning on May 11, 2005, Mr. Delaema had also told the interrogators that he was "mentally damaged" and could not concentrate well.

interrogations were involuntary and thus barred from evidence by the Due Process Clause of the

Fifth Amendment, and depending upon the evidence, perhaps also by the Privilege Against Self-

Incrimination Clause of the Fifth Amendment.   The defendant bases these claims on the fact that

he was held in isolation during the period he gave the statements, the circumstances of his arrest,

his lack of legal counsel [during the first two interrogations], the failure to advise him of the

consequences of making a statement or of the fact that the Dutch authorities were working with

U.S. authorities and that he faced potential prosecution in the United States and his emotional

and mental state, which was made known to and observed by his interrogators.

### A.  The Government May Not Introduce a Defendant's Involuntary Statement Against Him in a Criminal Trial

If the government elects to introduce the statements of an accused, it bears the

foundational burden of proving that the statements were the product of the accused's own free,

uncoerced will.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  The voluntariness determination

does not reduce to a mere "color-matching" of cases, *Reck v. Pate*, 367 U.S. 433, 442 (1961), but

instead requires a thorough inquiry into the circumstances of each case.

The preference for statements given as a result of a voluntary choice by the maker

has long been a cornerstone of Anglo-American jurisprudence.

> Conviction following admission into evidence of confessions
> which are involuntary, i.e., a *product of coercion, either physical
> or psychological*, could not stand.  This is not so because such
> confessions are unlikely to be true but because the methods used to
> extract them offend an underlying principle in the enforcement of
> our criminal law:  That ours  is an accusatorial not an inquisitorial
> system -- a system in which the state must establish guilt by
> evidence independently and fairly secured and may not by coercion
> prove its charge against an accused out of his own mouth.

*Rogers v. Richmond*, 365 U.S. 534, 541 (1961)(emphasis added).

The voluntariness' inquiry focuses on whether the accused exercised his own free will in making the statement or instead gave way to that of his interrogators. *See Reck v. Pate*, 367 U.S. 433, 440 (1961) (suppression mandated where the facts indicate that the defendant's "will was overborne"); *Blackburn v. Alabama*, 361 U.S. 199, 280 (not the product of a rational intellect and "free will"); *Payne v. Arkansas*, 356 U.S. 560, 567 (1958) (statement coerced and did not constitute an "expression of free choice"); *Mincey v. Arizona*, 438 U.S. 385, 398 (statement not the product of a "rational intellect" and "free will"); *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968) (statement not the product of "free and rational choice").

A statement need not be obtained by violence or the fear of violence to be excluded on due process grounds. "The blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn*, 361 U.S. at 206. Coercion is coercion regardless of whether the accused's will is subverted by physical, psychological or other improper methods. Indeed, the modern practice of in-custody interrogation is psychologically rather than physically oriented. *Miranda*, 384 U.S. at 448.

Recognizing that unconstitutional coercion presents itself in many guises other than mere physical violence, courts have frequently looked to conditions of confinement in assessing the voluntariness of statements given during or immediately after such confinement. *Brooks v. Florida*, 389 U.S. 413, 414-15(1967)(confession of defendant held involuntary where he was held in small, barren cell with an unhealthy diet and in solitary confinement for 14 days, where he "saw not one friendly face from outside the prison," and was "completely under the control and domination of his jailers."); *Arnett v. Lewis*, 870 F. Supp. 1514, 1523-25, 1540 (D. Arizona

1994)(in finding confession involuntary, among other factors Court notes that defendant had been incarcerated under "oppressive conditions," pointing out the Spartan and unsanitary condition of the jail, inadequate plumbing and hearing, lack of fresh, clean water, lack of adequate blankets, inadequate nutrition); *Townsend v. Henderson*, 405 F.2d 324, 326 (6th Cir. 1968)(in finding statement involuntary court notes defendant had been held in solitary confinement on an inadequate diet); *Wainwright v. LaSalle,* 414 F.2d 1235, 1237-39 (5th Cir. 1969)(among factors which Court notes in finding statement involuntary is that defendant was in "continuous incommunicado custody for about 12 hours" before confession was elicited for the first time and the ultimate confession followed previous denials).

As the above cases suggest, interrogation while the accused is held in solitary confinement, isolated from the rest of the world, including family, friends and counsel, is often the cardinal point in the determination both of voluntariness of a statement for due process purposes as well as the adequacy of a waiver of the Fifth Amendment privilege against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 476 (1966) ("Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights."). Further, given the inherent coercion involved in custodial interrogation wherever conducted, the lack of *Miranda*-like warnings may be considered by the Court in determining the voluntariness of a statement. *See United States v. Bin Laden*, 132 F. Supp. 2d 168, 185-187 (S.D. N.Y. 2001).[6] Finally, in evaluating the totality of the

---

[6]It is generally held that *otherwise voluntary statements* given to foreign law enforcement officers are not inadmissible solely because the suspect was not advised of his *Miranda* warnings. *See United States v. Chavarria*, 443 F.2d 904 (9th Cir. 1971); *United States v.*

circumstances,  the Court may consider Mr. Delaema's emotional and mental instability at the

time he gave the statements as bearing on their voluntariness.  *See Spano v. New York,* 360 U.S.

315 (1959); *United States v. Hull*, 441 F.2d 308, 311-12 (7th Cir. 1971).

    **B.  If the Court Finds That Mr. Delaema's Statements Were Involuntary the Fact
       That Dutch Law Enforcement Authorities Conducted the Questioning Is
       Irrelevant**

       It is expected that the government will argue that because the statements which Mr.

Delaema seeks to suppress resulted from questioning conducted by Dutch authorities, they are

admissible regardless of their voluntariness.  The defense submits that if the Court finds the

statements involuntary, they are inadmissible irrespective of who conducted the questioning.

The cases takes two approaches to this issue, with some use language suggesting that the conduct

of foreign officials must "shock the conscience" before the statements are excluded, while other

hold that statements elicited by foreign officials are not admissible if they do not meet traditional

voluntariness standards. *See United States v. Karake*, 443 F. Supp. 2d 8, 52-53 (D. D.C. 2006)(J.

Huvelle).[7]   The defense submits that the Court should follow the latter approach and exclude any

_____

*Nagelberg*, 434 F.2d 585, 587, n. 1 (2d Cir. 1970).  There is language in some cases, however,
suggesting that such statements would be inadmissible under the Self-Incrimination Clause of the
Fifth Amendment, irrespective of their voluntariness, if the evidence establishes that the foreign
officers in conducting the interrogation were merely acting as agents of U.S. law enforcement
officers. *See United States v.* Bagric, 706 F.2d 42, 69 (2d Cir. 1983); *United States v. Welch*, 455
F.2d 211, 213 (2d Cir. 1972)   Mr. Delaema is presently unaware of any facts that would support
this theory, but does not waive the argument if the evidence adduced at an evidentiary hearing
suggests this was the case.

      [7]As Judge Huvelle demonstrates,  the "shock the conscience" language found in some of
the voluntariness cases appears to have been mistakenly imported from cases dealing with
claimed Fourth Amendment violations by foreign officials, a claim which is analytically distinct
from issues related to the admission of claimed involuntary statements of the accused.  *Karake*,
443 F. Supp. 2d at 52, n. 74.

statements it finds to have been involuntarily given, regardless of the inquisitors.  This approach is consistent with the principles undergirding the exclusion of involuntary statements in the first instance: namely that the Fifth Amendment reflects a fundamental policy determination that our criminal justice system is not one based on inquisition of the defendant, but on independent evidence and that only statements which the defendant truly gives in a voluntary fashion without coercion, whether physical, psychological, or otherwise, will be admitted against him.  The use of involuntary statements, in the words of the Supreme Court, "offends an underlying principle in the enforcement of our criminal law." *Rogers* , 365 U.S. at 541.

If the Court finds the statements to have been involuntary, it should also exclude them because of questions concerning their reliability.   The reliability of involuntary statements was at one time recognized as an independent basis for exclusion under the Fifth Amendment. S*ee e.g. Bram v. United States*, 168 U.S. 532 (1887); *Stein v. New York*, 346 U.S. 156, 192 (1953) ("reliance on a coerced confession vitiates a conviction because such a confession combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence").  That is no longer the primary rationale for the constitutional rule but reliability still remains a critical component of admissibility of such statements, even though it is normally addressed as an evidentiary rather than constitutional matter.  "A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, . . . and not by the Due Process Clause of the Fourteenth Amendment."  *See Colorado v. Connelly,* 479 U.S. 157, 167 (1986)*.*

### C.  The Joint Venture Theory

13

If the Court finds that a statement elicited by foreign officials is admissible even if involuntary, the Court must still determine whether United States and Dutch law enforcement officials were engaged in a joint venture in investigating this case. If so, Mr. Delaema's statements clearly may not be used against him if the Court finds them to have been involuntary, as it has long been the law that the United States may be bound by actions taken by a different sovereign where the two sovereigns are engaged in a joint venture or where an agency relationship exists, *See Byars v. United States*, 273 U.S. 28, 32 (1927); *Pfeifer v. United States Bureau of Prisons*, 615 F.2d 873, 876 (9th Cir. 1980); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976). And regardless of whether foreign law enforcement officers assume the duty to administer *Miranda* warnings when engaged in a joint investigation with U.S. agents, the failure to advise Mr. Delaema of his right to have counsel present and that his statements could be used against him are additional factors that bear on the voluntariness issue.[8]

The determination of whether a joint venture existed is a particularly fact-intensive inquiry. *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978) (court must closely scrutinize facts to determine if U.S. and foreign officials were engaged in a joint venture); *Karake*, 443 F. Supp. 2d at 13 (resolution of joint venture issue is "intensely fact specific."). Counsel is presently unaware of all the evidence bearing on the joint venture issue. These facts will be

---

[8]And, as indicated in n. 6, supra, if the foreign officers were questioning the defendants as agents of U.S. law enforcement, the statements may be inadmissible simply because of a lack of proper *Miranda* warnings, irrespective of their otherwise voluntary nature. The joint venture and agency theories are not co-extensive, as the Dutch and U.S. law enforcement officers could be engaged in a joint venture without the Dutch necessarily be agents of the U.S. when questioning the defendant.

developed further at an evidentiary hearing.  However, the facts presently at counsel's disposal

suggest that the Dutch and U.S. law enforcement officials were engaged in a joint venture in

investigating this matter.  As indicated above, it appears that the Dutch National Police contacted

the FBI almost immediately upon receiving the information concerning Mr. Delaema's alleged

involvement in attacks on U.S. and Coalition troops and his alleged involvement in Mr. Berg's

murder.  An FBI memorandum provided in discovery indicated that after learning this

information, "the FBI started working with the KLPD in determining what Delaeme's terrorist

actions were and who he was working with."  The same memorandum indicates that the Dutch

police passed information concerning the wiretaps to the FBI, who in turn prepared evidentiary

charts related to the investigation.  FBI and Dutch investigators met in Amsterdam to discuss the

progress of the investigation, exchanged information and documents  and planned how the

investigation should proceed.   Both translated and untranslated material from the wiretaps were

provided to the U.S. agents.  The FBI provided the Dutch with material to help them identify

voices on some of the intercepted calls.   The Dutch authorities at times provided the FBI with

material from the wiretaps, which was then forwarded to the U.S. Department of Defense.

Shortly after the arrest of Mr. Delaema, an FBI agent traveled to Amsterdam to review evidence

recovered in various searches.

　　　　These facts strongly suggest that the Dutch National Police and the FBI were engaged in a

joint venture in the investigation of this case.   It is expected that the facts relating to the joint

venture issue will be developed further at an evidentiary hearing on this motion.

## III.  SUPPRESSION OF THE WIRETAP EVIDENCE

　　　　As noted above, the Dutch authorities intercepted all phone calls on Mr. Delaema's cell

phone for a period of approximately eight months.   In addition, phone calls of Mr. Delaema's

associates were intercepted.  Mr. Delaema was a party to some of these latter intercepted

conversations. From counsel's review of documents provided in discovery, it appears that the

intercept orders were issued by a prosecutor rather than a judicial official, were based at least in

part on misleading information provided the prosecutor by the police and were issued without

either a showing of necessity nor with any limits on the types of conversations which could be

intercepted.  All these defects would make the intercepts illegal under U.S. law.

The Federal Wiretap Statute was enacted in Title III of the Omnibus Crime Control and

Safe Streets Act of 1968, and is codified at 18 U.S.C. § 2510 et seq.  The statute provides

proscribes very specific requirements that must be met before a wire or oral communication can

be intercepted.  *See* 18 U.S.C. §§ 2516-2519.   Significantly for purposes of this motion, § 2515

provides that "no part of the contents of such communication and no evidence derived therefrom

may be received in evidence in any trial . . ." if the disclosure of such information would be in

violation of the wiretap statute.   § 2519 sets out the conditions when disclosure is appropriate.

Under this latter statute, an officer may disclose intercepted communications and evidence

derived from such communications while giving testimony at a trial or other proceeding as long

as the communication was intercepted in accordance with the procedures described in the statute.

*See* 18 U.S.C. § 2519(3).  By implication, no investigative or law enforcement officer may testify

concerning such intercepts where the procedures of the statute have not been followed.     The

procedure followed by the Dutch authorities in intercepting the phone calls of Mr. Delaema and

his associates failed to comply with the Wiretap Statute in several particulars.  First, § 2518 (1)

requires that a judge of competent jurisdiction approve the application for a wiretap order after

consideration of an application under oath.   Here, it appears that no judicial official was involved in issuing the wiretap order.  The documents provided the defense indicate that a Dutch prosecutor simply issued an order to the telecommunications company directing that the conversations on the various phones be intercepted.  These documents do not indicate that there was any independent judicial oversight of the process.  Second, it is not clear that the initial wiretap order was based upon a showing of probable cause.  The original wiretap order issued by the Dutch prosecutor refers to an "Official Report of September 1, 20004," which was presumably generated by the Dutch National Police and the basis upon which the wiretap order was issued. The defense does not presently have a copy of this report and thus cannot definitely argue whether the probable cause standard of § 2518 (3) was met.  But to the extent that this document references, as others have, Mr. Delaema's alleged involvement in the murder of Mr. Berg, in light of the information possessed by the Dutch police as to the inaccuracy of this assertion an issue will be presented whether the wiretap order was based upon a material misrepresentation by the police.  *See Franks v. Delaware,* 438 U.S. 154 (1978) (material misrepresentations in search warrant may not be considered on issue of probable cause).   Third, there is no indication in the documents available to the defense that the application described that other investigative procedures have been tried and why they have failed. *See* 18 U.S.C. § 2518(1)(c) & 3(c) Finally, there is no indication in the application or order that the interceptions should be conducted in a way so as to minimize those of conversations not germane to the investigation.  *See* 18 U.S.C. § 2518 (5).  With the exception of additional facts gleaned from the unlawful intercepts which arguably later provided probable cause, all of the extensions of the wiretap orders suffered from the same defects.  As discussed above, the wiretap order issued by

17

the prosecutor essentially authorized unlimited interception of Mr. Delaema's phone calls over a period of approximately eight months and a review of the actual intercepts indicates that this is precisely what was done.

The issue still remains to what extent Mr. Delaema can lay claim to the protection of the Federal Wiretap Statute in light of the fact that he is not a U.S. citizen and the wiretaps were authorized and conducted by U.S. officials.  As to the citizenship issue, unlike the language of the Fourth Amendment, which refers to the right of the "people" and which has been interpreted to be limited to U.S. citizens or those illegal aliens having substantial ties to this country, *see Verdugo-Urguidez*, *supra*, § 2510 (11) defines an "aggrieved person" as a "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the intercept was directed."   § 2510 (6), in turn, defines a "person" to include any . . . "individual." Thus, regardless of his alienage, Mr. Delaema is an "aggrieved person" within the meaning of the wiretap statute.

The fact that the wiretaps were conduct by Dutch officials raises the issue of whether the Federal Wiretap Statute applies to the actions of foreign officials.  There is some authority that Title III does not apply extraterritorially. *See United States v. Petersen*, 812 F.2d 486, 492 (9th Cir. 1987); *United States v. Toscanino*, 500 F.2d 267, 279-280 (2d Cir. 1974).  This circuit, however, does not appear to have ruled upon the issue, which was presented, but not decided, in *United States v. Dale*, 991 F.2d 819, 839-842 (D.C. Cir. 1993).   Even where it has been held that Title III has no extraterritorial force, two limited exceptions have nonetheless been recognized. The first excludes wiretap evidence that has been obtained by foreign officials by means which "shock the [judicial] conscience."  The second excludes such evidence where the United States

18

agents' participation in the investigation is so substantial as to amount to a joint venture with the foreign officials. *See United States v. Barona*, 56 F.3d 1087 (9th Cir. 1995). These two determinations are also fact-specific. As to the first inquiry, if the evidence establishes that the wiretap orders, lasting eight months and unlimited by subject matter, were issued by a prosecutor without judicial oversight and based on known misinformation, the "shock the conscience" test is met regardless of the joint venture inquiry.

## IV. CONCLUSION

For the reasons set out above Mr. Delaema submits that the statements he gave to Dutch authorities on May 2, 11, and 31, 2005 were involuntary and should be excluded on that basis alone. Alternatively, Mr. Delaema submits that the statements should be excluded both on voluntariness and self-incrimination grounds because the statements were elicited by the Dutch authorities pursuant to a joint venture with the FBI. Similarly, Mr. Delaema submits that the evidence derived from the various wiretaps should be excluded because they violate Title III, were obtained pursuant to the joint venture of the Dutch National Police and the FBI and were obtained by means which shock the judicial conscience.

Mr. Delaema requests an evidentiary hearing on this motion.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

"/s/"
_____
Robert L. Tucker
Assistant Federal Public Defender
625 Indiana Avenue, NW
Washington, DC 20004
(202) 208-7500

19