**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA      :
                            :    **Criminal No. 05-337 (PLF)**
    v.                      :
                            :
WESAM AL DELAEMA,         :
  also known as             :
  WESAM KHALAF CHAYED DELAEME,  :
                            :
          Defendant.        :

## OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this brief in response to defendant Wesam al Delaema's Motion to Suppress ("Motion"). For the reasons detailed below, the Court should deny the defendant's Motion in its entirety.

**I.      GENERAL BACKGROUND AND SUMMARY OF ARGUMENT**

In August 2004, the Dutch government identified one of its citizens, defendant Wesam al Delaema, as possibly having been involved in actions against Coalition forces in Iraq. The Dutch government identified defendant Delaema based partly on Dutch intelligence that he may have participated in the terrorist beheading of American citizen Nicholas Berg in Iraq in May 2004. Beginning in September 2004, the Dutch initiated a criminal investigation of defendant Delaema and, following the letter of Dutch law at every step, received approval to conduct and maintain wiretap surveillance of defendant Delaema's phone, among other investigative steps. In accordance with Dutch law, every four weeks a new application was submitted to request continued wiretap surveillance, citing relevant excerpts from the past month's surveillance and investigation, and those requests were approved by the appropriate Dutch authorities. During the course of their

investigation, the Dutch authorities shared information about their investigation with the Federal Bureau of Investigation ("FBI") and received information from the FBI, just as one would expect in an age where the only way a government can effectively protect its citizens from the potential threats posed by international terrorists is to cooperate and share information about those potential threats with other governments.

At the beginning of May 2005, the Dutch authorities decided it was time to end their investigation and to arrest defendant Delaema and several of his associates. The Dutch investigation had not uncovered evidence linking defendant Delaema to the terrorist beheading of which he was initially suspected by the Dutch. Indeed, information shared with the Dutch by the FBI suggested that it was unlikely that the defendant was one of the masked individuals shown in a video of the beheading of Berg. The Dutch wiretaps, however, had uncovered, among other things, numerous conversations between the defendant and an individual in Iraq named Fares, discussing their general support of the insurgency, sharing details of particular insurgent attacks after they occurred and expressing their desire to capture such attacks on film. Also, the Dutch investigation had uncovered evidence against defendant Delaema and some of his associates of local crimes, such as burglary, assault and weapons offenses. Following Dutch law and procedures, the Dutch authorities arrested defendant Delaema and some of his associates on May 2, 2005. Defendant Delaema was charged with participation in a terrorist organization, possession of firearms and/or ammunition, and assault. During the search of defendant Delaema's home, which was carried out in accordance with Dutch law, several videos were recovered, among other items.

Following his arrest, defendant Delaema was taken to the police station for questioning by the Dutch police. Given that the Netherlands is a sovereign nation with a long legal tradition

independent of our own legal traditions, it is not surprising that there are differences between the Dutch legal procedures and U.S. legal procedures. So, for example, an arrested suspect in the Netherlands does not have a right to an attorney under Dutch law until he makes his first appearance in court, which can be up to three days following arrest. However, all arrested suspects are informed that they are under no obligation to answer the police's questions, as was defendant Delaema, who stated that he understood and that he voluntarily agreed to answer questions.

After a brief initial interview of defendant Delaema shortly after his arrest, the Dutch police conducted a more detailed interview of the defendant on the evening of his arrest, May 2, 2005. This interview by the Dutch police proceeded in accordance with Dutch law and without any input or participation by the United States government. At the outset of the interview, the defendant announced to the Dutch police that he was not going to answer questions about the local charges, but that he wanted to answer questions about the "big case" – *i.e.*, the terrorism charges. During the interview, the defendant continued to demonstrate that he did not feel the least bit coerced, by picking and choosing which topics he would discuss. At the conclusion of the interview, the Dutch police produced a written memorialization of the interview, referred to as a *proces verbal*. Defendant Delaema reviewed and signed the *proces verbal*.

Two days later, on May 4, 2005, defendant Daleema was brought to court, where he appeared before an examining magistrate and was represented by counsel. The defendant was informed that he was not obligated to answer questions but he willingly answered some brief questions asked by the examining magistrate, while declining to answer at least one question. The court decided that there was a sufficient basis to detain the defendant and he was then transferred from the police cellblock where he had been held to the prison at Krimpen aan de Ijssel, where his attorney visited

him the next day.

On May 11, 2005, nine days after his first interview and seven days after he was transferred to the prison at Krimpen, defendant Delaema was interviewed again by the Dutch police. By that time, the Dutch police had reviewed some of the video materials recovered from defendant Delaema's home. One of the videos showed a group of men, including the defendant, wearing hooded masks over their heads and calling themselves the "Mujahideen from Fallujah." On the video, the defendant and his associates declared their intentions to kill Americans in Iraq and then uncovered destructive devices that they had buried in a road in or around Fallujah, Iraq. The defendant and his fellow "mujahideen" discussed how these roadside bombs would be detonated and would destroy the American vehicles driving on the road, thereby killing the American occupants of those vehicles.

The interview of the defendant on May 11, 2005, was videotaped by the Dutch police with the defendant's full knowledge. On the video, defendant Delaema can be seen entering the interview room in handcuffs, smiling and joking with the police officers and the female Arabic interpreter who was in the room. He was immediately taken out of handcuffs by the police and freely, voluntarily and gregariously talked with the police throughout the interview.

Defendant Delaema was again advised at the outset of the interview that he was not required to answer questions and he indicated that he understood. Defendant Delaema's attorney was contacted by the police prior to the interview, but he had not arrived at the time the interview began and, indeed, had still not arrived by the end of the interview. Under Dutch law, it was perfectly appropriate for the Dutch police to proceed with the interview, in the absence of an objection from defendant Delaema or his attorney. Defendant Delaema demonstrated during the interview that he

was familiar with the materials contained in the police file that had been produced to his attorney in the defense *dossier* and, concerning one topic, he indicated that he would not answer questions because he believed the police had incorrect information and defendant Delaema wanted to consult with his attorney so he could "expose" their mistakes. Again, this interview was conducted by the Dutch police without any participation or input from the United States government.

Twenty days later, on May 31, 2005, the Dutch police conducted another interview of defendant Delaema. This interview was also videotaped by the Dutch police with the defendant's full knowledge. Defendant Delaema's counsel was present for the entire interview. Again, this interview was conducted by the Dutch police without any participation or input from the United States government. Indeed, it was not until September 2, 2005, after a criminal complaint had been filed in the United States against defendant Delaema and a provisional arrest request lodged in the Netherlands by the United States that the FBI had its first opportunity to try to question defendant Delaema. In order to be given that opportunity, the United States was required to file a formal request for an interview under the Mutual Legal Assistance Treaty between the two countries. When the FBI appeared at the prison where the defendant was being held, defendant Delaema, following the advice of his counsel, who was present, declined to answer any questions other than basic identifying information.

Now that defendant Delaema has been extradited to the United States to face the serious terrorism charges against him, he seeks to use the cooperation and communications between the United States and the Dutch government concerning his case as a "get out of jail free" card. In moving to suppress the wiretap evidence obtained by the Dutch police in accordance with Dutch law, the defendant makes the breathtaking argument that this Court should apply the U.S. wiretap statute

to the actions of the Dutch police in investigating one of their own citizens in their own country for potential violations of their own laws. As we demonstrate below, *infra* at 12-14, there is absolutely no legal precedent to support the defendant's argument and, in fact, every court that has considered the argument has squarely rejected it.[1] In moving to suppress his voluntary statements obtained by the Dutch police in accordance with their laws, the defendant applies labels such as "involuntary" and "joint venture" that are not even supported by the facts he alleges and, in any event, will certainly not be supported by the evidence adduced at the hearing on this Motion. The evidence at the motions hearing will clearly show that the defendant's statements to the Dutch police were all given voluntarily and were not the product of a "joint venture" with the United States.

## II.    THERE IS NO LEGAL BASIS TO SUPPRESS THE WIRETAP EVIDENCE

### A.    Factual Background Concerning the Wiretap Evidence

On September 1, 2004, a police sergeant with the Dutch National Police Force, National Criminal Investigation Service, submitted a request for surveillance of telecommunications for a telephone number associated with defendant Delaema, a Dutch citizen who was then living in Amersfoort, Netherlands. This request was submitted in accordance with Article 126m of the Dutch Code of Criminal Procedure.[2] The Dutch police sergeant's report set forth the following

---

[1]    Given the lack of legal support for his position, we would ask the defendant to reconsider and withdraw his motion to suppress the wiretap evidence. In the absence of such a withdrawal, we would ask the Court to deny the defendant's motion to suppress wiretap evidence as a matter of law, prior to the scheduled motions hearing. Such a ruling will help to focus the scope of the evidentiary hearing and will also help to limit the resources expended in bringing Dutch law enforcement witnesses here to testify at the motions hearing.

[2]    Not surprisingly, the Dutch laws and procedures concerning the various means of conducting criminal investigations, including interception of telecommunications, are different from U.S. laws and procedures. For example, Dutch laws require law enforcement officers to apply for and receive approval for conducting many investigative steps that require no approvals

information, in part,  in support of the request:

> The Director of the Military Intelligence and Security Agency sent an Official Report to the National Public Prosecutor with information that a Dutch citizen of Iraqi origin, Mr. **Wesam Al Delaema**, residing at [street address redacted] in Amersfoort, may have been involved both in actions against coalition troops in Iraq, and in the kidnapping and murder of American businessman Nic[h]olas Berg in Iraq on or about May 11, 2004.

> The report continues as follows: "A short time before the murder, Mr. Delaema told someone on the telephone to [']pay close attention to the Internet and TV in the next few days.['] On May 11, 2004[,] images of Mr. Berg and his five kidnappers/murderers were shown worldwide on TV.  Mr. Delaema has been identified in one of these pictures, which were published as color photos (attached) on the Internet, recognized by his posture and bearing as the person on the far right side of the photo in question."

> The Deputy Chief of the General Intelligence and Security Agency also sent to the National Public Prosecutor an Official Report that a man who is a naturalized Dutch citizen, named **Wesam Al Delaema**, born on [month and date redacted], 1973, in Fallujah, Iraq, and who, according to the GBA [Municipal Citizen Registry] resides at [street address redacted] Amersfoort, and travels regularly to his native country, Iraq, for periods of about three months, to fight, and is willing to die there as a martyr.  Al Delaema first travels to Syria to buy weapons.  After that, he travels to Iraq where he visits his city of birth, Fallujah.  During one of his travels, he allegedly visited a training camp in Syria.

**Attachment 2** at T-06137 - T-06138 (emphasis in original).[3]  Following this information, the

---

under U.S. law, such as visual surveillance, undercover operations ("infiltration"), controlled purchases, entering a building that is not a dwelling and obtaining information from cooperative civilians.  For the Court's benefit, attached hereto as **Attachment 1** is a translation of the portion of the Dutch Code of Criminal Procedure dealing with powers of investigation.

[3]      Attached hereto as **Attachment 2** are English translations of the following Dutch police documents: (1) a Request for Order under Article 126m/n of the Code of Criminal Procedure, dated 9/1/04; (2) a Warrant for Surveillance of Telecommunications, dated 9/10/04; and (3) an Extract of Warrant for Surveillance of Telecommunications, dated 9/10/04.  Copies of the original Dutch documents are not included as attachments here.  In general, a Bates number

sergeant's Report described some basic background information about the defendant, including the following: "An investigation through the police information system (Xpol) disclosed that the aforementioned Delaema poured gasoline on himself and set himself on fire during a protest against the United States of America and President Bush on May 2, 2003. He suffered from second and third-degree burns as a result." *Id.* at T-06138. After reciting these and other bases for the request, the Dutch police sergeant stated that there was reason to conclude that defendant Delaema had committed kidnapping, hostage-taking, murder, and participation in a terrorist organization and therefore requested authority to conduct surveillance of the defendant's telephone communications.[4] *See id.* at T-06138 - T-06139. This request was signed by the Dutch police sergeant under oath and submitted to the public prosecutor.

On September 10, 2004, in accordance with Dutch law, the public prosecutor signed a warrant for surveillance of telecommunications based on the request, as well as an "extract of warrant," directing T-Mobile to allow a criminal investigator to record the communications on the

---

beginning with a "T" is meant to signify an English translation of a document with the Bates number matching the digits following the "T." Unfortunately, in preparing this Response, the government has discovered some discrepancies in its Bates numbering system. For example, the Bates numbers of translations may not match Bates numbers of originals and Bates numbers on some of the documents attached may not match the Bates numbers that were assigned to the same documents when they were produced to the defense in discovery. The government will work to rectify these discrepancies.

[4]    In contrast to our own system, where other investigative measures must be exhausted before telephone communications may be intercepted, under Dutch law and procedures, surveillance of telephone communications is often one of the first investigative steps undertaken. Dutch law also allows for such surveillance of third parties associated with a suspect. Accordingly, the Dutch investigation included wiretaps of telephones of several associates of the defendant, as well as of the defendant's telephone.

defendant's telephone for a period of four weeks, ending on October 7, 2004, at 3:00 a.m.[5]  *See id.* at T-06141 - T-06144.

On October 5, 2004, a Dutch Brigadier Inspector of the police submitted an official Report, under oath, requesting an extension of the surveillance on the defendant's telephone.  *See* **Attachment 3** at T-06145 - T-06150.  This Report included a section summarizing 12 relevant telephone conversations that the Dutch police had intercepted from the defendant's phone during the first four weeks of surveillance.  These summaries included the following information, in part:

> Wesam was in contact with an Anonymous Man who resides in Iraq (00017) on September 12, 2004 at 10:05 a.m.  Anonymous Man reported various assaults and rocket attacks in Iraq.  Wesam asked Anonymous Man to film for him.  Anonymous Man then said that [it] is important for him to have a good camera just like his old camera.  Wesam said that he will buy him such a camera.
>
> Later in the conversation, Anonymous Man spoke of a Japanese airplane that was apparently blown up by people who staged a suicide attack.
>
> On September 12, 2004 at 10:49 a.m., Wesam contacted the same Anonymous Man residing in Iraq (00020).  Anonymous Man would go to look at the plane, and Wesam asked him to film it.  He [Wesam] wanted a live recording.
>
> * * *
>
> On September 13, 2004 at 12:37 a.m., Wesam was in contact with Kifo (00027).  Wesam said that he is going completely crazy, but has no money to go over there.  Wesam lost a lot of his family and wants to go back.  Kifo asked Wesam to call him before he returns to Iraq.
>
> On September 16, 2004 at 2:33 p.m. Wesam contacted Faroussi

---

[5]    The public prosecutor's initial warrant was denied by a Dutch magistrate.  The public prosecutor then appealed that denial to a higher court and the warrant was approved.  The government has just received some of the Dutch documents memorializing these events and has not yet had an opportunity to have them translated.

[phonetic spelling] in Iraq (00070). Both men are very angry at a journalist named Karim Badr from Amsterdam, who mentioned names during TV-interviews and has talked about the resistance. Allegedly, Karim Badr also spoke about cars with explosives. Wesam says that he will fuck the son of a bitch when he comes face to face with him.

* * *

On September 28, 2004, at 1:18 p.m., Wesam had contact with Kifo (00222). Wesam said that the problem he has is constantly on his mind. It is not a small problem like money that can be easily solved. It is about life and feelings; Wesam is a complete wreck mentally. "You should take a look at my beard, I am not the Wesam from before," said Wesam.

On October 2, 2004, at 5:39 p.m., Wesam had contact with Fares/Fares (00338). Fares mentioned in this conversation that he sent reports to Wesam and Majid via the Internet.

In the same conversation, Wesam indicated that he might return to Iraq and that he will appear in the press together with Fares.

Wesam also asked Fares if there was good news from Fallujah, to which Fares answered him with a question of whether he had already spoken to Majid. Wesam hadn't heard anything from him. Fares then said that he made strong films for Wesam. There are not that many but they are exclusive. Wesam wants the films to be saved for him. Fares also indicates that the films are shown on TV.

On October 2, 2004, at 10:33 p.m., Wesam was in contact with Fares. The latter spoke about an event he caught on camera. Wesam asked if he knows the website felluja.com, to which Fares replied that his pictures were displayed on it and that his name, Fares Delaemi, was mentioned as well.

On October 2, 2004, at 10:51 p.m., Wesam had contact with Kahtan (00344). Both men discussed that they want to go to Russia and that someone else has to run [Kahtan's] garage, so that the money can keep coming in. Wesam also indicated that he has nothing to lose.

* * *

-10-

*Id.* at T-01646 - T-01647. The Brigadier Inspector's request reached the following conclusions based on the conversations: "The cited conversations show that Wesam Al Delaema is maintaining contacts with people in Iraq who are obviously planning confrontations between Iraqi groups and coalition troops on his behalf, or at his request. Furthermore, it is possible that Wesam is (mentally) preparing himself to go back to Iraq, clearly to fight there." *Id.* at T-01648. The request also stated that the Dutch police had examined the defendant's prior phone records, which indicated that the defendant was outside the Netherlands at the time that Nicholas Berg was killed in Iraq. *Id.* Attached to this request for an extension of telephone surveillance were 23 pages providing more detailed transcripts of the telephone calls that had been summarized in the request.[6] On October 7, 2004, in accordance with Dutch laws and procedures, the public prosecutor issued a warrant extending the telephone surveillance for another four weeks. *Id.* at T-01674 - T-01676.

For the remainder of the time that the Dutch investigation continued, until the defendant was arrested on May 2, 2005, these same procedures were followed by Dutch officials. Every four weeks, the Dutch police submitted a written application, under oath, carefully documenting the relevant investigative activity that had taken place during the preceding four weeks, including descriptions of relevant telephone calls that had been intercepted. Every four weeks, a warrant would be issued, under Dutch law, permitting the telephone surveillance to continue. *See* **Attachment 4.**[7]

---

[6]   We have omitted the 23 pages of detailed wiretap transcripts from **Attachment 3.**

[7]   Because all of the supporting documentation for these applications takes up more than 100 pages, we have included in this Attachment only the translations of the police requests and corresponding warrants, not all of the more detailed transcripts of telephone calls attached to each request.

B.      **The Wiretap Evidence is Admissible**

1.      **It is well established that Title III does not apply extraterritorially**

Defendant Delaema claims that because Dutch officials intercepted his telephone calls in the Netherlands without complying with U.S. law, specifically Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 ("Title III"), the evidence derived from the wiretaps is inadmissible. Defendant devotes significant space in his Motion to delineating several ways in which the Dutch wiretap procedures, not surprisingly, did not correspond with U.S. law. Def. Motion at 15-18. Defendant cites no authority in support of his argument that this Court should apply Title III to Dutch officials investigating a Dutch citizen in the Netherlands and he acknowledges that there is "some authority" that Title III does not apply extraterritorially. Def. Motion at 18. In fact, not only is there "some authority" for the proposition that Title III does not apply extraterritorially, but all of the courts to have addressed the issue have found that Title III does not apply outside the United States.

We are aware of no case that has disagreed with the "general and undisputed proposition[]" that Title III "'has no extraterritorial force.'" *United States v. Barona*, 56 F.3d 1087, 1090 (9th Cir. 1995) (quoting *United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) (Kennedy, J.)); *see also United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992) (Title III does not apply outside the United States); *United States v. Castrillon*, No. S2 05 Cr. 156, 2007 WL 2398810, *2 (S.D.N.Y. Aug. 15, 2007) (noting that the Government and defendant agree that Title III is inapplicable to recorded telephone conversations intercepted by Colombian law enforcement officials because Title III does not apply outside the United States); *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363 (N.D. Ga. 2001) ("Defendants have cited no authority, and the Court is aware of none, standing for the

proposition that Title III applies to wiretaps conducted by foreign agencies.").[8]  In *United States v. Toscanino*, 500 F.2d 267, 270-71, 279-80 (2d Cir. 1974), the Court of Appeals for the Second Circuit held that Title III does not apply to electronic surveillance abroad even where U.S. agents allegedly were directly involved in procuring the foreign wiretap.  The court analyzed the text of the statute and concluded that Congress did not intend for its provisions to apply extraterritorially.  *See id.* at 280-81 ("In prescribing the procedures to be followed in obtaining a wiretap authorization, *see* 18 U.S.C. § 2518, the statute significantly makes no provision for obtaining authorization from a foreign country."); *see also Angulo-Hurtado*, 165 F. Supp. 2d at 1369 ("If Congress had meant to require law enforcement agencies to satisfy Title III for interceptions conducted outside the United States, it would have provided some mechanism by which agents could obtain such approval. Congress did not do so.").  And in *United States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975), the Second Circuit clarified that Title III does not apply to the interception abroad of telephone conversations that traveled in part over the U.S. communications system, explaining that "it is not the route followed by foreign communications which determines the application of Title III; it is where the interception takes place."  *Accord Stowe v. Devoy*, 588 F.2d 336, 341 n.12 (2d Cir. 1978) (Title III does not apply to interceptions by Canadian officials in Canada of defendant's conversations while he was in the United States).

　　　　These authorities are consistent with the longstanding canon of statutory construction that

---

[8]　　　In this Circuit, the only reported case to mention the issue is an opinion of the Court of Appeals for the D.C. Circuit that affirmed a decision by the district court to admit tape recordings made in Korea by a U.S. citizen of telephone calls to and from the United States.  *United States v. Dale*, 991 F.2d 819, 840-42 (D.C. Cir. 1993).  The district court had "'assumed without deciding that Title III applies to all of the tape recordings at issue,'" but found that the tape recordings were not made in violation of Title III.  *Id.* at 840 (quoting *United States v. Dale*, Crim. No. 90-0027, Memorandum at 2 n.1 (D.D.C. Jan. 21, 1993) (Penn, C.J.)).

"legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Equal Emp. Opp. Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (quotations and citation omitted); *see also Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 158 (1993) ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested.").

Thus, this Court should reject, as a matter of law, the defendant's claim that, even though he is a non-U.S. citizen lacking substantial ties to the United States, he qualifies as an "aggrieved person" under 18 U.S.C. § 2510(11). *See* Def. Motion at 18. Congress did not intend for Title III to apply extraterritorially and, therefore, the defendant cannot claim the protections provided in that statute for an "aggrieved person."

### 2. The defendant cannot invoke the Fourth Amendment as a basis to challenge the wiretaps conducted by Dutch officials in the Netherlands

Defendant Delaema argues that, even if Title III has no extraterritorial application, the wiretap evidence here should be suppressed based on "two limited exceptions." Def. Motion at 18. One of the exceptions cited by the defendant is "where the United States agents' participation in the investigation is so substantial as to amount to a joint venture with the foreign officials." Def. Motion at 18-19, citing *United States v. Barona,* 56 F.3d 1087 (9th Cir. 1995). *Barona,* the one authority cited by the defendant in support of this argument, makes clear that "this exception is based solely on the Fourth Amendment" and that anyone who wishes to invoke this joint venture exception must be "among the class of persons that the Fourth Amendment was meant to protect." *Barona,* 56 F.3d at 1093. As the defendant concedes in his Motion, however, the Supreme Court has held that the protections of the Fourth Amendment are not available to a nonresident alien such as himself who

is searched overseas.  Def. Motion at 1 n.1, citing *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).

It is well established that neither the Fourth Amendment nor the judicially created exclusionary rule generally applies to acts of foreign officials.  As this Circuit has explained:

> It is obvious, and the decisions have therefore recognized, that since United States courts cannot be expected to police law enforcement practices around the world, let alone to conform such practices to Fourth Amendment standards by means of deterrence, the exclusionary rule does not normally apply to foreign searches conducted by foreign officials.

*United States v. Mount*, 757 F.2d 1315, 1317 (D.C. Cir. 1985); *see also United States v. Janis*, 428 U.S. 433, 455-56 n.31 (1976) ("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act."); *United States v. LaChapelle*, 869 F.2d 488, 489 (9th Cir. 1989); *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976).

Under the Supreme Court's decision in *Verdugo*, the Fourth Amendment does not apply to wiretaps conducted by Dutch officials in the Netherlands where the interception is directed at the telephone calls of a non-U.S. citizen with no voluntary connection to the United States.  In *Verdugo*, the Court held that the Fourth Amendment does not apply to a search conducted by U.S. law enforcement agents working together with Mexican officials in Mexico of a Mexican citizen's property.  *Id.*, 494 U.S. at 262-75 (plurality); *see id.* at 278 (Kennedy, J., concurring) (the Fourth Amendment "does not require United States agents to obtain a warrant when searching the foreign home of a nonresident alien").  It is beyond dispute that wiretapping qualifies as a "search" within the meaning of the Fourth Amendment.  *See, e.g., Berger v. New York*, 388 U.S. 41 (1967).  Thus,

the Fourth Amendment does not apply to the Dutch wiretaps of the defendant. *See Castrillon*, 2007 WL 2398810 at *3 (Fourth Amendment "simply has no application" where Colombian law enforcement officials wiretapped telephone numbers given to them by the U.S. government, the interception was of telephone lines based in Colombia, and each of the defendants was a citizen and resident of Colombia who had no voluntary attachment to the United States other than their participation in various schemes to send controlled substances here).

> **3.    The defendant has not come close to articulating facts that "shock the conscience"**

The other limited exception cited by the defendant as a basis to suppress the wiretap evidence, even if Title III has no extraterritorial application, is for evidence that has been obtained by judicial officials by means that "'shock the [judicial] conscience.'" Def. Motion at 18. Again relying on *Barona*, the defendant argues that "if the evidence establishes that the wiretap orders, lasting eight months and unlimited by subject matter, were issued by a prosecutor without judicial oversight and based on known misinformation," then this Court should suppress the wiretap evidence based on the "shocks the conscience" test. Def. Motion at 19.

*Barona* made clear that the "shocks the conscience" exception is based entirely on the court's supervisory powers and can be invoked only "when absolutely necessary to preserve the integrity of the criminal justice system." *Barona*, 56 F.3d at 1092. In *Barona*, the only authority cited by the defendant in support of this argument, the Court of Appeals for the Ninth Circuit quickly dismissed the applicability of the "shocks the conscience" argument to that case, noting:

> Even when no authorization for a foreign wiretap was secured[,] in
> violation of the foreign law itself, we have not excluded the evidence
> under this rationale, nor should we. Here, the foreign courts were
> involved and purported to authorize the wiretaps. The conduct here,

> therefore, does not come close to requiring the invocation of this
> exception.

*Id.* (citation omitted).

  *Barona*'s analysis was consistent with that of other courts, which have made clear that the

"shocks the judicial conscience" standard is extremely high.  As the Court of Appeals for the First

Circuit has explained, "[c]ircumstances that will shock the conscience are limited to conduct that not

only violates U.S. notions of due process, but also violates fundamental international norms of

decency."  *United States v. Mitro*, 880 F.2d 1480, 1483-84 (1st Cir. 1989) (citations omitted).  In

*Castrillon*, the court found that "the conduct identified by defendants as conscience-shocking — that

Colombian law does not require a neutral and detached magistrate to review wiretap applications,

a showing of probable cause, or sealing of wiretap evidence — falls far short of that standard."  2007

WL 2398810 at *3.  Not surprisingly, there appears to be no case in which evidence derived from

wiretapping conducted in accordance with foreign law has been excluded under a "shocks the

conscience" rationale.  *See Stowe*, 588 F.2d at 342; *cf. Cotroni*, 527 F.2d at 710-12 & n.10 (Canadian

wiretapping undertaken during period when wiretapping was completely unregulated by the

government did not shock the conscience).

  In fact, this Circuit has never relied on the use of its supervisory powers in a case such as this

one.  In *Mount*, the Court explained:

> We reject as entirely without merit appellant's alternative argument
> that the evidence should be suppressed in the exercise of the courts'
> supervisory power over the administration of criminal justice.  No
> court has ever endorsed reliance on that power in circumstances such
> as these where the actions of foreign law enforcement authorities
> could not be regarded as shocking the judicial conscience by any
> legitimate test.  As for the *broader questions* of interpretation and
> policy which surround the issue of the present existence of the

> supervisory power, we believe that decision thereon should await a
> case in which they may be weighed in the context of the employment
> of foreign police actions which, unlike those in this case, are at least
> arguably shocking and where the court is able, in that context, to
> consider such factors as the precise nature of those actions and the
> probative value of the evidence.

757 F.2d at 1318 n.5 (emphasis added).

The "broader questions" to which the Court referred were the issues raised by Judge Bork in his concurrence in *Mount* concerning whether the court even possesses the supervisory powers presupposed by the "shocks the conscience" test.  Judge Bork argued that, under *United States v. Payner*, 447 U.S. 727 (1980), the court "clearly lack[s] the supervisory power to create any exclusionary rule that expands the rule the Supreme Court has created under the Fourth Amendment. That forecloses any exclusion of evidence seized abroad by foreign police." 757 F.2d at 1320 (Bork, J., concurring); *see also United States v. Mitro*, 880 F.2d 1480, 1483 n.4 (1st Cir. 1989) ("There is some debate as to whether a federal court has the authority to exclude evidence seized by foreign officials even in circumstances that shock the judicial conscience in light of *United States v. Payner*, 447 U.S. 727 (1980), where the Supreme Court held that a federal court could not exclude evidence under its supervisory power where the defendant would not have standing to seek exclusion under the Fourth Amendment.").  After *Verdugo*, it is even more clear that the courts lack supervisory power to create an exclusionary rule in circumstances such as these, involving a nonresident alien defendant subject to a search abroad.

Even if this Court were to possess the supervisory power to exclude the wiretap evidence here  – and, under *Payner* and *Verdugo*, it does not – the case law described above makes clear that the defendant has not come close to alleging facts that would "shock the conscience."  Here, it is

-18-

undisputed and fully documented that every four weeks a Dutch police officer submitted a sworn statement setting forth an investigatory basis for the request to conduct surveillance of the defendant's telephone communications, including, for each extension request, detailed summaries of the relevant intercepted conversations from the previous four weeks. Likewise, every four weeks a warrant was issued in accordance with the Dutch law and procedures permitting the requested surveillance. The essence of the defendant's argument is that the judicial conscience should be shocked by a foreign government that has wiretap procedures that do not precisely match our own, a claim which fails as a matter of law.[9] *See, e.g., Castrillon*, 2007 WL 2398810 at *3; *Cotroni*, 527 F.2d at 710-12 & n.10; *Stowe*, 588 F.2d at 342.

Accordingly, this Court should deny the defendant's motion to suppress wiretap evidence prior to the scheduled motions hearing because, as a matter of law: (1) Title III does not apply to the Dutch wiretap evidence; (2) the Fourth Amendment – and therefore the "joint venture" doctrine – does not apply to foreign searches of the defendant, who is a nonresident alien; (3) the court lacks the supervisory power to exclude the evidence here based on a "shocks the conscience" test; and (4) the defendant has not alleged facts that would "shock the conscience."

---

[9]     The defendant also apparently wants this Court to hold a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the Dutch "wiretap order was based upon a material misrepresentation by the [Dutch] police." Def. Motion at 17. Such an unprecedented request would extend the concept of the court's supervisory powers far beyond any recognizable bounds. Defendant offers no precedent for a U.S. court to conduct a *Franks* hearing for foreign officials.

### III.    THERE IS NO BASIS TO SUPPRESS THE DEFENDANT'S STATEMENTS

#### A.    Facts Concerning the Defendant's Statements

On May 2, 2005, at 5:00 a.m., the Dutch police, acting in accordance with Dutch laws and procedures, entered defendant Delaema's home to arrest him.  As documented in a Dutch police report, the Dutch police ordered the defendant several times to show his hands but he did not obey. Instead, the defendant kept his hands hidden under a duvet.  *See* **Attachment 5** at T-C1-001.  In light of this resistance by the defendant, a Dutch police officer gave the defendant a kick against the side of his head and struck him on the face.  *Id.*  When the defendant then showed his hands, the police handcuffed him.  *Id.*  There is no report of any injury to the defendant resulting from the police use of force during his arrest.

At 5:10 a.m., following his arrest, the defendant was brought before a deputy public prosecutor on the scene at his home.  *Id.* at T-C1-002.  The deputy public prosecutor informed the defendant that he was under arrest and was being charged with participation in a terrorist organization, possession of a firearm and/or ammunition, and assault.  The defendant was also informed that he was not required to speak with law enforcement.  The defendant was then brought to the Amersfoort police station at 5:15 a.m.  *Id.*

At 11:15 a.m., the defendant was arraigned before an assistant public prosecutor at the Amersfoort police station.  *Id.* at T-C1-003.  Under Dutch law, an arrested defendant can be held by the police for up to three days before being brought to court.  During this detention period, a defendant does not have a right to an attorney under Dutch law.  At the arraignment at the police station, the defendant was again informed of the charges against him and again informed that he was not obligated to answer questions.  *Id.*  The defendant then gave and signed the following brief

statement:

> I hear and understand you reasonably well. I hear and understand the interpreter clearly. I have not assaulted anyone. I wouldn't know whom. I have nothing to do with firearms. I have no firearms at home and I have not given a firearm to anyone.
>
> I often, and regularly, travel to Iraq and Syria. This was already more than two weeks ago. I am not part of any group of persons who are involved in terrorist activities. I was arrested in Syria on my last visit, because I was suspected of spying for America or the Netherlands. I have nothing to do with that.

*Id.* at T-C1-003 - T-C1-004. Following Dutch legal procedures, the defendant was then remanded to custody at the Amersfoort police station for a period of up to three days, "in the interests of the investigation, that the suspect shall remain at the disposal of law enforcement during the investigation." *Id.* at T-C1-005 - T-C1-006.

At about 5:00 p.m. on May 2, 2005, defendant Delaema was brought out of his jail cell by the Dutch police. In accordance with Dutch law, the defendant was again informed that there was no requirement for him to speak with the police. Defendant Delaema stated that he understood that right. The police then asked the defendant if he wished to make a statement and he said that he did. The interview was conducted by the Dutch police with the assistance of an Arabic interpreter. The Dutch memorialization of the interview, referred to as a *proces verbal*, notes the following at the outset:

> After we informed the suspect that he was under no obligation to answer, he stated:
>
> "I understand that I do not have to answer, but I would like to make a statement.
>
> I was arrested because of assault, possession of a firearm, and in connection with terrorism. I do not want to talk about the first two

> charges, I have absolutely nothing to do with them.  I do, however,
> want to talk about the big case, although I have nothing to do with it."

Thus, from the very beginning of the interview, defendant Delaema demonstrated that he understood the charges against him, he understood his right not to answer questions, but he voluntarily chose to answer the police's questions about "the big case" – *i.e.*, the terrorism charge.  The fact that the defendant announced at the outset which types of questions he would answer and which he would not is a clear demonstration that he in no way felt compelled or coerced.  Indeed, during the course of the interview, the defendant made clear that he did not want to talk about how he burned his hand and he did not do so.[10]  The defendant also indicated during the interview that he was aware that the Dutch police had been monitoring his phone for several months.  At the conclusion of the interview, the *proces verbal* was read to the defendant in Arabic and he confirmed its accuracy and signed it.

On May 4, 2005, two days after his arrest, defendant Delaema was brought before an examining magistrate in the Court of Rotterdam.  Defendant was represented by counsel at this proceeding and informed by the examining magistrate that he was not obligated to answer questions.  *See* **Attachment 7** at T-PR-00046.  The hearing took place with the assistance of an Arabic interpreter.  *Id.*  Defendant Delaema answered a few brief questions posed by the court, although he declined to answer one of the court's questions, calling upon his "right to remain silent."  *Id.*  Based on the police reports submitted to the court, the magistrate upheld the arrest based on the terrorism

---

[10]     On March 22, 2003, the defendant had attended a rally in Amsterdam to protest the war in Iraq.  At the rally, among other forms of protest, individuals were setting flags on fire.  During the protest, the defendant caught on fire, suffering several burn injuries.  A Dutch police officer was nearby in the crowd and responded.  As documented in the police report, in the immediate aftermath of being burned, before being placed in an ambulance, the defendant stated to the Dutch police officer that "he, with the aid of gasoline, had set himself on fire to show Bush what he was doing to the world."  *See* **Attachment 6.**

charge and rejected the weapons charge. *Id.* at at T-PR-00046 - PR-00047, PR-00054 - PR-00055. Defendant Delaema was ordered detained. *Id.* at PR-00054 - PR-00055. That same day, May 4, 2005, the defendant was transferred from the local police cellblock to the prison at Krimpen aan de Ijssel. The next day, according to jail visitation records, May 5, 2005, the defendant received a visit from his attorney. *See* **Attachment 8** at T-PR-000251.

On May 11, 2005, defendant Delaema was brought to the Amstelveen North Police Station for another police interview. By this time, the Dutch police had had an opportunity to review some of the video materials seized from the defendant's home. Among those materials, the Dutch police had discovered a video, with a date-stamp of Ocober 30, 2003, showing a group of men wearing hooded masks over their heads and calling themselves the "Mujahideen from Fallujah." Although the defendant was masked, he was recognizable on the video because of his western clothing and the distinctive bandages on his hand, worn as the result of burn injuries he had received in the March 2003 at a rally protesting the war in Iraq. *See supra* note 10. On the video, the defendant and his associates declared their intentions to kill Americans in Iraq. They then uncovered destructive devices that they had buried in a road in or around Fallujah, Iraq. The defendant and his fellow "mujahideen" discussed how these roadside bombs would be detonated. They expressed their hopes that the bombs would destroy the American vehicles driving on the road and would kill the American occupants of those vehicles.

Prior to the interview of May 11, 2005, the Dutch police contacted the defendant's attorney, informed him of the planned interview and invited him to attend. However, the defendant's attorney was running late and was not present at the time the interview began at approximately 1:30 p.m. It is not unusual in the Netherlands for an attorney to fail to attend a police interview of the attorney's

client and there is no requirement under Dutch law for the police to wait for an attorney to be present. In this case, if either the defendant or his attorney had voiced an objection to the interview proceeding without the attorney, the police would have honored that objection and waited. However, neither the defendant nor his attorney raised such an objection. As with the first police interview, the defendant was assisted by an Arabic interpreter and was informed at the outset that he was not required to answer any questions, which he indicated that he understood. This interview was conducted in a room with video capability and this interview was videotaped by the police, using a two-camera setup (one showing a close-up of the defendant and the other showing a long-shot of the room).

The videotape of this second police interview is very telling. The defendant entered the interview room in handcuffs, smiling and joking with the Dutch police officers and the female Arabic interpreter who was in the room. The defendant smiled and laughed with the police as he identified where the cameras were situated. He was immediately taken out of handcuffs by the police and then he took off his outer jumpsuit, under which he was wearing civilian clothing.[11] Throughout the interview, which lasted approximately two hours and 15 minutes, he spoke freely, voluntarily and gregariously. He demonstrated repeatedly that he had reviewed the materials produced to his attorney as part of the defense *dossier*. For example, when the Dutch police tried to ask the defendant about how he burned his hand, as they had during his previous police interview, he said that he thought they had the "wrong information" and he added, "I want to use it against

---

[11]     The government intends to play portions of this video at the motions hearing and to enter the video into evidence to oppose the defendant's Motion. Attached hereto as **Attachment 9** are still photos taken from the first few minutes of the video, during which time the defendant's handcuffs were removed, he removed his outer jumpsuit, and he began to speak with the Dutch police.

you." T-C1-032.[12] As the police attempted to ask defendant Delaema to explain what he meant, he declined to provide any more information, saying he wanted to talk to his lawyer about this "[i]n order to expose your mistakes." T-C1-033. At another point in the interview, defendant Delaema demonstrated that he was aware, presumably from his review of the *dossier*, of the exchange of information about him between the Dutch and the Americans. The defendant recounted for the Dutch police how they had initially thought he was involved in the murder of an American but they "figured out that wasn't true . . . because of the FBI report." T-C1-035. The defendant said: "You ask those Americans, then they know everything about me." *Id.* At one point in the interview, someone announced that the defendant's attorney was on his way. T-C1-050. The defendant made no request to suspend the interview and wait for his attorney to arrive, and the interview proceeded until the end, without his attorney arriving.

During the first half of the interview, the defendant talked comfortably, unchallenged by the police. As the interview progressed, the police started discussing with the defendant the evidence they had reviewed and they challenged his various versions of events as inconsistent with the videotaped evidence. While the defendant was clearly less comfortable with the direction of the questioning, he reacted the same way many others do – he kept trying to talk his way out of it. A review of the videotape and the transcript of this interview reveals no threats and no coercion, just good police work.[13]

---

[12]    The government plans to introduce the full transcripts of the defendant's interviews by the Dutch police at the motions hearing. We have not attached those fairly lengthy transcripts here. Nonetheless, we have provided page citations for ease of reference once the transcripts are produced in evidence.

[13]    In his Motion, the defendant stated that he told the police during this interview that he was "mentally damaged" and could not concentrate well. Def. Motion at 8, n.5. In fact,

According to jail records, the defendant was visited in prison by his attorney on May 27, 2005, and by his wife Zina on May 30, 2005.  *See* **Attachment 8** at T-PR-000251.

On May 31, 2005, defendant Delaema was again brought from the prison at Krimpen aan de Ijssel to the Amstelveen North Police Station for a police interview.  The defendant's attorney was present throughout the entire interview, which lasted approximately two hours and was again videotaped.  Early in the interview, the defendant made clear that he trusted the police interviewer, who had conducted the previous interviews of the defendant on May 2, 2005, and May 11, 2005:

> Jos, I trust you, you're a good person and I know that.  I have a good feeling, only, look . . . look, normally speaking I . . . everyone advises me that I shouldn't, that I shouldn't talk but I like you, I just have the feeling that you're a good person and you're honest.  I'm going to talk to you, you know . . . I just want my case to be handled right . . . .

T-C1-078.  Later in the interview, the defendant decided to ignore his attorney's firm advice not to answer a question.  The Dutch police had asked the defendant about his being in jail in Greece in 1993 and the defendant denied ever being in jail in Greece.  T-C1-091 - T-C1-092.  As the Dutch police began pressing the defendant about his answer, the defendant's attorney said to the defendant: "Could you just shut up?"  T1-C1-092.  The defendant ignored his attorney's advice, telling the Dutch police: "I will make a statement about that later."  *Id.*  The Dutch police made clear that it was the defendant's option not to answer their questions, saying to the defendant: "Or do you prefer to think about whether you're going to speak about it?"  *Id.*  The defendant responded: "No, I'm not going to think about it."  *Id.*  At another point during the interview, the defendant expressed his belief that his statements to the Dutch police would be shared with the Americans.  He explained that

immediately after making that statement, the defendant, who had been asked by the police whether he traveled through Turkey with his friend Kahten, stated: "Really, really, *I don't mean anything by that*, but I can't remember."  T-C1-032 (emphasis added.).

he did not wish to speak about his family in Iraq because "when my statement goes to America, they'll go after those . . . pitiful people." T-C1-084. As the interview progressed, the defendant expressed his frustration that the police were not asking him the "important" questions. T-C1-093. He pleaded with them to ask him questions "about big accusations," so that he could talk about those things. *Id.* Toward the end of the interview, the defendant reiterated that he had been advised not to speak to the police, but that he had cooperated with them willingly:

> Look, Jos, I told you everything, so now you have everything. Just take a moment and think about everything that I talked about please, and just make a good investigation[.] I just want a fair investigation, you know, look, the stories that you've heard, innocent, and so, everyone says, I'm making a statement, don't make a statement, everyone advises me, but I'm going to cooperate because I have nothing to hide.

T-C1-107. As the interview came to a close, the Dutch police announced: "Wesam, we're going to wrap it up." T-C1-111. Both the defendant and his attorney complained that the police had not asked *more* questions, particularly questions about a local burglary charge. T-C1-111 - T-C1-112. The police informed the defendant and his attorney that they had asked the questions that they brought with them and perhaps they would interview him again in the future. *Id.* Even after the police again said, "We're going to stop now," the defendant continued to re-initiate the conversation for several more minutes, until the police finally managed to end the interview. T-C1-113 - T-C1-114.[14]

---

[14]    In his Motion, the defendant described himself as "overwrought" during this interview. Def. Motion at 8. A review of the transcript and the video of this interview will not at all support that characterization. The defendant also cited a passage where he said that he had "bad difficulty in my brains" and where he had also said to the Dutch police interviewers, "[Y]ou're making me such a wreck." *Id.* These statements came near the end of the interview. T-C1-110. The context of the statements was that the defendant was describing the destruction he had seen in Iraq and the emotional toll that seeing such destruction had taken on him. *Id.* He was

On June 28, 2005, defendant Delaema was again brought from the prison at Krimpen aan de Ijssel to the Amstelveen North Police Station for a police interview. By this point, the defendant had changed attorneys. His new attorney was advising him not to answer questions and, this time, the defendant had decided to heed his attorney's advice. A colloquy ensued between the Dutch police and the defendant, with the police trying to understand why the defendant no longer wished to speak to them. The defendant did not waiver from his stated intention to not answer questions and the police, after the colloquy was complete, honored his request. Even during this colloquy in which the defendant was refusing to answer questions on the advice of his counsel, who was present, the defendant still acknowledged quite clearly that his prior statements to the Dutch police had been voluntary: "I've said so much, and . . . *I have always been very willing to cooperate with you, with everything* . . . I go and say things, these things I brought about myself . . . but it doesn't help and * * * nothing has changed . . . I mean . . . only worse, worse . . . I have wrecked myself enough . . . in the media, my life, my marriage, and my country . . . ." C1-127 (emphasis added).

All of the Dutch police interviews described above were conducted independently by the Dutch police, without any participation or input from the United States government. On July 27, 2005, a criminal complaint was issued in the United States charging defendant Delaema with four counts, including conspiracy to kill U.S. citizens outside the United States, in violation of 18 U.S.C. § 2332(b)(2); conspiracy to use a weapon of mass destruction (explosives), in violation of 18 U.S.C. § 2332a(a)(1)&(3); possession of a destructive device (explosives) during a crime of violence, in violation of 18 U.S.C. §§ 924(c) & 2; and conspiracy to possess a destructive device (explosives)

---

expressing his feeling that he probably should see a psychiatrist, but he was afraid of how the police would interpret the statements he made to a psychiatrist in the context of the charges against him. *Id.*

during a crime of violence, in violation of 18 U.S.C. § 924(o). That same date, a provisional arrest warrant request was issued from the United States to the Netherlands. On August 10, 2005, the United States transmitted a formal request for assistance, under the Mutual Legal Assistance Treaty ("MLAT") between the two countries, requesting, among other things, that the FBI be permitted to interview the defendant. The Dutch authorities required this formal request under the MLAT before the FBI could be permitted to participate in an interview of a Dutch citizen in the Netherlands. On September 2, 2005, two FBI agents, accompanied by Dutch police officials, arrived at the prison at Krimpen aan de Ijssel to attempt to interview the defendant. The defendant was represented by counsel, who advised him not to answer any questions, except for his personal data. The defendant followed his attorney's advice and did not provide the FBI with any information other than his name, date of birth, place of birth and address in the Netherlands.

**B.     The Defendant's Statements to Dutch Law Enforcement are Admissible**

The defendant claims that the admission of his statements to Dutch law enforcement authorities on May 2, 2005, May 11, 2005, and May 31, 2005, would violate his rights under the Due Process and Self-Incrimination Clauses of the Fifth Amendment.[15]

The defendant's Motion notably lacks any allegations that typically accompany an involuntary or coerced confession claim. The defendant does not claim that he was threatened, intimidated or otherwise compelled to answer questions by the Dutch police. Nor does the defendant claim that the Dutch police made direct or indirect promises to him. He does not claim that he was deprived of sleep, food or liquid prior to the interviews or that he was subjected to questioning for

---

[15]     Defendant states that whether the Self-Incrimination Clause is implicated will depend upon the evidence at the motions hearing. Def. Motion at 9.

-29-

a prolonged period of time. Indeed, even though there is a *proces verbal* memorializing each of the Dutch police interviews, as well as videos of the May 11th, May 31st and June 28th Dutch police interviews, the defendant has not pointed to a single phrase uttered by the Dutch police or a single action by those interviewing the defendant that he claims was coercive. In short, the defendant has not alleged any actions by the Dutch police that potentially could have resulted in his will being "overborne." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). Instead, the defendant's motion to suppress statements rests almost entirely on the fact that Dutch law does not parrot U.S. law exactly and, as a result: (1) he did not have an attorney present for his first or second police interviews; (2) he was not told he had the right to have an attorney present for those interviews; (3) he was not explicitly told that his statements could be used against him; and (4) he was not told that the Dutch authorities were sharing information with U.S. authorities. *See* Def. Motion at 7-8.[16]

**1.    The defendant's statements to the Dutch police were voluntary**

It is well established that a statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause. *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985). The principle that involuntary statements, *i.e.*, those obtained by official coercion, are inadmissible is based on the Fifth Amendment's Due Process and Self-Incrimination Clauses. As the Supreme Court explained in *Colorado v. Connelly*:

> [C]oercive government misconduct was the catalyst for this Court's seminal confession case, *Brown v. Mississippi*, 297 U.S. 278 (1936). In that case, police officers extracted confessions from the accused through brutal torture. The Court had little difficulty concluding that even though the Fifth Amendment did not at that time apply to the States, the actions of the police were "revolting to the sense of

---

[16]    The defendant also cites rough treatment during his arrest, the conditions of his confinement, and his "emotional and mental state" as grounds for suppressing his statements to the Dutch police. These claims are discussed *infra* at 35-39.

justice." *Id.* at 286. The Court has retained this due process focus, even after holding, in *Malloy v. Hogan*, 378 U.S. 1 (1964), that the Fifth Amendment privilege against compulsory self-incrimination applies to the States.

479 U.S. 157, 163 (1986).

For a statement to be involuntary under the Due Process Clause, it must be "extracted by . . . threats or violence" or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quotations and citation omitted). The crucial inquiry is whether the subject's will has been "'overborne'" or his "'capacity for self-determination critically impaired.'" *Schneckloth*, 412 U.S. at 225 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). If there is no coercive activity by the police, a statement is voluntary for Fifth Amendment purposes. *See Connelly*, 479 U.S. at 164 (Critical to the analysis in confession cases is whether there is "a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."); *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991) ("[A] confession is not constitutionally involuntary unless it is precipitated in some way by *police* coercion, for there cannot be a due process violation unless there is some form of state action.") (emphasis in original); *see also Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988).

In this Circuit, courts determine whether a statement is involuntary for purposes of the Due Process Clause based on the totality of the circumstances. *Bradshaw*, 935 F.2d at 299. As Judge Leon recently explained in the context of a typical domestic case:

> Factors to evaluate include: the defendant's age, education, intelligence; whether the defendant was informed of his constitutional rights; the length of questioning; repeated and prolonged nature of questioning; whether the police or the accused initiated the dialogue;

> and the use of physical punishment, such as the deprivation of food
> or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). *The
> bottom line, however, is whether the suspect's will was overborne by
> police coercion. Colorado v. Connelly*, 479 U.S. 157 (1986).

*United States v. Lovelace*, 357 F. Supp. 2d 39, 44 (D.D.C. 2004) (Leon, J.) (emphasis added). The

burden is on the government to show by a preponderance of evidence that a statement it seeks to

introduce at trial was voluntary, if that statement is challenged as involuntary. *See Lego v. Twomey*,

404 U.S. 477, 489 (1972); *United States v. Bourdet*, 477 F. Supp. 2d 164, 179 (D.D.C. 2007) (Bates,

J.).

      In contrast to the Fourth Amendment, which does not apply to a foreign search of a

nonresident alien with no voluntary contacts to this country, the Fifth Amendment's protections

apply to the defendant because the government seeks to use his statements to the Dutch police at trial

here in the United States. As the Supreme Court explained in *Verdugo*, 494 U.S. at 264, a violation

of the Fifth Amendment right against self-incrimination occurs not when statements are obtained

from the defendant by law enforcement officials, but rather when they are used at trial. The Supreme

Court reaffirmed that principle in *Chavez v. Martinez*, 538 U.S. 760, 767 (2002) (plurality opinion),

which held that a plaintiff could not allege a violation of his rights under the Self-Incrimination

Clause because his statements were never introduced against him in a criminal case. *See id.* at 766-

67 (plurality); *id.* at 777 (Souter, J., concurring in the judgment) ("the text of the Fifth Amendment

. . . focuses on courtroom use of a criminal defendant's compelled, self-incriminating testimony").

Because the Fifth Amendment privilege against self-incrimination is a trial right, it applies to

nonresident aliens tried in the United States. *Verdugo*, 494 U.S. at 264 ("The privilege against self-

incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal

defendants."). [7][1]

In *United States v. Bin Laden*, 132 F. Supp. 2d 168 (S.D.N.Y. 2001), the District Court relied

on the broad language of the Fifth Amendment, which states that "[n]o person . . . shall be compelled

in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property,

without due process of law," U.S. Const. Amend. V, to find that Fifth Amendment protections

"seemingly apply with equal vigor to all defendants facing criminal prosecution at the hands of the

United States, and without apparent regard to citizenship or community connection." *Id*. at 183. The

court relied in part on the plurality's analysis in *Verdugo*, which contrasted the "relatively universal

term of 'person'" with the phrase "the people" in the Fourth Amendment. *Verdugo*, 494 U.S. at

270.[18]

It is well established that statements obtained by foreign police in the absence of a *Miranda*

warning are admissible if made voluntarily.[19] *See United States v. Yousef*, 327 F.3d 56, 145 (2d Cir.

---

[17]     In contrast, a violation of the Fourth Amendment is "fully accomplished at the time of an
unreasonable governmental intrusion," and thus cannot be invoked at trial to seek to suppress the
fruits of a search to which the Fourth Amendment did not apply. *Verdugo*, 494 U.S. at 264
(citation and quotation omitted).

[18]     The plurality in *Verdgugo* found that because the phrase "the people" "refers to a class of
persons who are part of a national community or who have otherwise developed sufficient
connection with this country to be considered part of that community," *id*. at 266, the Fourth
Amendment did not protect an alien with no voluntary connection with the United States.

[19]     In *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that "the
prosecution may not use statements, whether exculpatory or inculpatory, stemming from
custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards
effective to secure the privilege against self-incrimination." *Id.* at 444. To protect criminal
defendants from overreaching and coercive police tactics, the Court adopted a set of "concrete
constitutional guidelines for law enforcement agencies and courts to follow." *Id.* at 442. "Those
guidelines established that the admissibility in evidence of any statement given during custodial
interrogation of a suspect would depend on whether the police provided the suspect with four
warnings." *Dickerson* v. *United States*, 530 U.S. 428, 435 (2000). In particular, the suspect
must "be warned that he has a right to remain silent, that anything he says can be used against

2003) (citations omitted); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973); *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972); *United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970); *United States v. Marzook*, 435 F. Supp. 2d 708, 743(N.D. Ill. 2006); *United States v. Abu Ali*, 395 F. Supp. 2d 338, 381 (E.D. Va. 2005); *United States v. Lopez-Imitola,* No. 03 Cr. 294, 2004 WL 2534153, *2 (S.D.N.Y. Nov. 9, 2004); *Bin Laden*, 132 F. Supp. 2d at 182 n.9.  The reason for not excluding statements obtained by foreign police on a *per se* basis is that

> "*Miranda* was intended as a deterrent to unlawful police interrogations.  When the interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has little or no effect upon the conduct of foreign police.  Therefore, so long as the trustworthiness of the confession satisfies legal standards, the fact that the defendant was not given *Miranda* warnings before questioning by foreign police will not, by itself, render his confession inadmissible."

*United States v. Martindale*, 790 F.2d 1129, 1132 (4th Cir. 1986) (quoting *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971) (per curiam)).  *Accord Welch*, 455 F.2d at 213 ("since the *Miranda* requirements were primarily designed to prevent United States police officers from relying upon improper interrogation techniques[,] . . . the requirements have little, if any, deterrent effect upon foreign police officers").

As in a typical domestic case, courts consider the totality of the circumstances when analyzing whether statements to foreign officials were made voluntarily.  *See, e.g.*, *Welch*, 455 F.3d at 213 ("Whenever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary."); *Abu Ali*, 395 F. Supp. 2d at 372-78 (examining the totality of the

him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479.

circumstances and finding that defendant's statements to Saudi officials were voluntary and therefore could be admitted).[20]

Despite the defendant's use of the term "involuntary" in describing his statements to Dutch police, he does not even allege facts that would render any of his statements involuntary under the Due Process Clause. Other than his complaint that Dutch procedures do not precisely mirror U.S. *Miranda* requirements, the defendant relies almost exclusively on the conditions of his confinement to support his claim that his statements were made involuntarily. *See* Def. Motion at 8, 10-12. The defendant alleges that he was kept in a cell for "several days," during which he was "isolated" from his family and, despite the cold, given only a thin piece of clothing. *See id.* at 8.

As discussed above, the conditions of a defendant's confinement can be relevant to the admissibility of his statements to the police to the extent they demonstrate that the "totality of the circumstances" conspired to "overbear" the defendant's will and bring about his statements.

---

[20]    In assessing whether a statement taken by foreign officials violates the Due Process Clause, some courts have indicated that statements obtained in circumstances that "shock the judicial conscience" must be suppressed. *See, e.g., Yousef*, 327 F.3d at 146; *cf. Chavez*, 538 U.S. at 774 ("Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause" (quoting *Rochin v. California*, 342 U.S. 165, 174 (1952)). This language has raised the theoretical issue, alluded to by the defendant, *see* Def. Motion at 12-13, of whether there can be "involuntary" statements taken by foreign officials that would be admissible, so long as they do not "shock the conscience." *See United States v. Karake*, 443 F.Supp.2d 8, 52 (D.D.C. 2006) (Huvelle, J.); *cf. Abu Ali*, 395 F. Supp. 2d at 372-81 (analyzing independently whether defendant's statements were made voluntarily and whether the statements were made under circumstances that shock the conscience). Further, in *United States v. Suchit*, 480 F. Supp. 2d 39, 56-57 (D.D.C. 2007) (Bates, J.), the Court raised the possibility that a statement made to foreign officials may be admissible without regard to either a "voluntariness" or a "shock the conscience" analysis. *Id.* at 56-57. The Court appears to have relied on *United States v. Wolf*, 813 F.2d 970, 972 n.3 (9th Cir. 1987), which briefly suggested that, under *Connelly*, suppression may not be required when foreign police obtain a statement by coercion. Judge Bates did not decide this issue in *Suchit* and this Court need not decide these legal issues here, as the evidence at the motions hearing will establish that the defendant's statements to Dutch officials were made voluntarily under circumstances that in no way shock the conscience.

However, by his own description, the conditions about which the defendant complains occurred "[a]fter the questioning" at the police interview of May 2, 2005. *Id.* As a result, those conditions could not have affected the voluntariness of his statements to the police on the date of his arrest. Moreover, within two days, the defendant was brought to court, represented by an attorney and moved to the prison at Krimpen aan de Ijssel, about which he appears to have no complaints. During the seven full days he spent at Krimpen prior to his police interview of May 11. 2005, the defendant was not kept "isolated," as he was visited by his attorney on the day after he arrived. Nor was he kept in a thin piece of clothing, as exemplified by the video of his second police interview, which shows him wearing a thin jumpsuit on top of warm, comfortable civilian clothes. *See* **Attachment 9.** Thus, the defendant has not even articulated conditions of confinement that could serve as a basis to suppress any of his statements to the Dutch police.

The inadequacy of the defendant's assertions are clear when one examines the cases he cites, all of which describe factual scenarios that are completely distinguishable from the circumstances of this case. In *Brooks v. Florida*, 389 U.S. 413 (1967), the defendant was held naked with two other men for 14 days in a tiny windowless cell block with no bed or other furnishings or facilities except for a hole in the floor that served as a commode. His only nourishment each day was 12 ounces of thin soup and eight ounces of water. During those two weeks he was not allowed to visit with anyone from outside the prison. *Wainwright v. LaSalle*, 414 F.2d 1235, 1237-39 (5th Cir.1969), involved an illiterate defendant who had little formal education, could not communicate effectively in English, and was not familiar with police investigative practices. The court found involuntary a confession elicited for the first time after the defendant was in "continuous incommunicado custody for about 12 hours," and that followed his previous denials. *Id*. at 1239. In *Townsend v. Henderson*,

405 F.2d 324, 327-28 (6th Cir.1968), the prisoner was an illiterate nineteen-year-old who at the time of the confession was in solitary confinement, which consisted of being stripped naked and placed in a dark cell where the only nourishment was bread and water. The prisoner was also suffering from a head wound received the preceding day that had rendered him unconscious. In *Arnett v. Lewis*, 870 F. Supp. 1514 (D.Ariz. 1994), the court found that the prisoner's confession was involuntary where the police "took undue advantage of both the inherent pressures of confinement itself and the conditions and circumstances occurring in this case," *id.* at 1540, which included a prison with inadequate plumbing and heating, clean water, blankets and nutrition. The police failed to scrupulously honor the prisoner's right to remain silent, and the court found that the prisoner maintained his silence for seven days until his will was "simply overborne by the unexplained delay, his personal fear of the conditions of his confinement, and improper police conduct." *Id.* at 1541.

Defendant Delaema also complains of the circumstances of his arrest, saying that he was forcibly removed from his bed early in the morning, forced face down on the floor, and struck several times in the side and the back while being restrained by police. *See* Def. Motion at 7. In fact, the Dutch police documented their justified use of force in arresting the defendant. As stated in the Dutch police report, when the defendant refused to comply with an order to show his hands and, instead, kept his hands hidden under a duvet, a police officer kicked the side of the defendant's head and struck him in the face, thereby allowing the police to handcuff the defendant. *See* **Attachment 5** at C1-001. The police documented no injury to the defendant from this use of force and the defendant does not allege any injury. As this Circuit has explained, being pushed to the floor during arrest "is not an unusual occurrence . . . even in this country." *Bourdet*, 477 F. Supp. 2d at 179.

Moreover, the fact that the police used some force at the time of the defendant's arrest does

-37-

not render involuntary his statements to different Dutch police officers 12 hours later in a different

location. As the D.C. Circuit has explained in the context of evaluating whether a defendant's

waiver of his *Miranda* rights was voluntary, "[b]ecause the injury to Yunis' wrists was a byproduct

of his arrest on the yacht, we doubt that Yunis would have perceived it as a threat aimed at inducing

his confession some two hours later, on board the Butte," a U.S. munitions ship. *United States v.

Yunis*, 859 F.2d 953, 962 (D.C. Cir. 1988). More recently, in *United States v. Mendes-Mesquita*, No.

04-212-06, 2008 WL 792169 (D.D.C. Mar. 25, 2008) (Kessler, J.), the court found that the

defendant's statements to foreign police were voluntary, even though the defendant was assaulted

twice at the time of arrest by a member of the Panamanian Military Special Forces.

The defendant also cited his "emotional and mental state" as a basis for concluding that his

statements were involuntary. *See* Def. Motion at 8-9, 12. This claim appears to focus primarily on

his police interview of May 31, 2005, at which he was represented by his attorney. *See id.* at 8.

Importantly, the defendant points to <u>no</u> police coercion which caused him to be "disjointed,

rambling[,] . . . confused" and/or "overwrought."[21] *Id.* Accordingly, the defendant lacks a necessary

element of an involuntariness claim. *See Connelly*, 479 U.S. 157; *see also United States v. Reed*,

No. 06-3048, slip op. at 7 (D.C. Cir. Apr. 8,. 2008) ("Although the defendant's mental condition can

be a factor in the "'voluntariness' calculus,' 'this fact does not justify a conclusion that a defendant's

mental condition, by itself and apart from its relation to official coercion, should ever dispose of the

inquiry.'") (quoting *Connelly*, 479 U.S. at 164); *Suchit*, 480 F. Supp. 2d at 59 ("[I]n the absence of

some coercive police action that exploits a person's mental state, defendant's subjective fears of

---

[21]     As the facts set forth *supra* at 26-27 & note14 indicate, and as the evidence at the motions
hearing will demonstrate, far from being "overwrought," the defendant repeatedly expressed his
desire to speak to the police about the charges against him.

retaliation from other suspects cannot support a finding of involuntariness."); *United States v. Duran*, 884 F. Supp. 562, 566 (D.D.C. 1995) (Richey, J.). As in *Duran*, "there is simply no evidence on the record of police coercion that exploited the Defendant's alleged mental problems." 884 F. Supp. at 566. In contrast, both of the cases on which the defendant relies to urge the Court to consider his alleged "emotional and mental instability" at the time he gave the statements, Def. Motion at 12, involved strong elements of police coercion. *See Spano v. New York*, 360 U.S. 315 (1959) (prisoner questioned for almost eight hours straight overnight in the face of his repeated refusals to answer on the advice of counsel and denied repeated requests for his local attorney who he had already retained); *United States v. Hull*, 441 F.2d 308 (7th Cir. 1971) (defendant continuously confronted with new evidence and with questions from a relay team of officers between midnight and noon, with some officers yelling and pounding on the table).

The evidence at the motions hearing will show that each of the Dutch police interviews was conducted in a non-threatening, non-coercive manner, exemplifying model police work under any legal standard. The defendant's voluntary statements were not rendered involuntary merely by the fact that the Dutch police – who were acting independently and in accordance with their own laws and procedures – did not use procedures that precisely mirror U.S. *Miranda* procedures. *Cf. United States v. Lombera-Camorlinga,* 206 F.3d 882, 886 (9th Cir. 2000) (en banc) ("while the rights to counsel and against self-incrimination are secured under the Fifth and Sixth Amendments to our own Constitution and are essential to our criminal justice system, they are by no means universally recognized or enforced"). The defendant's claims concerning the use of force during his arrest, the conditions of his confinement and his mental state, viewed in their totality, simply do not support his assertion that his statements to the Dutch police were involuntary.

### 2. No joint venture existed between the United States and the Netherlands

In an effort to attach greater significance to the fact that the Dutch police did not provide the defendant with warnings that exactly paralleled *Miranda* warnings, the defendant has invoked the "joint venture" doctrine. *See* Def. Motion at 13-15 & n. 6. As the evidence at the motions hearing will show, however, U.S. agents had <u>no</u> involvement in the Dutch police interviews of the defendant. Accordingly, there was no "joint venture" between the United States and the Netherlands.

Under the "joint venture" doctrine, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents *actively participate* in questioning conducted by foreign authorities." *Yousef*, 327 F.3d at 145 (emphasis added). *Accord United States v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978); *United States v. Trenary*, 473 F.2d 680, 681-82 (9th Cir. 1973) (per curiam). Under the "joint venture" doctrine, suppression of statements can also result where U.S. officials did not ask any questions directly, but instead used the foreign officials as their "agents" to circumvent the requirements of *Miranda*. *Bin Laden*, 132 F. Supp. 2d at 187. As Judge Huvelle recently explained, "[i]n the absence of *active participation* by a United States official in the evidence-gathering event, a joint venture can only exist when foreign officials are rendered 'agents' of the United States government . . . or when the cooperation was designed to evade the constitutional requirements applicable to American investigators." *United States v. Karake*, 443 F. Supp. 2d 8, 94 n.114 (D.D.C. 2006) (citations omitted) (emphasis added).

While the defendant devotes much of his factual recitation to characterizing the cooperation between the Dutch and the FBI as a "joint investigation," *see* Def. Motion at 3, 6-7, the defendant concedes that he is presently unaware of any facts to support a theory that the Dutch were merely

acting as agents of the United States in their questioning of him.  *Id.* at 11-12, n.6.  Still, the

defendant advances a "joint venture" claim in support of his argument that his statements to the

Dutch police should be suppressed.  *Id.* at 13-15.

It is clear from the case law that cooperation between the United States and the Netherlands

in the investigation, without more, does not rise to the level of a "joint venture."  The district court's

decision in *Abu Ali* supports this position.  In *Abu Ali*, the defendant was arrested in Saudi Arabia

and interrogated repeatedly by Saudi officials without receiving *Miranda* warnings.  The district

court noted that "the governments of Saudi Arabia and the United States . . . cooperate with each

other in foreign terrorist investigations.  The U.S. and Saudi governments share intelligence

information, conduct investigations of terrorist acts, and . . . the Saudi government will return

individuals detained in Saudi Arabia to the United States."  395 F. Supp. 2d at 382.  Despite such

cooperation, the court declined to find the existence of a joint venture.  *Id.* at 383; *see also United*

*States v. Bagaric*, 706 F.2d 49, 69 (2d Cir. 1983), *overruled on other grounds by National*

*Organization for Women v. Scheidler*, 510 U.S. 249, 259 (1994) (allegation of "close cooperation"

between U.S. and Canadian officials was insufficient to upset finding that Canadian detective

conducted search "on his own country's authority and in connection with an ongoing Canadian

investigation"); *United States v. Morrow*, 537 F.2d 120, 140-41 (5th Cir. 1976) (finding no joint

venture where United States officers merely furnish information to foreign officials and noting that

"normal lines of communication between the law enforcement agencies of different countries are

beneficial without question and are to be encouraged"); *United States v. Mundt*, 508 F.2d 904, 906-

07 (10th Cir. 1974) (upholding trial court's finding that joint venture did not exist where DEA officer

had coordinated with Peruvian officers in operation and had played a "substantial part" in events

leading up to the defendant's arrest); *United States v. Chavarria*, 443 F.2d 904 (9th Cir. 1971) (upholding confession obtained by Mexican police to transportation of a stolen car in foreign commerce, where California Highway Patrol had informed Mexican authorities that car had been stolen); *see also Yousef*, 327 F.3d 146 ("evidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its border is insufficient . . . to constitute United States participation under the joint venture doctrine"); *United States v. Lira*, 515 F.2d 68, 71 (2d Cir. 1975) (holding that arrest of defendant by Jordanian officials at the request of the United States and defendant's allegations that Jordanian officials questioned him without *Miranda* warnings insufficient to show that Jordanian officials were acting as agents of the United States).

In fact, the evidence at the motions hearing will show that the United States and Dutch authorities had independent interests in investigating the defendant and both countries pursued their investigations accordingly. *Cf. United States v. Balsys*, 524 U.S. 666, 700 (1998) ("the mere support of one nation for the prosecutorial efforts of another does not transform the prosecution of the one into the prosecution of the other"). Moreover, U.S. agents did not even suggest questions for the Dutch police officers who were questioning the defendant. *Compare Abu Ali*, 398 F. Supp. 2d at 382 (fact that Saudi authorities permitted FBI and Secret Service agents to submit questions before an interrogation of the defendant and to watch the interrogation through a one-way mirror did not create a "joint venture" between U.S. and Saudi law enforcement for purposes of *Miranda*).

Because U.S. agents had <u>no</u> involvement in any of the Dutch police interviews that the defendant seeks to suppress, there was no "joint venture" between the United States and the Netherlands. *See United States v. Hensel*, 509 F. Supp. 1364, 1375 (D. Me. 1981) (*Miranda*

warnings during foreign interrogation not required because, *inter alia*, "no American agent was present or in any way participated in the questioning of [the] defendant by Canadian officers"); *cf. United States v. Nagelberg*, 434 F.2d 585, 586, 587 n.1 (2d Cir. 1970) (*Miranda* rule has no application where arrest and interrogation focused upon violations of Canadian law despite extensive involvement of United States law enforcement officer in defendant's questioning and detention).

## IV.    CONCLUSION

This Court should deny the defendant's motion to suppress wiretap evidence prior to the scheduled motions hearing because, as a matter of law: (1) Title III does not apply to the Dutch wiretap evidence; (2) the Fourth Amendment – and therefore the "joint venture" doctrine – does not apply to foreign searches of the defendant, who is a nonresident alien; (3) the court lacks the supervisory power to exclude the evidence here based on a "shocks the conscience" test; and (4) the defendant has not alleged facts that would "shock the conscience."

In addition, the evidence at the motions hearing will establish that all of the statements given by the defendant to the Dutch police were voluntary. The defendant has not even alleged actions by the Dutch police that potentially could have resulted in his will being "overborne." The evidence will further establish that U.S. agents had <u>no</u> involvement in the Dutch police interviews of the defendant and, therefore, there was no "joint venture" between the United States and the Netherlands. Accordingly, this Court should deny the defendant's motion to suppress statements and allow the United States to offer the defendant's statements into evidence before the ultimate trier of fact — the trial jury. *See Abu Ali*, 395 F. Supp. 2d at 386-87.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498-610

By:        /s/
    _____
    GREGG A. MAISEL
    Assistant United States Attorney
    D.C. Bar No. 447-902
    National Security Section
    555 Fourth Street NW, Room 11-453
    Washington, DC 20530
    (202) 514-7746
    Gregg.Maisel@usdoj.gov

    RACHEL CARLSON LIEBER
    Assistant United States Attorney
    D.C. Bar No. 456-491
    National Security Section
    555 Fourth Street NW, Room 11-909
    Washington, DC 20530
    (202) 353-8055
    Rachel.Lieber@usdoj.gov

    DAVID I. MILLER
    Trial Attorney
    N.Y. Bar # 2959369
    Counterterrorism Section
    U.S. Department of Justice
    10th & Constitution Avenue, N.W.
    Washington, D.C. 20530
    (202) 353-2440
    David.Miller@usdoj.gov

    CAROLINE D. KRASS
    Special Assistant United States Attorney
    D.C. Bar No. 453-506
    National Security Section
    555 Fourth Street NW, Room 11-860
    Washington, DC 20530
    (202) 514-5623
    Caroline.Krass2@usdoj.gov

Dated: April 14, 2008

-44-