IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| v. : | CR. NO. 05-337 (PLF) |
| : | |
| WESAM AL-DELAEMA, : | |
| : | |
| Defendant. : | |

## MOTION TO DISMISS COUNTS FOUR AND FIVE

Counsel for Mr. Wesam Al-Delaema (herein "Mr. Delaema") moves the Court for an Order dismissing Counts Four and Five. Count Four charges Mr. Delaema with possession of a destructive device during a crime of violence in violation of 18 U.S.C. § 924(c). Count Five charges him with conspiring to commit this offense in violation of 18 U.S.C. § 924(o). Mr. Delaema contends that these two counts should be dismissed because Congress did not intend that § 924(c) should apply extraterritorially.

### I. It is Presumed that Congressional Enactments Apply Only Within the Territorial Jurisdiction of the United States

Count Four specifically charges:

> In or about October 2003, in Iraq, defendant Delaema and others, known and unknown to the Grand Jury, knowingly possessed a firearm, that is, a destructive device, during, in relation to and in furtherance of a crime of violence for which he may be prosecuted in a court of the United States, that is, conspiracy to murder a United States national outside the United States, as set forth in Count One of this Indictment, conspiracy to use a weapon of mass destruction, as set forth in Count Two of the Indictment, and conspiracy to maliciously damage or destroy U.S. government property by means of an explosive, as set forth in Count Three of this Indictment.  [In violation of Title 18, United States Code, Sections

924(c)(1)(A)&(B)(ii) & 2.].

Count Five charges a conspiracy to commit the above offense in violation of 18 U.S.C. § 924(o).

The relevant language of § 924(c), the statute underlying both counts, reads as follows:

> **(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime —
>
>> **(i)** be sentenced to a term of imprisonment of not less than 5 years;
>>
>> **(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 10 years;
>>
>> **(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
>
> **(B)** If the firearms possessed by a person convicted of a violation of this subsection —
>
>> **(i)** . . . .
>>
>> **(ii)** is a. . . . destructive device,[1] or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

§ 924(o) makes it a crime to conspire to commit an offense under § 924(c). The issue thus presented as to both Counts Four and Five is whether § 924(c) applies outside the territorial

---

[1] The term "destructive device" is defined at 18 U.S.C. § 921(a)(4).

jurisdiction of the United States.[2]

Unless a contrary intent appears, legislation of the Congress is interpreted as applying only within the territorial jurisdiction of the United States. *Foley Brothers v. Filardo*, 336 U.S. 281, 285 (1957). Thus, "unless there is 'the affirmative intention of the Congress clearly expressed,'" it is presumed that statutes of the United States do not apply extraterritorially. *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 247, 248 (1991) (internal cite omitted); *see also United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (recognizing presumption and agreeing with Second Circuit's observation that "all statutes, without exception, [should] be construed to apply within the United States only, unless a contrary intent appears."); *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("[C]ourts should hesitate to give penal statutes extraterritorial effect absent a clear congressional directive.").

In applying this presumption courts should examine the language of the statutory enactment to determine whether Congress intended to extend coverage beyond the territorial jurisdiction of the United States. *Arabian American Oil Co.*, 499 U.S. at 248. The party seeking to invoke the court's jurisdiction bears the burden of overcoming the presumption against extraterritoriality. *Id.*, at 250. Where the jurisdictional language relied upon is ambiguous or where equally plausible interpretations exist, the burden of showing extraterritorial application is not met. *Id*. This circuit has held that in considering the question of extraterritorial applicability, courts may consider contextual as well as textual evidence, but "must apply the canons of construction to interpret, not rewrite, congressional acts." *Delgado-Garcia*, 374 F.3d

---

[2]The territorial jurisdiction of the United States is defined at 18 U.S.C. § 7. Obviously, the country of Iraq, in general, and the city of Fallujah and its surrounding desert, in particular, are not within the defined jurisdiction.

at 1344.

## II.  Nothing in the Language of § 924(c), the Context in Which it Was Passed, or its Legislative History Suggests That it Was Meant to Apply Extraterritorially

An examination of § 924(c) suggests that any attempt by the government to overcome the presumption against extraterritorial application by resort to its plain language will be futile. Nothing in the text of the statute or its surrounding subsections suggests an intent to reach extraterritorial conduct.  § 924(c), which criminalizes the "use," "carrying" or "possession" (with added penalties for "brandishing" or "discharging") of a firearm in connection with statutorily-defined crimes of violence or drug-trafficking crimes, is set within a comprehensive statutory scheme regulating the domestic licensing, trade and use of guns and other firearms.  Congress's evident goal in § 924(c) was to address one aspect of the gun violence problem within the United States, by attempting to deter criminals from using firearms during the commission of other crimes.  *See generally United States v. Washington,* 106 F.3d 983, 1010 n. 41 (D.C. Cir. 1997).

The legislative history amply confirms the absence of any extraterritorial intention. § 924(c) was enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 233.  Its history suggests that the "safe streets" referred to in the Act's title were those of the United States alone.  The Act was a compendium of provisions ranging from technical and financial assistance to state and local law enforcement agencies (Title I), major changes to the rules relating to the admissibility of confessions and other evidence in the courts of the United States (Title II), authorization of wiretapping and electronic surveillance by domestic law enforcement agencies (Title III), and new licensing, transfer, transportation, and use and possession laws relating to firearms, with associated criminal

4

penalties (Title IV). *See generally Id.*, S. Rep. No. 1097 *available in* 1968 U.S.C.C.A.N 2112, 2113. As explained in the Senate Report, the goal of the Title IV provisions, which included the enactment of the new 18 U.S.C. § 924(c), was to "keep firearms out of the hands of those not legally entitled to possess them" and to "assist law enforcement authorities *in the States and their subdivisions* in combating the increasing prevalence of crime in the United States." *Id*., at 2113-14 (emphasis added); *see also id.*, at 2163-66, 2164 (describing and documenting the aim of Title IV of the Act as "curbing the problem of gun abuse that exists in the United States"). That exclusive domestic focus on the "safe streets" of "the States and their subdivisions" has been maintained through over thirty years of amendments, up to and including the 1998 amendments that were the last revisions to become effective prior to the date of the crimes charged in the indictment.[3] Neither the contextual nor the legislative history supports the government's attempt to invest § 924(c) with extraterritorial jurisdiction.

### III. The Supreme Court's Decision in *Small v. United States*, 544 U.S. 385 (2005)

Although the Supreme Court has not directly addressed the extraterritorial application of § 924(c), the decision in *Small v. United States*, *supra*, strongly supports Mr. Delaema's position that Congress did not intend the statute to have extraterritorial effect. As noted, § 924 contains several subsections defining different crimes. § 922(g), enacted at the same time as § 924(c),

---

[3] In the floor debate on the 1998 amendments, for example, a leading proponent explained the aim of the bill: "Mr. Speaker, today we take an important step in the battle against firearm violence in America. . . . We need it because dedicated law enforcement officers across the country are being gunned down for the mere thrill of the kill." 144 Cong. Rec. H531 (Feb. 24th, 1998) (comments of Rep. McCollum); *see also id.* H532("Throughout North Carolina and the Nation, citizens routinely claim that crime is one of their greatest fears and concerns. Nothing is scarier or more dangerous than a criminal possessing or brandishing a gun during the commission of a crime. We do not have to put up with it and we will not.") (comments of Rep. Myrick).

makes it a crime for an individual convicted of a felony to possess a firearm.  The issue in *Small* was whether § 922(g) applies to an individual who is convicted of a felony in a foreign court or whether the statute is limited only to domestic convictions.  Relying on the presumption against extraterritorial application of Congressional statutes and its reading of the statutory language and legislative history, the Court held that § 922(g) does not prohibit the possession of firearms by individuals who have been convicted in foreign courts.   The presumption against extraterritoriality did not directly dictate the result in *Small* since the statute was actually being applied to domestic conduct - the defendant who possessed the firearm was in the United States - but the presumption was accorded significant weight in the analysis.  The Court actually began its analysis with its line of cases recognizing the "legal presumption that Congress ordinarily intends it statutes to have domestic, not extraterritorial effect, application." 544 U.S. at 385.  Applying the reasoning underlying this presumption, *Small* then found "no convincing indication" in  the statutory language or the contextual or legislative history that would overcome it.

      The decision in *Small* supports Mr. Delaema's position in several respects.  First, although it was used only in support of the Court's reasoning, *Small* directly stated that the presumption against extraterritoriality would apply to possession of a firearm abroad: "That presumption would apply, for example, were we to consider whether this statute prohibits unlawful gun possession abroad as well as domestically." 544 U.S. at 389.  Second, like § 922(g), the subject matter of § 924(c) is not immigration[4] or terrorism where it might be reasoned

---

[4]In contrast to, for example, the statute at issue in *United States v. Delgado-Garcia*, *infra*.

that Congress did intend to address extraterritorial conduct.[5]  Third, there is no more indication in the text of § 924(c), nor the contextual or legislative history of the statute of an intent that the Congress meant the statute to apply extraterritorially than there is in that of § 922(g).  As noted, both statutes were initially part of the same Omnibus Crime Control and Safe Streets Act of 1968.

Finally, *Small* found that application of § 922(g) to foreign convictions would be inconsistent with the principles which underlie the presumption against extraterritorial application of statutes.  *Id*., at 389-90.  The extraterritorial application of § 924(c) is also inconsistent with these principles.  § 924(c) essentially regulates the possession of firearms.  If applied extraterritorially, it means that Congress intended to outlaw the possession of firearms in foreign countries under a whole host of factual scenarios, some of which would likely implicate situations where the interests of the foreign country are paramount to those of the United States, since the circumstances under which an individual may carry a firearm is quintessentially a matter of the law of the sovereign where the individual is located.  Congress may set whatever limitations it deems appropriate for the possession of firearms in the United States.  And while it may or may not have the power to set limitations on such possession in foreign countries, it should not be inferred that Congress intended to exercise such power in the absence of unambiguous evidence of such intent.  *See Arabian American Oil Co*., 499 U.S. at 248 ("It [the presumption against extraterritorial application] serves to protect against unintended clashes

---

[5] § 924(c) does use the language "*any* crime of violence or drug trafficking crime. . .," but § 922(g) also contains the identical phrase.  *Small* held that the use of such boilerplate terminology has no particular significance as to the issue of whether a legislature intends its laws to apply outside the sovereign's normal jurisdiction.  *Id*., at 388-89.

between our laws and those of other nations which could result in international discord.").

IV.  **Treatment of the Issue of Extraterritorial Application of Criminal Statutes in this Circuit**

The two principal cases in this Circuit which discuss the extraterritorial application of criminal statutes appear to be *United States v. Delgado-Garcia*, *infra*, and *United States v. Yakou*, *infra*.

**(a)  *United States v. Delgado-Garcia*, 374 F.3d 1337, 1343-51 (D.C. Cir. 2004)**

*Delgado-Garcia* presented the issue of whether two immigration-related statutes should be interpreted as reaching extraterritorial conduct. In a 2-1 decision, with a strong dissent from Judge Rogers, the majority held that two provisions of 18 U.S.C. § 1324(a), which make it a crime, respectively, to encourage or induce an alien to illegal enter the United States or to bring or attempt to bring someone to the United States who is not legally authorized, apply extraterritorially. *Delgado-Garcia*, however, began by categorically affirming the strength of the presumption against extraterritorial application, noting that the presumption should be applied "without exception" absent a discernible contrary intent of the Congress. 374 F.3d at 1344. Because of the unique immigration-related subject matter of the two statutes, the court did find such evidence from both textual and contextual analysis of the statute. The court began by noting that § 1324 is "on its face" more international than domestic because, in contrast to ordinary domestic statutes, those protecting the borders address conduct that is most likely to occur outside the United States. *Id*., at 1345. The Court also found support for its interpretation in *United States v. Bowman*, 260 U.S. 94 (1922),[6] reasoning that because of the nature of the

---

[6]*Bowman* is often cited for the proposition that criminal statutes in general apply only to conduct committed within the territorial jurisdiction of the sovereign. *Bowman* created an

offense, Congress would naturally infer that much of the conduct covered by § 1324 would occur outside the United States. *Id.*, at 1345-46. Finally, the court found support for its conclusion in the statute's specific forfeiture provisions. *Delgado-Garcia* reasoned that Congress would have been unlikely to provide that vehicles and other conveyances used to bring illegal aliens to the United States be forfeited while the criminal conduct would be left unredressed. *Id.*, at 1346-47.

*Delgado-Garcia* provides little comfort to the government's attempt to apply § 924(c) extraterritorially. Unlike the core conduct addressed by limited-reach immigration statutes such as § 1324, § 924(c) potentially covers a wide swath of conduct that has no relation to the extraterritorial affairs of the United States. More importantly, in contrast to *Delgado-Garcia*, Congress had absolutely no reason to assume that most of the criminal conduct covered by § 924 would actually occur outside the United States. For the reasons pointed out by *Delgado-Garcia*, Congress could obviously presume that the core conduct involved in attempting to help illegal aliens enter the United States will likely occur outside our territorial borders. But there is no reason why Congress would have inferred the same regarding § 924(c). Indeed, as cited above,

---

exception for a class of statutes whose purpose is to protect the government itself against fraud or obstruction, irrespective of the locality of the offense. 260 U.S. at 98. *Bowman* involved fraud committed on the high seas and in Brazil against the United States Shipping Board Emergency Fleet Corporation, whose sole stockholder was the United States. Because the conspiracy statute was amended to specifically include the unique shareholder status of the United States in the corporation, whose business naturally contemplated activity on the high seas, the Court inferred that Congress had not thought it necessary to specifically provide extraterritorial jurisdiction. *Id.*, at 98-100. In reaching its conclusion, *Bowman* rendered several examples of other statutes where the circumstances of the offense clearly suggested that it would be committed overseas, such as, for example, altering a ship's paper's etc. "The natural inference from the character of [such] offense[s]" is that they will likely be committed outside the territorial jurisdiction of the United States. *Id.*, at 99. Thus, for this class of offenses *Bowman* effectively held that the presumption against extraterritoriality is overcome. *See also Delgado*, 374 F.3d at 1345. The § 924(c) prohibition against possession or use of a weapon during a crime of violence does not come within the terms of this *Bowman* exception.

the available evidence, including the legislative history of the Omnibus Safe Streets Act of 1968, suggests that Congress was concerned with punishing the use of weapons during violent crimes and drug trafficking on the streets of this country.

### (b) *United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005)

*Yakou* concerned the prosecution of a non-U.S. citizen for violation of the Arms Export Control Act [AECA] and its implementing regulations known as the International Traffic in Arms Regulations [ITAR]. After finding that Mr. Yakou could not be prosecuted under the AECA because he was not a "U.S. person" within the meaning of the statute, the court considered the issue of whether he could be prosecuted under the ITAR regulations, which prohibited the aiding and abetting of AECA violations. 428 F.3d at 251-254. Applying the presumption against extraterritorial application, the court found that Mr. Yakou could not be prosecuted for violation of ITAR. "Congress has not expressed with the requisite clarity that it sought to apply the Brokering Amendment and, by extension the IRAR's brokering provisions, in such an extraterritorial manner." *Id.*, at 253.

The Brokering Amendment on its face applied only to "U.S. persons." Although the government unsuccessfully claimed Mr. Yakou came within this classification due to his alleged lawful permanent resident status, it alternatively argued that that he could be prosecuted under ITAR even if he was not a "U.S. person" because ITAR prohibited aiding and abetting AECA violations and this liability was not dependent on the "U.S. person" classification. Essentially, the government argued that Congress intended the statute to apply extraterritorially to "U.S. persons" and thus, regardless of whether he came within this classification, Yakou was liable as an aider and abetter of such a person. The court rejected this reading and held that the limitation

of extraterritorial liability to "U.S. persons" in the Brokering Amendment trumped any attempt to impose such liability on the basis of an aiding and abetting theory where the principal statute did not extend jurisdiction extraterritorially.

There is dicta in *Yakou* suggesting that in certain situations extraterritorial jurisdiction for aiding and abetting an offense can be found to the same extent that such jurisdiction exists for the underlying offense, *id*., at 252, but this principle, even if accepted, does not support an expansive reading of such jurisdiction for § 924(c) violations. 18 U.S.C. § 2 does not actually define a separate offense of aiding and abetting, but simply defines the manner in which one may commit an offense and be held liable as a principal. Indeed, it is well-established that conviction may be grounded in aider and abettor liability even if the indictment does not refer to § 2. *United States v. Kegler*, 724 F.2d 190, 200-201 (D.C. Cir. 1984). Thus, it makes sense that if there is a showing that the underlying offense applies extraterritorially, then such jurisdiction extends to the aider and abettor of the offense. In contrast, § 924(c) is an independent offense - no one would suggest that its penalties could be imposed absent a specific charge in the indictment. *See United States v. Anderson*, 59 F.3d 1323, 1326 (D.C. Cir. 1995) ("a § 924(c) conviction stands on its own even if the defendant is acquitted of the underlying offense or the underlying offense is not charged, so long as the government presented sufficient evidence to prove the predicate offense as a element of the § 924(c)(1) violation.").

**V.   The Theory of Ancillary Jurisdiction of *United States v. Bin Laden,* 92 F. Supp. 2d 189 (S.D. N.Y. 2000)**

There is little case law directly addressing the issue of the extraterritorial application of § 924(c). The claim appears to have been denied in *United States v. Yousef*, 927 F. Supp. 673

(S.D. N.Y. 1993), although the district court's opinion does not directly address the jurisdictional claim as it specifically relates to § 924(c). The issue was also raised in a second case from the Southern District of New York, *United States v. Bin Laden*, 92 F. Supp. 2d 189, 197 (S.D.N.Y. 2000). In *Bin Laden*, which arose out of the bombing of the United States' Embassy in Nairobi, the defendants moved to dismiss several counts based on a claimed lack of extraterritorial jurisdiction, including one count charging a violation of § 924(c). The opinion in *Bin Laden* discusses the principles of extraterritorial jurisdiction as they relate to several of the specific counts. After finding such jurisdiction proper as to 18 U.S.C. § 844(f), the crime of violence underlying the § 924(c) charge, the court then found that extraterritorial jurisdiction exists for § 924(c), based on "ancillary jurisdiction." *Id*., at 198-201. Relying on cases dealing with conspiracies and attempts, the court observed that "a statute that is ancillary to a substantive offense statute will be presumed to have extraterritorial effect if the underlying substantive statute is first determined to have extraterritorial effect." *Id*., at 197.

  Mr. Delaema submits that *Bin Laden* erroneously relied on a theory of "ancillary jurisdiction" to find that Congress intended § 924(c) would apply to conduct outside the territorial jurisdiction of the United States. The opinion contains no discussion or analysis of the doctrine of ancillary jurisdiction - it simply concludes that the doctrine supports a finding of extraterritorial jurisdiction where such jurisdiction otherwise lies for the predicate offense for § 924(c) violations. In so concluding, *Bin Laden* confuses the concept of the court's *power* to hear such a claim with the issue of whether Congress has actually conferred jurisdiction over the subject matter. The concept of ancillary jurisdiction arises when an issue is raised whether the court has power under the constitution to adjudicate a case or claim. Even if the power to hear a

claim is conferred by the concept of ancillary jurisdiction, and thus within the court's constitutional authority, a district court may not decide the controversy if Congress has not actually conferred jurisdiction. *See generally Owen Equipment & Erection Co., v. Kruger*, 437 U.S. 365, 371-72 (1978)("Constitutional power is merely the first hurdle that must be overcome in determining that a federal court has jurisdiction over a particular controversy. For the jurisdiction of the federal courts is limited not only by the provisions of Art. III of the Constitution, but also by Acts of Congress.)". Mr. Delaema is not claiming that this Court would lack the constitutional authority or power to adjudicate the § 924(c) charge if Congress had intended that the statute apply extraterritorially. But, as discussed above, there is no indication that this was the case. Thus, *Bin Laden* was incorrect in concluding that it had jurisdiction of the § 924(c) charge by virtue of "ancillary jurisdiction."

For the reasons stated above, Mr. Delaema moves the court for an order dismissing Counts Four and Five.

Respectfully submitted,

"/s/"
Robert L. Tucker
Counsel for Mr. Wesam Al-Delaema
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500