IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,         :
         :
        v.         :   CR. NO. 05-337 (PLF)
         :
WESAM AL-DELAEMA,         :
         :
       Defendant.         :

_____

## MOTION TO DISMISS THE INDICTMENT

### I. Introduction

Counsel for the defendant, Mr. Wesam Al-Delaema (herein "Mr. Delaema"), moves the Court for an order dismissing the indictment for lack of jurisdiction. In particular, Mr. Delaema contends that Congress as a general proposition did not intend to extend jurisdiction for criminal violations of Title 18 to offenses allegedly committed by foreign nationals in foreign countries administered under a regime of belligerent occupation by the forces of the United States military. Alternatively, Mr. Delaema contends that his prosecution under the circumstances of this case violates due process.[1]

_____

[1]The Scheduling Order entered in this case provides that the defense will file pre-trial non-evidentiary motions by June 2, 2008. Accordingly, in addition to this motion the defense is filing three other motions on this date addressing the face of the indictment. The instant motion seeks dismissal of the indictment in its entirety. The other three motions address specific counts. *See Motion to Dismiss Count One and to Strike Allegations of Counts Four and Five*; *Motion to Dismiss Counts Four and Five*; and *Motion to Dismiss Any Counts in the Indictment Subject to the Rule of Speciality or the Doctrine of Dual Criminality*. The defendant has previously filed a *Motion to Suppress* and on this date is also filing a *Reply to Opposition to Motion to Suppress*. The defendant's reply was due earlier, but was delayed in part because he was awaiting further discovery from the government and in part because of schedule issues. The government is not

The law governing military occupation, also known as belligerent occupation, is primarily governed by a body of international law, including treaties to which the United States has long been a party. These treaties directly address the legal framework imposed on citizens of territories under belligerent occupation. Congress was intimately familiar with these treaties at the time of the passage of the Title 18 offenses that Mr. Delaema is charged with violating. In particular Congress was aware of the provisions of the *The Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War*, August 12, 1949, 6 U.S.T. 3516, U.N.T.S. No. 973 [hereinafter *Geneva IV*]. *Geneva IV* codifies what has become customary international law, namely that the laws of an occupied territory shall generally remain in force unless repealed or suspended by the Occupying Power and that new or amended penal provisions of the Occupying Power only come into force the limited circumstances specifically delineated in the Convention.

In the absence of clear evidence that Congress specifically intended that the provisions of

---

prejudiced by the delayed filing of the reply, as the motions hearing is not set until October 20, 2008. The Scheduling Order also provides that the parties may file appropriate pleadings dealing with discovery issues at a later date, as they become ripe. The defense made a plenary discovery request in February and the government has recently responded. It is expected that the defendant will likely file a motion to compel regarding some matters. The parameters of such a motion are still being considered. The defense will file the motion in a timely manner, as the defense is committed to keeping the present trial date of February 24, 2009. It is also expected that there will be evidentiary-type motions at some point in the future after all the discovery is completed and the trial issues become more crystallized. For example, it is likely that a *Daubert* motion will be filed based on the conclusions contained in FBI lab reports which have been provided in discovery, but such a motion is not ripe before receipt of the government's expert notice pursuant to Fed. R. Crim. P. 16(a)(1)(G). That notice is due on the same date as the defendant's non-evidentiary motions. Finally, inasmuch as the events surrounding this indictment took place in Iraq and the Netherlands, there may be a need for a motion to take depositions. At present, it is too early for the defense to determine if this will be necessary, but any such motion will be filed in a timely manner so as to allow the trial to proceed on schedule.

Title 18, which Mr. Delaema is accused of violating were to apply to areas under the direct military occupation of the United States Army in the immediate aftermath of war, this Court should dismiss the indictment.

## II.  The Invasion of Iraq, Its Subsequent Occupation and the Establishment and Operation of the Coalition Provisional Authority

On March 20, 2003, Coalition Forces, led and dominated by the Armed Forces of the United States, initiated war against the independent nation of Iraq by aerial bombardment of its capital city of Baghdad.  Within three hours after commencement of the aerial attack, White House press secretary, Ari Fleisher, announced that "the disarmament of the Iraqi regime" has begun.  *See* http://www.guardian.co.uk/world/2003/mar/20/iraq.  Forces of the U.S. Army entered Baghdad on April 9, 2003.  *See* A Timeline of the Iraq War, *found at* www.thinkprogress.org/iraq-timeline/.  A little over three weeks later, speaking from the deck of a United States warship and standing under a large sign proclaiming "Mission Accomplished," the President of the United States declared that major combat operations were complete.

Shortly thereafter, in May 2003, the Coalition Provisional Authority [CPA] was established.   There are two views concerning the authority under which the CPA was created.  One holds that it was born of a U.S. National Security Policy Directive.  The other is that its authority grew out of United Nations Security Council Resolution 1483.  *See generally* L. Elaine Halchin, *The Coalition Provsional Authority (CPA): Origin, Characteristics, and Institutional Authorities*, April 29, 2004, CRS Report to Congress, at 4-7 (National Security Directive), 7-10 (UN Resolution), *available at www.fas.org/man/crs/RL32370.pdf.*[2]  While the precise origin of

---

[2]The CPA's Orders and Regulations ( the relevant ones of which are discussed and cited below) contained a preamble reciting the alleged authority under which they were issued.  These

the CPA is unclear, its mission was not.  The CPA was charged with administration of the

occupation of Iraq.  Its Administrator reported directly to the President through the U.S.

Department of Defense and was responsible for all U.S. programs in Iraq except those directly

under the Commander of  U.S. military forces in Iraq.   One of the principal purposes of the CPA

was "to restore conditions of stability and security" in Iraq.  Its budget was provided by the

United States.  *Id.*, at 15-24.

        Whether established under a policy directive of the President of the United States or

created pursuant to a resolution of the United Nations, the CPA was under the control of and

financed by the United States and charged with administering the belligerent occupation of Iraq.

United Nations Resolution 1483 clearly set out that the CPA was created pursuant to military

occupation powers and that its authority was to be interpreted consistently with international law

governing such occupation:

> The Security Council, . . . Noting the letter of 8 May 2003 from the Permanent
> Representatives of the United States of America and the United Kingdom of Great
> Britain and Northern Ireland to the President of the Security Council
> (S/20003/538) and *recognizing the specific authorities, responsibilities, and
> obligations under the applicable international law of these states as occupying
> powers* under the unified command (the "Authority"). . . Calls upon the Authority,
> consistent with the Charter of the United Nations and other relevant international
> law, to promote the welfare of the Iraqi people through the effective
> administration of the territory, including, in particular working towards the
> restoration of conditions of security and stability and the creation of conditions in
> which the Iraqi people can freely determine their own future.

Emphasis added.  United Nations Security Council, *Resolution 1483 (2003)*, S/RES/1483(2003),

May 22, 2003, 2003, *available at* http://www.un.org/Docs/sc/unsc_resolutions.html, quoted at

---

authorities included what was termed the general authority of the Administrator, the laws and
usages of war, relevant U.N. Security Council resolutions, including Resolution 1483, and
*Geneva IV.  See* Attachments A-H.

Halchin, supra, at 7-8.

Consistent with the provisions of modern international law that call for the cessation of belligerent military occupations of conquered territory within one year after the termination of hostilities,[3] the existence of the CPA ended on June 30, 2004, the date on which sovereignty of its territory was ostensibly returned to Iraq.[4]   The principal events underlying the charges in this indictment occurred in Iraq in October 2003, during the time the country was under direct military occupation, as administered by the CPA.[5]

## III. The Law Governing Military Occupation

When the United States and its Coalition allies undertook the obligations and duties of military occupation of Iraq  it was not entering uncharted waters, as a body of international law and treaties govern such occupations.  This body of law finds its source in customary

---

[3]"In the case of occupied territory, the application of the present Convention shall cease one year after the general close of military operations; however the Occupying Power shall be bound, for the duration of the occupation, to the extent that such Power exercise the functions of government in such territory, by the provisions of the following Articles of the present Convention: 1 to 12, 27, 29 to 34, 47, 49, 51, 52, 53, 59, 61 to 77, 143." *Geneva IV*, Art. 6.

[4]On this date, the CPA was replaced by a caretaker government created by the United States and Coalition forces known as the Iraqi Interim Government.  That entity was replaced by the Iraqi Transitional Government on May 3, 2005, after the election of the Iraqi National Assembly earlier that year.  *See* Coalition Provisional Authority and Iraqi Governing Council, *The November 15 Agreement: Timeline to a Sovereign Democratic and Secure Iraq*, available at http://www.iraqcoalition.org/government/AgreementNov15.pdf.

[5]Count One of the indictment does allege that the conspiracy existed from October 2003 until May 2, 2005, but the remaining substantive counts all relate to Mr. Delaema's alleged possession of an improvised explosive device on October 31, 2003, and it is clear that the thrust of the allegations against Mr. Delaema revolve around his alleged activities on that date.  The alleged extension of the conspiracy past that date is apparently based on conversations he allegedly had at a later date with co-conspirators and his later possession of a video documenting events on the night of October 31, 2003.   The events of October 31, 2003, are clearly the heart of the charges.

5

international law and treaties such as the 1907 Hague Regulations, which include an annex

entitled *Regulations Respecting the Laws and Customs of War* [hereinafter *Hague Convention]*

and the Fourth Geneva Convention.[6]  *See generally* McCarthy, *The Paradox of the Internal Law*

*of Military Occupation:  Sovereignty and the Reformation of Iraq*, Journal of Conflict & Security

Law, Spring, 2005.  As demonstrated below, it appears that the CPA was ostensibly established

as a result of and for the purpose of administering that body of international law.

As far back as our Civil War, the United States Army has formalized rules concerning the

administration of military occupation.  *See generally*, GERHARD VON GLAHN, LAW

AMONG NATIONS, 669-670 (4th Edition, MacMillan Publishing Co, Inc.)(1981).  The

provisions of the Hague Conventions of 1899 and 1907, adopted by the international community

to address the rules of military occupation were for the most part honored in their breach during

World War II.  *Id*.  In light of these and other abuses of warfare committed during World War II,

numerous governments met in Geneva, Switzerland in 1949 under the auspices of the

International Red Cross and negotiated four treaties concerning the conduct and aftermath of

armed conflicts.   The third treaty addressed issues concerning the treatment of prisoners of war.

*See Geneva Convention (III) Relative to the Treatment of Prisoners of War*, August 12, 1949, 6

U.S.T. 3316, T.I.A.S. No. 3364.  *Geneva III* has been extensively discussed in connection with

the detainees at Guantanamo Bay and was the subject of the Supreme Court's opinion in *Hamdi*

*v. Rumsfeld*, 542 U.S. 507 (2004).  This case, however, concerns the provisions of the fourth

---

[6]Although it signed the Fourth Hague Convention, the United States never ratified it.
Regardless, its provisions are generally considered part of customary international law at this
point.  *See* McCarthy, § 6.1.  The most relevant provisions of this body of law for purposes here
are those in *Geneva IV*, particularly Art. 64 and 65, which the United States did ratify.

treaty (signed the same day as *Geneva III*), which address the signatories' obligations as military

occupiers of conquered territory.  *See Geneva Convention (IV) Relative to the Protection of*

*Civilian Person in Time of War*, August 12, 1949, 6 U.S.T. 3516, U.N.T.S. No. 973 [hereinafter

*Geneva IV*].

> Article 42 of The Hague Convention defines areas under military occupation:
>
>> Territory is considered to be occupied when it is actually placed under the
>> authority of the hostile army.  The occupation extends only to the territory where
>> such authority has been established and can be exercised.

As noted above, on May 1, 2003, the President of the United States announced that major

hostilities had ended.  On May 8, 2003, the United States and Great Britain informed the United

Nations Security Council that they had established the CPA for the purpose of provisionally

administering the country of Iraq.  Thus, Iraq was under military occupation within the meaning

of international law and the relevant treaties from early May 2003 until June 28, 2004 when

sovereignty was turned over to the Iraqi National Council.  That occupation was administered by

the CPA.

> As its name suggests, the preamble to *Geneva IV* recites its purpose is the protection of

civilian populations in the time of war, while Art. 2 makes clear that its provisions "also apply to

all cases of total or partial occupation of the territory of a High Contracting Party, even if said

occupation meets with no armed resistance."  The Convention is primarily concerned with

regulating the conduct of the Occupying Power in relation to the occupied population.

McCarthy, at 4, <u>citing</u> Pictet (ed.), *Commentary on Geneva Convention IV of 1949* (1958) 614.

> Art. 4 of *Geneva IV* defines those persons who are protected by its provisions as "those

who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or

occupation, in the hands of a[n]. . . Occupying Power of which they are not nationals." At the

time of the acts in question, the United States was an Occupying Power in Iraq within the

meaning of *Geneva IV*. Mr. Delaema is not a national of the United States.[7] Mr. Delaema is

therefore a "protected person" within the meaning of *Geneva IV*.[8]

Articles 64-78 of *Geneva IV* address the administration of penal laws in the occupied

territory. Articles 64 and 65 specifically deal with the issue of when protected persons within the

occupied territory may be subjected to the penal laws of the Occupying Power. Article 64

provides that as a general proposition the penal laws of the occupied territory remain in force.[9]

This general proposition of Article 64 comes with two provisos. First, the Occupying

Power may repeal or suspend any of the penal laws of the occupied territory which the Occuping

Power believes constitute a threat to its security or which present an obstacle to application of the

Convention itself. The enforcement of these penal laws is entrusted to the courts of the occupied

territory, which are to continue to function. Second, Article 64 provides that the Occupying

Power may also subject the population of the occupied territory to provisions which it deems

---

[7]Article 4 exempts Nationals of a non-signatory State and those of neutral States. Whether Mr. Delaema is viewed as an Iraqi citizen, a Dutch citizen, or both, neither exemption applies, as both Iraq (on Feb. 14, 1956) and the Netherlands (on March 8, 1954) have ratified Geneva *IV*. *See* http://www.icrc.org/ihl.nsf/WebSign?ReadForm&id=375&ps=P (web page of International Committee of the Red Cross listing those countries that have signed and/or ratified *Geneva IV*. The United States ratified the treaty on Feb. 8, 1955. *Id*.

[8]The definition of "protected persons" within the meaning of *Geneva III* is distinct from that of "lawful combatants" within the meaning of Art. 4 of *Geneva III*. Because, as noted below, Mr. Delaema is not charged with committing war crimes, the defense expresses no view as to whether he would qualify as a legal combatant under *Geneva III* if the allegations of the indictment were true.

[9]Article 43 of the Hague Convention also requires the Occupying Power to "respect the laws in force in the country," consistent with public order and safety.

necessary to protect the security of its forces and property and to maintain the orderly government of the occupied territory.

Thus, Article 64 expressly provided the Occupying Power in Iraq - here the United States and its Coalition allies acting through the CPA - both the authority to repeal or suspend Iraqi laws where necessary to maintain its security and the authority to enact new provisions as necessary for this purpose.  As set out in the next section, the CPA explicitly informed the local population in Iraq that with certain exceptions the Iraqi penal code remained in force.[10]  The CPA also exercised both its power to amend or repeal particularized provisions of that Code[11] and to adopt independent provisions for the purpose of maintaining security and protecting its forces and property.[12]

The broad authority given by Article 64 is limited by two provisions of Article 65.  First, such penal provisions "shall not come into force before they have been published and brought to the knowledge of the inhabitants in their own language."  Second, the  penal provisions enacted by the Occupying Power may not be applied retroactively.

Articles 64 and 65 reflect the "assumption in the laws of war that occupying powers should respect existing law and economic arrangements within the occupied territory and should

-------

[10]*See* CPA Regulation One, issued June 9, 2003, *Attachment A* and CPA Order Number 7, issued June 9, 2003, *Attachment D*.

[11]For example, CPA Order Number 7, issued June 9, 2003, gave notice of the applicability of the Third Edition of the 1969 Iraqi Penal Code with certain enumerated amendments and exceptions.  *See Attachment D*.

[12]For example, CPA Order Number 3 (Revised), issued December 31, 2003, gave notice of the adoption of provisions independent of the Iraqi Penal Code, relating to "Weapons Control."  *See Attachment* C.

generally make as few changes as possible."  Buchan, *International Community and the Occupation of Iraq*, Journal of Conflict and Security Law, Spring 2007, at 2, quoting A. Roberts, *The End of Occupation: Iraq* (2005), 54 ICLQ 27, at 36.   This approach has long been reflected in U.S. law:

> Nor is the position of the invading belligerent affected, or his relation to the local tribunals changed, by his temporary occupation and domination of any portion of the enemy's country.  As a necessary consequence of such occupation and domination, the political relations of its people to their former government are, for the time, severed.  But for their protection and benefit, and the protection and benefit of others not in the military service, or in other words, in order that the ordinary pursuits and business of society may not be unnecessarily deranged, *the municipal law- that is, such as affect the private rights of person and property, and provide for the punishment of crime - are generally allowed to continue in force, and to be administered by the ordinary tribunals* as they were administered before the occupation.  They are considered as continuing, unless suspended or superseded by the occupying belligerent. . . *If guilty of wanton cruelty to persons, or of unnecessary spoliation of property, or of other acts not authorized by the laws of war, they may be tried and punished by the military tribunals.  They are amenable to no other tribunal . . .*

*Dow v. Johnson*, 100 U.S. 158, 166 (1879) (emphasis added).

## IV.  Relevant Orders and Regulations Issued by the Coalition Provisional Authority

The Coalition Provisional Authority enacted and published penal provisions, some of which specifically addressed the conduct at issue in this case.  The various documents promulgated by the CPA can be found at its archived website: www.cpa-iraq.org/ [13]  The meticulous care which the CPA took in drafting and promulgating its Orders and Notices,

---

[13]The website of the CPA defines its "Orders" as "binding instructions or directives to the Iraqi people that create penal consequences or have a direct bearing on the way Iraqis are regulated, including changes to Iraqi law." *See www.cpa-iraq.org/regulations/*. The penal consequences of "Orders," contrasts with the non-penal aspects of "Public Notices."  The CPA also published "Memoranda" and "Regulations," both of which contained procedural rather than penal provisions.  *Id.*

Regulations and Memoranda reflect its awareness of its obligations as an Occupying Power

under Articles 64 [enactment] and 65 [publication] of *Geneva IV*.   Documents issued by the

CPA that are relevant to this motion include:

> On May 16, 2003, the CPA issued *Regulation 1*, which provided that Iraqi institutions, such as the court system, would remain in place.[14]   *See Attachment A.*
>
> On June 5, 2003, the CPA issued a *Public Notice* prohibiting certain pronouncements in public places and the distribution of certain materials "in whatever form."  Among these materials and pronouncements were those that incite violence against the Coalition Forces.  *See Attachment B.*
>
> On June 9, 2003, the CPA issued Order No. 7, which  provided that with certain exceptions, the 1969 Iraqi Penal Code remains applicable.[15]  *See Attachment D.*
>
> On June 18, 2003, the CPA issued Memorandum Number 3, which set out detailed provisions "establishing procedures for applying criminal law in Iraq."  In the preamble Memorandum Number 3 recited that its provisions were meant "in particular, [to be] consistent with the Fourth Geneva Convention of 1949. . ."  *See Attachment* H.  Section 2 (1) of the Memorandum made its provisions inapplicable to military courts, commission or tribunals established by the Coalition.  Section 2 (2)  addressed the issue of jurisdiction and is of particular importance for purposes of this motion.  In particular, it specifically informed the Iraqi people that "[N]othing in the Memorandum shall deprive courts martial, military commissions or military tribunals of their jurisdiction as provided for under the laws of a Coalition member State or in accordance with the laws and usages of war."  This language made no reference to also maintaining possible jurisdiction under the domestic criminal law of the Coalition states.   Section 3 provided that the Iraqi Law on Criminal Proceedings of 1971 remained in force unless expressly modified by this Memorandum.  Thus, an Iraqi reading Memorandum Number 3 was put on notice that he was  subject to Iraqi law as amended by the CPA and that he could be tried in Iraqi Criminal Courts as well as by *military tribunals* established by the Coalition States but nothing in this or any other Order of the CPA suggested that he would also be subject to the domestic

---

[14]*See: http://www.iraqcoaltion.org/regulations/20030516_CPAREG_1_Coaliton_ Provisional_Authority_.pdf.*

[15]*See: http://www.iraqcoaltion.org/regulations/20030610_CPAORD_7_Penal_Code.pdf.*
.

civilian law of the respective Coalition countries or that he would be subject to trial in the civilian courts of those countries. In fact, the detailed recitation of the tribunals to which the Iraqi population would be held to account suggested by its omission that the civilian courts of the Occupying Powers were not among them, a conclusion also buttressed by the provisions of *Geneva IV*, prohibiting the deportation of the civilian population.

On July 11, 2003, the CPA issued Order No. 13 (Revised), which established a Central Criminal Court of Iraq, which would sit in Baghdad and have national jurisdiction over "all criminal offenses assigned to it by the Administrator." The Central Court was to have jurisdiction over crimes committed in Iraq after March 19, 2003 and apply the 1969 Iraqi Penal Code, as modified and promulgated in the Order. *See Attachment G.* Section 4 of Order 13 (Revised) provided that the Iraqi Criminal Court would apply the 1969 Penal Code of Iraq, as modified by CPA Order No 7.

On September 19, 2003, the CPA issued Order No. 41, entitled: "Notification of Criminal Offenses." Order No. 41 referenced provisions of Iraqi law requiring notification of public authorities of any information involving attempts to commit explosives and firearm offenses, extending the public's duty notify authorities as including the CPA and the Coalition forces.

On December 31, 2003, the CPA issued Order Number 3 (Revised), which dealt with "Weapons Control." *See Attachment C.* Order Number 3 (Revised) prohibited and attached significant penalties for, *inter alia*, the possession, transportation, distribution or use of various types of weapons, including "Special Category Weapons," as defined in Section 1(9). The definition of "Special Category Weapons," included "improvised explosives" such as that allegedly possessed by Mr. Delaema.

As noted, these pronouncements suggest that the CPA was aware of its obligations as an Occupying Power under the relevant international conventions. The maintenance of the Iraqi judiciary and its Penal Code was consistent with the principle of international law that the Occupying Powers should recognize the domestic law and judicial procedures of the occupied country to the extent consistent with good order. The enactment of Order 7 concerning weapons control was likewise with the Occupying Power's right under international law to supplement the domestic law of the occupied country in order to protect the Occupying Power's forces and

property.

As the review of the relevant provisions of the Iraqi Penal Code of 1969 and independent Orders, Regulations and Memoranda promulgated by the CPA demonstrates, the conduct at issue in this Indictment was very specifically addressed by the CPA through its announcement that the 1969 Iraqi Penal Code, as supplemented and repealed by its Orders, would govern their conduct.[16]   And, as noted above, the CPA, citing the provisions of *Geneva IV* as authority,

---

[16]Review of these CPA orders and regulations shows that conduct similar to each substantive offense referenced in the Indictment was directly prohibited by the CPA.

As to the offense of Conspiracy to Murder U.S. Nationals Outside the United States charged in Count One: Unlawful murder of another in Iraq was punished by imprisonment up to life under Paragraph 405 of the Iraqi Penal Code of 1969, *see Attachment J*, which was adopted by and called to the attention of the population of Iraq by CPA Order Number 41. *See Attachment E*. The crime of conspiracy to commit this offense was prohibited by Paragraphs 56 and 57 of the Iraqi Penal Code and provided for a maximum penalty of seven or ten years, depending upon whether the defendant was an organizer or played a major part in the conspiracy, either penalty being far less than that under 18 U.S.C. § 2332.   The Count One Offense also was likely covered by provisions of Chapter Two of the Iraqi Penal Code dealing with "offenses against the internal security of the State," which, with the non-pertinent exceptions of Paragraphs 191 and 192, was adopted by Section 1 of CPA Order Number 41 by virtue of its order that the terms "government" and "state" in those sections of the Iraqi Penal Code be interpreted to include the CPA and Coalition Forces.  *See Attachment E*.

As to the offense of Conspiracy to Use a Weapon of Mass Destruction charged in Count Two: Order Number 3 (Revised) prohibited the possession of "military weapons," including explosive devices of any type designed for use by military forces as well as "Special Category Weapons," which included improvised explosive devices. Order Number 3 (Revised) did not prohibit *conspiracy* to possess such weapons, which is the precise offense charged in Count Two.  The substantive offense, as applied to the improvised explosive device that is the subject of this prosecution, was also covered by Paragraphs 190 and 197 of the Iraqi Penal Code, as adopted by the CPA.  In addition to the general conspiracy sections of the Iraqi Penal Code cited above, conspiracy to commit this offense was also covered by Paragraph 216 of that Code.

As to the Offense of Conspiracy to Destroy U.S. Property by Means of an Explosive charged in Count Three: The offense of destruction of property by any means was prohibited by Paragraph 477 of the Iraqi Code.  The destruction of government property, in particular, was prohibited by Paragraph 197 of that Code, which once again was adopted by CPA Order Number 41.

informed the population of Iraq that they would be subject to the criminal courts that has been

established in Iraq as well as "military courts, commissions or tribunals established by the

Coalition." *See Attachment H*.  The failure to inform the population of Iraq that they would also

be subject to U.S. domestic law or the domestic law of its Coalition partners was no oversight.

In citing *Geneva IV* and omitting an fourth overlay of legal obligations on the Iraqi population

during the military occupation (*see* below) , the CPA knew that it was acting in accordance with

generally accepted principles of international law.

     In short, there was a comprehensive body of law governing belligerent occupation well

before Congress passed the statutes which Mr. Delaema is accused of violating. An important

part of that body of law is found in *Geneva IV*, the provisions of which had become the law of

the United States by virtue of its ratification by Congress.  In enacting its Orders and

---

As to the Offense of Teaching or Demonstrating the Use of an Explosive with the Intent to Further a Crime of Violence, under the circumstances of this case that offense likely came directly within provision c) of the CPA Public Notice Regarding Public Incitement of Violence and Disorder, which was issued on June 5, 2003, and which barred "incit[ing] violence against Coalition Forces or CPA personnel.  *See Attachment B*.  The offense also was covered by Paragraphs 48 of the Iraqi Penal Code (inciting other to commit offenses), and several sections of the Chapter of the Code dealing with offenses against state security such as Paragraph 185 (inciting other to commit offenses against the State, which by virtue of CPA Order Number 41 includes the CPA and Coalition Forces).

As to the Substantive Offense of Possession of a Destructive Device During a Crime of Violence and the related conspiracy offense charged in Counts Four and Five: The Iraqi Penal Code does not appear to have criminal provisions independently defining such crimes, but Paragraphs 190 and 197, for example, do increase the penalty for certain offenses committed by use of explosives.

All paragraphs of the Iraqi Penal Code are from the 1969 version adopted by the CPA pursuant to Order Number 41 and are appended hereto as *Attachment J*.  The entire Iraqi Penal Code of 1969 can be found at the following Library of Congress database: http://law.case.edu/saddamtrial/documents/Iraq_Penal_Code_1969.pdf.

Regulations, the CPA was acting pursuant to that body of law.

**V.  Congress Did Not Intend That the Provisions of Title 18 Which Mr. Delaema Is Charged with Violating Would Apply to Violations Allegedly Committed by Citizens of Foreign Countries in Territories under Military Occupation of the Forces of the United States as it Was Aware That the Above Treaties and Provisions of International Law Would Apply**

The threshold issue presented by Mr. Delaema is whether Congress intended that the domestic law penal provisions of Title 18 that he is charged with violating would be applied to alleged offenses committed by foreign nationals in countries under military occupation of the United States.  As reflected by the provisions of Geneva IV and the customary law of nations, individuals present in territory under military occupation are subject to three bodies of law:

> **Three Systems of Law**   The result of belligerent occupation, then, is that three distinct systems of law apply in territory under an enemy occupant: the indigenous law of the legitimate sovereign, to the extent that it has not been necessary to suspend it; the laws (legislation, orders, decrees, proclamations, and regulations) of the occupant, which are gradually introduced; and the applicable rules of customary and conventional international law.

GERHARD VON GLAHN, LAW AMONG NATIONS, An Introduction to Public International Law, 672, MacMillan Publishing Company (1981).  As Congress was well aware at the time of passing the Title 18 offenses at issue here, the population in militarily-occupied territories were not generally understood to be also subject to the domestic penal law of the Occupying Power. As discussed below, the government's attempt to graft a *fourth* body of law on the population of Iraq during the period of the military occupation flies directly in the face of that law.

Because Congress was aware that such occupations were generally governed pursuant to treaties which it had ratified and which thereby became the law of the United States and because there is no indication in either the statutory language or the legislative history that Congress intended to supplant or replace jurisdiction in this specialized military sphere, Mr. Delaema

15

submits that there is no jurisdiction to try him in the district courts of the United States for

violations of Title 18 of the United States Code allegedly committed during the military

occupation of United States forces in Iraq.  Several reasons compel this conclusion.

First, nothing in either the text or legislative history of the Title 18 statutes at issue here

suggests that Congress envisioned their application in foreign countries under U.S. military

occupation during times of hostilities.  Admittedly, 18 U.S.C. § 2332, the statute underlying the

lead offense charged in Count One, if read literally would cover any homicide or related attempt

or conspiracy to kill a national of the United States, who is located outside the United States

anywhere in the world provided the Attorney General certifies that the offense was intended to

coerce, intimidate or retaliate against a government or a civilian population.[17]  The statute

contains no geographical limitation and was obviously meant to apply extraterritorially since its

subject refers to attempts on the lives of U.S. nationals located outside this country.  But its plain

language makes clear that Congress did not envision that it would apply in the military arena as

there is no exclusion for deaths of members of the U.S. armed forces killed by opposing forces

during lawful war.  In other words, if read literally,  members of opposing armed forces could be

prosecuted for murder for killing U.S. troops in lawful combat.  Obviously, Congress did not

intend the statute to be interpreted in such a manner, as this would directly violate Articles 87, 99

and 102 of *Geneva III*,[18] which provide that prisoners of war cannot be tried or sentenced except

---

[17]By separate motion filed this date, Mr. Delaema contends that this certification feature of § 2332(d) is unconstitutional.  *See Motion to Dismiss Count One and to Strike Allegations of Counts Four and Five*.

[18]The United States ratified *Geneva III* on February 8, 1955.  As discussed below, the Congress statutorily implemented its provisions through the War Crimes Act of 1996 - and as further set out below, in reporting on the need for that legislation the accompanying House

for offences that the Detaining Power would also prosecute its soldiers - it goes without saying

that the United States would not prosecute its soldiers for killing the enemy in lawful combat.[19]

A broad interpretation of the statute in its strictest literal terms, without reference to the

military-civilian distinction, would thus produce an absurd - and thus disfavored - result. *See*

*Johnson v. United States*, 529 U.S. 694, 706, n. 9 (2000), <u>quoting</u> *Helvering v. Hammel*, 311 U.S.

504, 510-511 (1897)( "[N]othing is better settled, than that statutes should receive a sensible

construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an

unjust or an absurd conclusion"). Thus, a basic principle of statutory construction suggests that

it is unlikely that in enacting § 2332, Congress intended its scope to reach into the military arena,

much less the specialized area of the law of belligerent or military occupation. This

conclusion is buttressed by the legislative history of § 2332, which suggests that the statute was

intended to address terrorism in the non-military context. Nothing in the legislative history

envisions its application to the military arena or otherwise to foreign land under the occupation of

U.S. military. § 2332 initially appeared as § 2331 of Title 18 and was enacted as Section 1202

of the Omnibus Diplomatic Security and Antiterrorism Act of 1996. *See* Pub. L. 99-399, Title

12, § 1202(a), August 27, 1986. As the title of the Act suggests, the legislative history indicates

---

Report pointed out that our domestic law does not apply to foreign territory under military occupation.

[19]§ 2332(a) refers to the penalty provisions for homicide in § 1111, which, in turn, refers to "unlawful killings." It can therefore be argued that § 2332(a) does not, even if read literally, authorize prosecution of lawful combatants who kill U.S. soldiers as in that situation the killing is not "unlawful" because of the cited provisions of *Geneva III*. But on its face, § 2332 does authorize such prosecution. It is only by consulting *Geneva III* and reading the statute in light of its provisions that the absurd result is avoided. Similarly, a literal reading of § 2332 as applied to the population of foreign countries under military occupation must be read in light of the provisions of *Geneva IV*.

that Congress' primary concern was protecting diplomatic personnel overseas from terrorist attacks. Pub L. 99-399 is rife with references to the need to protect State department and diplomatic personnel employed overseas, but there is no indication that the statute was directed against attacks on American troops in foreign countries under military occupation or was otherwise directed at military affairs. A search of the lengthy contents of Pub. L. 99-399 finds no reference to military occupations or the goal of protecting U.S. troops in such occupations or during wartime.[20]

Second, Congress ratified *Geneva III* well before passage of each of the statutes at issue here. A treaty is considered the law of the United States and is treated in parity with an Act of Congress. *Breard v. Greene*, 523 U.S. 371, 376 (1998). In attempting to divine Congressional intent, it is a fundamental principle of statutory construction that Congress is aware of it own existing law when it legislates. *Cannon v. University of Chicago*, 441 U.S. 677, 696-97 (1990). Thus, in passing each of the above statutes Congress was aware that there were already U.S. laws dealing with military occupations, namely the provisions of *Geneva IV*. While not conclusive, this is nonetheless additional evidence suggesting that Congress was not attempting to provide invest jurisdiction in the federal district civilian courts of this country for attacks against U.S.

---

[20]Interestingly, § 1308 of Pub. L. 99-399, entitled "Policy Toward Afghanistan," recites abuses of the Soviet Army in its military occupation of Afghanistan after its invasion of that country. § 1308(a)(9) references President Reagan's State of the Union address in 1986, wherein he promised the people of Afghanistan material assistance in their resistance against that occupation. § 1308(b) then stated that it would be the policy of the Congress of the United States to provide "appropriate material assistance" to the people of Afghanistan in their resistance. In contrast, the reasoning underlying the indictment in this case is apparently that the United States government can prosecute in its civilian courts those who attempt to resist its military occupation of Iraq, an occupation that like the Soviet's presence in Afghanistan, resulted from its invasion of Iraq.

troops in foreign countries under military occupation when it passed the provisions of Title 18 at

issue in this case.  In passing § 2332(b), for example, Congress perceived a need to permit

prosecution of terrorists who attempt to kill U.S. nationals outside the United States in areas not

subject to the special territorial and maritime jurisdiction of the United States.[21]  But irrespective

of the need for such legislation, there is no suggestion that Congress perceived a need to

supplement or repeal the relevant provisions of  *Geneva IV*.

Third, treaties are not deemed to be abrogated or amended by later Congressional acts

unless Congress has clearly expressed such a purpose.  *Cook v. United States*, 288 U.S. 102, 120

(1933); *Committee of U.S. Citizens in Nicaraugua v. Reagan*, 859 F.2d 929, 936 (D.C. Cir. 1988)

(courts should not lightly infer Congressional intent to abrogate a treaty absent a clearly

expressed intent to do so).  Here, an interpretation that Congress intended to enact a regime

where the population of a foreign country under military occupation of U.S. troops would be

subject to the domestic penal law of the United States in addition to its own country's laws and

the laws directly promulgated and announced by the Occupying Power would counter the

provisions of *Geneva IV*, which was entered into to expressly limit the burdens placed on those

subject to such occupation.  *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S.

172, 202 (1999) ("[A] review of the history and the negotiations of the agreements is central to

the interpretation of treaties."); *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185

(in interpreting a treaty a Court should look to the intent of the parties).  This principle is even

---

[21]*See* 18 U.S.C. § 7, defining the special territorial and maritime jurisdiction of the United States.  Conspiracy to murder U.S. nationals within this jurisdiction has long been a crime under 18 U.S.C. § 1111.

more applicable where, as here, the Occupying Power directly informs the population of the occupied territory of the laws and regulations to which it is subject and the tribunals to which it must answer and never mentions its own domestic penal law or its own domestic civilian tribunals.

Fourth, Mr. Delaema does not suggest that Congress necessarily lacks the power to apply domestic penal law to territories under U.S. military occupation. The source of such authority under U.S. law might be found in Congress' power under Article I, Section 8 of the U.S. Constitution to "define. . .offenses against the law of nations" or its power under the same section to "declare war. . . make rules concerning captures on land and water." And even if such legislation otherwise violated international law, Mr. Delaema recognizes that the federal courts of the United States are not bound by international law. *United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991). But "[A]n act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains. . . ," *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804), and "courts will not blind themselves to potential violations of international law where legislative intent is ambiguous." *Yunis*, 924 F.2d at 1092. Certainly, in light of the provisions of *Geneva IV* and the generally understood principles of international law concerning military occupations, *the best* that could possibly be said about whether Congress intended the applicable provisions of Title 18 to apply to foreign land under military occupation of the Armed Forces of the United States is that its failure to affirmatively indicate such jurisdiction is an ambiguous indication of Congressional intent. But Congressional silence is not enough to infer such jurisdiction in light of the customarily understood jurisdiction in foreign countries under areas military occupation as lying in the local courts of the occupied country or

those tribunals specifically established by and made known to those in the occupied country. *See South Dakota v. Bourland*, 508 U.S. 679, 687 (Congress' intent to abrogate provisions of treaty must be clearly expressed).

In this regard, it should be noted that if Congress intends for the district courts to assume jurisdiction over war-related offenses, it knows how to directly say so.   Indeed, it has directly done so in 18 U.S.C. § 2441, giving the district courts jurisdiction over  war crimes as defined therein and specifically providing jurisdiction over such offenses whether they are committed "inside or outside the United States."  Mr. Delaema, is course, not charged under § 2441, but the legislative history of § 2441 strongly supports his argument that Congress was fully aware that the general provisions of Title 18 do not apply to alleged offenses committed by non-U.S. nationals in foreign lands under military occupation.  The initial version of § 2441 was enacted as § 2401 in Section 2 of the War Crimes Act of 1996. *See* Pub. L. 104-192 (1996).[22]  The House Report accompanying the War Crimes Act sets out that its purpose was to implement this country's obligations under the four Geneva Conventions of 1949. *See* H.R. Rep. 104-698 (1996), Section I.  The same House Report specifically points out that military tribunals or commissions have been widely used by this country "from the Mexican-American War to the Civil War to World War II to prosecute war criminals and *to provide a system of justice in lands occupied by our armed forces.*"  *Id*., Section II, Part D.  The Report goes on point out a need for the legislation because military commissions have been limited to among other groups

---

[22]Congress initially defined the offense of "war crimes" simply as "grave breaches of the Geneva Convention," the language that now appears at subsection (c)(1) of § 2441.  The additional provisions of subsection (c) and the specific examples of Common Article 3 war crimes set out in the present subsection (d) were added by the Military Commission Act of 2006. *See* Pub. L. 109-366 (2006).  The additions of 2006 are not relevant here.

"inhabitants of enemy's country occupied and held by the right of conquest." *Id*. Thus, Congress was perfectly aware that U.S. law had previously laid jurisdiction for offenses in foreign lands under military occupation solely with military tribunals and that other provisions of Title 18 were not applicable to land under such occupation. Otherwise, each of the crimes defined in the War Crimes Act would have already been crimes under other provisions of Title 18 and jurisdiction would have already existed in the district courts. Because Congress recognized that not to be the case, the House Report accompanying the War Crimes Act reported that there was a need for legislation establishing jurisdiction over the "war crimes" offenses.

Fifth, another provision of Title 18 counsels the same conclusion. § 3185 provides that any person who flees from any territory under the occupation or control of the United States, who has committed an offense against the laws in force in that occupied territory shall, if found in the United States, be returned to the chief executive officer in control of the territory. The statute, which specifically refers to foreign territory under occupation or control of the United States (military occupation) gives no suggestion that the individual could simply be prosecuted in the district courts of the United States for the enumerated offenses on the theory that Title 18 crimes extend to foreign lands under military occupation.

Sixth, an interpretation that Congress intended that the provisions of Title 18 would supplement the penal provisions enacted by the occupying powers and those of the occupant country that remain in effect, thus providing a fourth layer of concurrent jurisdiction over acts of the inhabitants, would run counter to the underlying purpose of *Geneva IV* to protect the population of war-related occupations from abuses which had taken place during prior wars. If, in addition to the above penal provisions, an Occupying Power's domestic penal laws

generically applies to the local population for acts committed during the occupation, this would provide a vehicle for the Occupying Power to import its own law into the occupied territory and serve as a pretext to deport the local population.   For example, Article 49 of *Geneva IV* prohibits the deportation of protected persons from occupied territory to the territory of the Occupying Power.  Application of the Occupying Power's domestic penal laws to inhabitants of the occupied territory would provide a vehicle for the former to deport the inhabitants under the guise of prosecution under its domestic laws.  Clearly, as noted, the relevant conventions envision that the local inhabitants will be subject primarily to prosecution under the local legal regime which remains in effect, supplemented by whatever regulations that Occupying Power publicly announces that it is adopting.  There is nothing to suggest that the Occupying Power has the right to further usurp local sovereignty by claiming that its domestic law also applies in the occupied territory.  Even if Congress has the power to apply the domestic law of the United States to foreign nations under military occupation there is nothing to suggest that it intended to do so.

## VI.  Under the Circumstances Prosecution of Mr. Delaema For Violations of Title 18 Would Violate Due Process

Assuming *arguendo*, that Congress did intend for Title 18 to apply to offenses committed by foreigners in lands under military occupation of the United States, the prosecution of Mr. Delaema for the offenses charged in the indictment would violate due process, which requires "fair warning. . . in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear."  *McBoyle v. United States*, 283 U.S. 25, 27 (1931).   The fair warning requirement encompasses three requirements:

23

First, the vagueness doctrine bars enforcement of a "statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." [citations omitted]. Second. . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. [citations omitted]. Third, although clarity at the requsite level may be supplied by judicial gloss on an otherwise uncertain statute [citations omitted], due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. [citations omitted].

*United States v. Lanier*, 520 U.S. 259, 266 (1997).

Because of time and space restrictions, Mr. Delaema will not elaborate on this argument in more detail at this time. Because of the generally understood principles of law governing military occupation and particularly the body of law to which he would be subject, exacerbated by the detailed Orders issued by the CPA, which confirmed these principles and specifically omitted reference to the domestic law or tribunals of the United States or its Coalition partners, "men of common intelligence" in Iraq would, at best, "necessarily guess" as to the application of those provisions and be unlikely to divine the "novel construction" of jurisdiction proposed by the United States in this case.

Respectfully submitted,

_____
"/s/"
Robert L. Tucker
Counsel for Mr. Wesam Al-Delaema
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.  20004
(202) 208-7500

24