IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 05-337 (PLF) |
| v. | : | |
| | : | |
| WESAM AL DELAEMA, | : | |
| also known as | : | |
| WESAM KHALAF CHAYED DELAEME, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR LACK OF JURISDICTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this Opposition to Defendant's Motion to Dismiss the Indictment for Lack of Jurisdiction ("Motion").

### INTRODUCTION

On September 9, 2005, a U.S. District Court Grand Jury sitting in the District of Columbia returned an Indictment charging the defendant, Wesam Al Delaema, also known as Wesam Khalaf Chayed Delaeme ("defendant"), an Iraqi-born Dutch national, with the following charges: (1) conspiracy to murder United States nationals outside the United States, a conspiracy alleged to have taken place from in or about October 2003, until on or about May 2, 2005, in violation of Title 18, United States Code, Section 2332(b)(2); (2) conspiracy to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a); (3) conspiracy to maliciously damage or destroy U.S. Government property by means of an explosive, in violation of Title 18, United States Code, Sections 844(f) and (n); (4) possession of a destructive device during a crime of violence, and aiding and abetting and causing an act to be done, in

violation of Title 18, United States Code, Sections 924(c) and 2; (5) conspiracy to possess a destructive device during a crime of violence, in violation of Title 18, United States Code, Section 924(o); and (6) teaching or demonstrating the making or use of an explosive with intent to further a crime of violence, and aiding and abetting and causing an act to be done, in violation of Title 18, United States Code, Sections 842(p) and 2.

Briefly summarized, the Indictment alleges that during October 2003, the defendant, together with co-conspirators, traveled from the Netherlands to the vicinity of Fallujah, Iraq. Calling themselves the "Mujahideen from Fallujah," the conspirators declared their intentions to kill Americans in Iraq using destructive devices and other means. During the same month, the defendant and his co-conspirators hid destructive devices and wires in a road in the vicinity of Fallujah. They also discussed and demonstrated the way in which the destructive devices they had buried would destroy American vehicles driving on the road and kill the American occupants. Further, the defendant made a videotape of himself documenting such activities and memorializing his intent to kill Americans.

Thereafter, from September 2004 through May 2005, the defendant discussed with co-conspirators (and others) attacks against Americans in Iraq. On May 2, 2005, he possessed video images of himself and his co-conspirators documenting their intention to attack Americans in Iraq, and their acts in furtherance of the conspiracy, including the hiding of destructive devices in a road in the vicinity of Fallujah, Iraq. See Indictment, Count 1, ¶ 4.

The day the Indictment was returned, Magistrate Judge Facciola issued a warrant for the defendant's arrest. In September 2005, the United States filed a formal extradition request in the Netherlands, seeking to bring the defendant, who was then residing in the Netherlands, to the

United States in order to stand trial.  The extradition request was subsequently granted by a

Dutch court and approved by the Dutch Ministry of Justice.  In December 2006, the extradition

decision was upheld on appeal in the Netherlands, and the defendant was subsequently brought to

the United States for trial.

On June 2, 2008, the defendant filed the instant motion to dismiss the Indictment.  The

defendant contends that during October 2003, the time of the alleged commission of hostile acts

in Fallujah, the nation of Iraq was occupied by United States and Coalition armed forces, a status

that continued to exist until June 30, 2004, when sovereignty was returned to Iraq by replacement

of the "Coalition Provisional Authority" ("CPA") with the Iraqi Interim Government.  See

Motion at 3-5.  Because of the occupation – the defendant's argument proceeds – the conduct of

the military occupiers, including the United States, was governed by the Geneva Convention

Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75

U.N.T.S. 287 ("Geneva Civilian Convention").

In particular, the defendant relies upon Article 64 of the Geneva Civilian Convention to

support dismissal of the Indictment.  Article 64 provides as follows:

> The penal laws of the occupied territory shall remain in force, with
> the exception that they may be repealed or suspended by the
> Occupying Power in cases where they constitute a threat to its
> security or an obstacle to the application of the present Convention.
> Subject to the latter consideration and to the necessity for ensuring
> the effective administration of justice, the tribunals of the occupied
> territory shall continue to function in respect of all offenses
> covered by the said laws.
>
> The Occupying Power may, however, subject the population of the
> occupied territory to provisions which are essential to enable the
> Occupying Power to fulfill its obligations under the present
> Convention, to maintain the orderly government of the territory,

3

and to ensure the security of the Occupying Power, of the members and property of the occupying forces or administration, and likewise of the establishments and lines of communication used by them.

Id. Art. 64, 6 U.S.T. at 3558, 75 U.N.T.S. at 328.

Applying Article 64 to Iraq during the period of its occupation, and a CPA Regulation stating that, with certain exceptions, the Iraqi Penal Code remains applicable, the defendant contends that:  (1) any offense he may have committed during the occupation is subject *only* to prosecution under Iraqi law; and (2) particularly in its enactment of 18 U.S.C. § 2332, Congress never contemplated enforcement of that statute, or the related offenses with which he is now charged, for violations in occupied territories to which the Geneva Civilian Convention applies. The defendant also makes a last-ditch argument that his prosecution for violating the applicable Title 18 offenses would offend due process.  The defendant's arguments fail for three reasons: (1) the Geneva Civilian Convention neither applies to him nor affords him any protections that he can now be heard to invoke; (2) even if the Convention were applicable to him, it is perfectly appropriate for the defendant to be subject to prosecution in Iraqi courts at the same time he is subject to prosecution in U.S. courts for statutory violations that Congress plainly intended to apply extraterritorially; and (3) the defendant had adequate notice of the statutory offenses with which he is charged, and thus constitutional due process is not offended.

## ARGUMENT

### I.  THE GENEVA CIVILIAN CONVENTION IS NEITHER APPLICABLE TO THE DEFENDANT NOR AFFORDS HIM ANY JUDICIALLY ENFORCEABLE RIGHTS

The defendant first argues that he is a protected person under the Geneva Civilian Convention; he can assert Article 64 as a bar to his prosecution; and Article 64 precludes the assertion of concurrent jurisdiction by the courts of the United States.  Each contention is fundamentally flawed because the Convention is not applicable here, and it affords the defendant no private relief.

### A.  The Geneva Civilian Convention Has No Applicability Here

Articles 2, 4 and 6 of the Geneva Civilian Convention set forth the circumstances under which the Convention applies and identify the classes of persons covered by the Convention. Under Article 2, "the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them."  Geneva Civilian Convention, Art. 2, 6 U.S.T. at 3518, 75 U.N.T.S. at 288.  Further, "[t]he Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance."  Id.  Article 4 governs the classes of persons protected by that Convention.  Pertinent to this case, they include: "[p]ersons . . . who, at a given moment and in any manner whatsoever, find themselves, in a case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals."  Id. Art. 4, 6 U.S.T. at 3520, 75 U.N.T.S. at 290.  Article 6 addresses the duration of the Convention's application during such conflicts or occupations.  It provides that "[t]he present Convention shall apply from

the outset of any conflict or occupation mentioned in Article 2. In the territory of the Parties to the conflict, the application of the present Convention shall cease on the general close of military operations. In the case of occupied territory, the application of the present Convention shall cease one year after the general close of military operations . . . ." Id. Art. 6, 6 U.S.T. at 3522, 75 U.N.T.S. at 292.

By the defendant's own reasoning, Iraq's occupation by Coalition forces (including the United States) terminated on June 30, 2004, when the CPA restored sovereignty to Iraq through the Iraqi Interim Government. See Motion at 5. Thus, even assuming the defendant's analysis is somehow correct, application of the Geneva Civilian Convention to Iraq would have terminated – at the very latest – on June 29, 2005, a year and a half before the defendant found himself "in the hands of" the United States, by virtue of his extradition from the Netherlands. Geneva Civilian Convention, Art. 4, 6 U.S.T. at 3520, 75 U.N.T.S. at 290.

If that fact alone is insufficient to preclude application of the Geneva Civilian Convention to this case, nothing in that Convention even hints that it has application to any geographic locale that is neither the operational theater of an ongoing armed conflict nor subject to a military occupation. For example, as explained above, Article 2 makes the Convention applicable to all cases of armed conflict and to "all cases of partial or total occupation of the territory of a High Contracting Party." Here, the defendant was transferred to the custody of the United States in January 2007, which, under defendant's analysis, is a year and a half after the protections of the Geneva Civilian Convention ceased to apply to the conflict in Iraq. And neither the United States nor the Netherlands, of course, is the operational theater of an ongoing armed conflict or

6

subject to a military occupation.  Accordingly, the Geneva Civilian Convention has no

application here.

      B.     Private Individuals Have No Enforceable
              Rights Under the Geneva Civilian Convention

     Aside from the Geneva Civilian Convention's inapplicability to the defendant, it is well

settled that private individuals do not automatically enjoy enforceable rights under international

agreements to which the United States is a party.  As the Supreme Court recently explained:

> A treaty is, of course, primarily a compact between independent nations.  It
> ordinarily depends for the enforcement of its provisions on the interest and the
> honor of the governments which are parties to it.  If these interests fail, its
> infraction becomes the subject of international negotiations and reclamations.
> It is obvious that with all this the judicial courts have nothing to do and can
> give no redress.  Only if the treaty contains stipulations which are self-
> executing, that is, require no legislation to make them operative, will they
> have the force and effect of a legislative enactment.

Medellin v. Texas, 128 S. Ct. 1346, 1357 (2008) (internal quotation marks and citations omitted).

The Court recognized in Medellin that, "[e]ven when treaties are self-executing in the sense that

they create federal law, the background presumption is that '[i]nternational agreements, even

those directly benefitting private persons, generally do not create private rights or provide for a

private cause of action in domestic courts.'"  Medellin, 128 S. Ct. at 1357 n.3 (quoting

Restatement (Third) of the Foreign Relations Law of the United States § 907 cmt. a (1987)).

     Thus, in order for an individual to invoke a private protection or right under a treaty, he

must demonstrate:  (1) that the treaty is "self executing" – that is, it operates as domestic law

without the benefit of domestic legislation – or that it has been given domestic effect through

domestic legislation; *and* (2) that any such domestic effect provides him with an enforceable

private right of action.  The defendant has not even made a pretense of satisfying this daunting

two-pronged test, and indeed, he cannot possibly do so.

    Nothing in the Geneva Civilian Convention's provisions concerning its execution and

enforcement suggest that it was intended to be self-executing or to otherwise establish a panoply

of rights – such as a right not to be prosecuted in the courts of a party to a conflict –  enforceable

in the domestic courts of the signatory nations at the behest of aggrieved individuals.  To the

contrary, the text of the Geneva Civilian Convention indicates that the Convention is not self-

executing.  Under Article 146 of the Geneva Civilian Convention, for example, each high

contracting party is required "to enact any legislation to provide effective penal sanctions for

persons committing, or ordering to be committed, any of the grave breaches of the present

Convention defined in the following Article."  Geneva Civilian Convention, Art. 146, 6 U.S.T. at

3616, 75 U.N.T.S. at 386.  Thus, as the <u>Medellin</u> Court observed with respect to the U.N.

Charter's provision governing compliance with a decision of the International Court of Justice,

"[t]he Article is not a directive to domestic courts" but, rather, "call[s] upon governments to take

certain action."  <u>Medellin</u>, 128 S. Ct. at 1358 (internal quotation marks and citations omitted).

In short, the treaty "addresses itself to the political, *not* the judicial department; and the

legislature must execute the contract before it can become a rule for the Court."  <u>Id.</u> at 1363

(internal quotation marks omitted).[1]

---

    [1]  Congress has fulfilled its obligation to implement the Geneva Civilian Convention
through the enactment of 18 U.S.C. § 2441, which subjects to prosecution, *inter alia*, grave
breaches of any of the four 1949 Geneva Conventions.  That legislation, however, does not
provide for any legally-enforceable rights on the part of individuals who claim to have been
aggrieved by violations of the Conventions.

In like manner, Article 149 of the Convention provides that "[a]t the request of a Party to the conflict, an enquiry shall be instituted, in a manner to be decided between the interested Parties, concerning any alleged violation of the Convention." Geneva Civilian Convention, art. 149, 6 U.S.T. at 3618, 75 U.N.T.S. at 388. Thus, as in the case of the U.N. Charter's provision at issue in Medellin, Article 149 contemplates "an express diplomatic – that is, nonjudicial – remedy," Medellin, 128 S. Ct. at 1359, for violations of its provisions. Article 149 does not contemplate an individual claim for a judicial remedy cognizable in the domestic courts of the signatory nations.

For these very reasons, the courts that have considered the question have held that the 1949 Geneva Conventions are not self-executing and do not "'create private rights of action in the domestic courts of the signatory countries.'" Hamdi v.Rumsfeld, 316 F.3d 450, 468-69 (4th Cir. 2003) (addressing Geneva Convention Relative to the Treatment of Prisoners of War) (quoting Huynh Thi Anh v. Levi, 586 F.2d 625, 629 (6th Cir. 1978) (addressing Geneva Civilian Convention)), rev'd. on other grounds, 542 U.S. 507 (2004); see also Tel-Oren v. Libyan Arab Rep., 726 F.2d 774, 809-10 (D.C. Cir. 1984) (Bork, J., concurring) (stating that the Geneva Prisoner of War Convention is not self-executing because it expressly calls for implementing legislation); cf. Johnson v. Eisentrager, 339 U.S. 763, 789 n.14 (1950) ("It is, however, the obvious scheme of the [predecessor 1929 Geneva Conventions] that responsibility for observance and enforcement of these rights is upon political and military authorities.");[2] Holmes v. Laird,

---

[2] In Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005), rev'd 126 S. Ct. 2749 (2006), the Court of Appeals for the D.C. Circuit relied upon footnote 14 in Eisentrager to hold that "the 1949 Geneva Convention does not confer upon Hamdan a right to enforce its provisions in court." Id. at 40. The Supreme Court's subsequent decision in Hamdan v. Rumsfeld, 126 S. Ct. 2749 (2006), found that the Eisentrager footnote did not control because the Geneva Conventions

459 F.2d 1211, 1222 (D.C. Cir. 1972) (finding that NATO Status of Forces Agreement is not judicially enforceable).

Thus, this court should reject the defendant's effort to privately enforce an alleged "right" to be free of prosecution, which is predicated upon a Convention that is not self-executing and that has not been given any domestic effect granting a private cause of action in U.S. courts.

Finally, we note that even if the defendant were protected by the Geneva Civilian Convention, which he is not, and possessed standing to assert it as a bar to prosecution, which he cannot, it would provide him no assistance. Although Article 64 provides that the penal laws of an occupied territory remain in force (albeit it subject to such modifications by the occupying power as are necessary to promote security), and it further contemplates subjecting local inhabitants to such additional provisions enacted by the occupying power as may be necessary to "fulfill its obligations under the present Convention, to maintain the orderly government of the territory, and to ensure the security of the Occupying Power," Geneva Civilian Convention, Art. 64, 6 U.S.T. at 3558, 75 U.N.T.S. at 328, nothing in Article 64 or any other Convention provision to which the defendant has directed our attention suggests that the Convention precludes the occupying power from subjecting persons protected by the Convention (which does

---

were a "part of the law of war," id. at 2794. For purposes of the opinion, the Supreme Court "assume[d] that the 'obvious scheme' of the 1949 Conventions is identical in all relevant respects to that of the 1929 [Geneva] Convention, and even that that scheme would, absent some other provision of law, preclude Hamdan's invocation of the Convention's provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right." Id. (footnotes omitted).

not include the defendant) to prosecution under its municipal laws[3] having extraterritorial effect.

## II.   THE CHARGED OFFENSES APPLY EXTRATERRITORIALLY, INCLUDING IN AREAS SUBJECT TO MILITARY OCCUPATION

The gravamen of the defendant's next argument is that when Congress enacted legislation establishing the offenses for which the defendant is charged, it did so with an implicit understanding that the statutes would have no effect in locations and under circumstances governed by the Geneva Civilian Convention.  But even if the Geneva Civilian Convention applied to the defendant and articulated a regime of laws to which he is subject, it does not preclude the United States from exercising *concurrent* jurisdiction over offenses similar to those cognizable in Iraqi courts.  Moreover, the language and legislative context of 18 U.S.C. § 2332 (which appears to be the primary focus of the defendant's challenge) and the related or ancillary offenses set out in the indictment simply do not support his argument.

### A.   Title 18 Clearly Covers Defendant's Conduct and Is in Accordance with the Geneva Civilian Convention

In construing the compass of a statute, it is axiomatic that "[w]e begin with the text." United States v. Wells, 519 U.S. 482, 490 (1997).  Section 2332(b) subjects to punishment "[w]hoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States."  18 U.S.C. § 2332(b).  Section 2332(d), however, limits the government's ability to undertake a prosecution by requiring the Attorney General (or a designated subordinate responsible for supervising criminal prosecutions) to certify that the

---

[3]   The phrase "municipal law" is a term commonly used in international law to connote the national law of a particular nation.  See Encyclopedic Dictionary of International Law 332 (2d ed. 2004) (defining "municipal law" as "[t]he law applying within States, as opposed to international law, the law applying between States and other subjects of international law").

offense "was intended to coerce, intimidate, or retaliate against a government or a civilian

population." Id. § 2332(d). Thus, as the defendant candidly acknowledges,

> [a]dmittedly, 18 U.S.C. § 2332 . . . if read literally would cover any homicide or
> related attempt or conspiracy to kill a national of the United States, who is located
> outside the United States anywhere in the world provided the Attorney General
> certifies that the offense was intended to coerce, intimidate or retaliate against a
> government or a civilian population. The statute contains no geographical
> limitation and was obviously meant to apply extraterritorially since its subject
> refers to attempts on the lives of U.S. nationals located outside this country.

Motion at 16. This concession is fatal to the defendant's claim. Indeed, nowhere does the plain

language of Section 2332 confine the statute's applicability to areas in which the United States is

not engaged in armed conflict or in which the Geneva Civilian Convention does not extend its

protections. Thus, "under the first criterion in the interpretative hierarchy, a natural reading of

the full text," Wells, 519 U.S. at 490, there is no geographical limitation on the applicability of

Section 2332. Indeed, in enacting Section 2332, Congress fully demonstrated its ability and

desire to confine the breadth of the statute by requiring the Attorney General to certify that the

offense at issue was "intended to coerce, intimidate, or retaliate against a government or a

civilian populace." 18 U.S.C. § 2332(d).[4]

---

[4]    Likewise, none of the other statutes the defendant has been charged with violating
contain or suggest any limitation upon their application with respect to territory subject to armed
conflict or occupation. Count 2 alleges a violation of 18 U.S.C. § 2332a(a). That statute
prohibits, inter alia, a conspiracy to use a weapon of mass destruction against a national of the
United States while such national is outside of the United States, or against property of the
United States that is outside the United States. See 18 U.S.C. § 2332a(a). Nothing in section
2332a(a) suggests that it does not apply to territory subject to military occupation by the United
States. Count 3 alleges a violation of 18 U.S.C. §§ 844(f)(2) & (n). Those provisions prohibit
conspiracies to destroy, by means of fire or an explosive, property of the United States, thereby
creating a substantial risk of personal injury to any person. They contain no geographic
limitation whatsoever. Count 4 alleges the possession of a destructive device during and in
relation to a federal crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) & (B)(ii).
Similarly, Count 5 alleges a conspiracy to violate Section 924(c), in violation of Section 924(o).

Having virtually acknowledged that, under the plain language analysis of Section 2332, he cannot prevail, the defendant argues that, at least insofar as theaters of military operations or zones of military occupation are concerned, Congress surely could not have meant what it explicitly said.   Of course such efforts run afoul of the principle that "[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete, 'except in "rare and exceptional circumstances."'" Rubin v. United States, 449 U.S. 424, 430 (1981) (quoting TVA v. Hill, 437 U.S. 153, 187 n.33 (1978) (citation omitted)); see also United States v. Turkette, 452 U.S. 576, 580 (1981) ("In determining the scope of a statute, we look first to its language.   If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'") (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).   But even absent the plain applicability of that canon of construction, none of the justifications underlying the defendant's misguided statutory analysis support his contention that the Court must disregard the plain – and sweeping – jurisdictional language of Section 2332.

The defendant's principal argument appears to be that when it enacted what is now Section 2332 in 1986, Congress was aware that the United States was then a signatory to the Geneva Civilian Convention and therefore would not have intended the statute to cover the same

---

The extraterritorial nature of these offenses is governed by the extraterritorial scope of their predicate offense, conspiring to murder a United States national outside of the United States.   See generally Government's Opposition to Defendant's Motion to Dismiss Counts Four and Five, filed this date.   Finally, Count 6 alleges a violation of 18 U.S.C. § 842(p), in that the defendants taught and demonstrated the manufacture and use of an explosive, a destructive device and a weapon of mass destruction, with the intent that it be used to commit a federal crime of violence, that is, the conspiracy to kill United States nationals outside the United States.   As in the case of Counts 4 and 5, its extraterritorial scope is governed by the predicate offense alleged in Count 1, which, as explained, contains no implicit limitation regarding armed conflicts.

13

jurisdictional terrain as the Convention – i.e., to reach individuals subject, under Article 64 of the Geneva Civilian Convention, to the penal laws of the occupied nation as well as any additional regulatory provisions enacted by the occupying power.  See Motion at 17-19.  In the first place, as we have stated, nothing in the plain language of Article 64 or elsewhere in the Convention expressly forbids an occupying power from enforcing its extraterritorial municipal laws against persons who are also subject to prosecution under the laws of the occupied nation.  Indeed, nothing in the Convention precludes a *former* occupying nation from prosecuting such individuals when, by virtue of their departure from the scene of occupation and apprehensions elsewhere, they no longer fall within the scope of the Convention.  Thus, the defendant's argument that such a construction and application of Section 2332 would contravene the Geneva Civilian Convention or otherwise violate the law of nations (see Motion at 20) – a result that he maintains Congress could not have intended – is without foundation and has no application here.

Moreover, "Congress is 'predominantly a lawyer's body,' Callanan v. United States, 364 U.S. 587, 594 (1961), and it is appropriate for us 'to assume that our elected representatives . . . know the law.' Cannon v. University of Chicago, 441 U.S. 677, 696-97 (1979)." Albernaz v. United States, 450 U.S. 333, 341 (1981).  Thus, it may be assumed that when Congress enacted what is now Section 2332, it was conversant with the principle that a state having jurisdiction to prescribe or enforce a rule of law may exercise such jurisdiction notwithstanding the fact that another state also has jurisdiction over the same subject matter.  See Restatement (Second) of the Foreign Relations Law of the United States § 37 (1965).  As the Court of Appeals for the D.C. Circuit explained in Laker Airways Ltd. v. Sabena, Belgian World Airlines:

There is no principle of international law which abolishes concurrent jurisdiction. Since prescriptive jurisdiction is based on well recognized state contacts with controversies, the reality of our interlocked international network guarantees that overlapping, concurrent jurisdiction will often be present. There is therefore no rule of international law holding that a "more reasonable" assertion of jurisdiction mandatorily displaces a "less reasonable" assertion of jurisdiction as long as both are, in fact, consistent with the limitations on jurisdiction imposed by international law.

731 F.2d 909, 952 (D.C. Cir. 1984) (footnotes omitted).[5]  See also United States v. Rashed, 234

F.3d 1280, 1282 (D.C. Cir. 2001) ("The exception [to the Double Jeopardy Clause] for dual

sovereignty flows from the understanding that every sovereign has the authority to punish

infractions of its own laws."); United States v. Rezaq, 134 F.3d 1121, 1128 (D.C. Cir. 1998)

(recognizing the right of different sovereigns to conduct sequential prosecutions for the same

offense).  Consequently, it was in accordance with this principle of multi-sovereign concurrent

---

[5]  Other than asserting that the exercise of extraterritorial jurisdiction here is precluded by the Geneva Civilian Convention, the defendant makes no claim that the government is precluded from exercising extraterritorial jurisdiction under recognized principles of customary international law.  Nor could he.  Section 2332 and, in particular, its application here, is fully justified under both the "protective" and the "passive personality,"and possibly under the "universality," theories of extraterritorial criminal jurisdiction.  See United States v. Yousef, 327 F.3d 56, 110 (2d Cir. 2003) (the "protective principle" of extraterritorial jurisdiction is invoked to obtain jurisdiction over acts committed outside of a state's territory that are directed at interfering with a state's governmental functions or that otherwise affect the security of the state); United States v Rezaq, 134 F.3d 1121, 1133 (D.C. Cir. 1998) (the "passive personality" basis of extraterritorial jurisdiction "'asserts that a state may apply law – particularly criminal law – to an act committed outside its territory by a person not its national where the victim of the act was its national'") (quoting Restatement (Third) of Foreign Relations Law § 402 cmt. g (1987)); United States v. Bin Laden, 92 F. Supp. 2d 189, 222 (S.D.N.Y. 2000) (noting that "'universal jurisdiction is increasingly accepted for certain acts of terrorism, such as . . . indiscriminate violent assaults on people at large'") (quoting Restatement (Third) of Foreign Relations Law § 404 cmt. a (1987)).  But cf. Yousef, 327 F.3d at 91-92 & n.24 (the "'universality principle,' which provides for jurisdiction over extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations," does not provide jurisdiction over the bombing of an international commercial airline flight).

jurisdiction that Congress enacted legislation that reaches the same activities as those embraced

by the municipal laws of an occupied country, and kept in effect by virtue of Article 64 of the

Geneva Civilian Convention (as well as other regulatory measures promulgated by the occupying

power). The existence of that well-settled principle of concurrent jurisdiction forecloses the

defendant's argument (in his Motion at 18-20) that Congress could not have intended Section

2332 to reach activities also penalized by the law of an occupied nation and kept in force by

Article 64 because doing so would have been tantamount to the abrogation of a pre-existing

treaty obligation.[6]

        B.        Applying Section 2332 to the Defendant Would Not Lead to an "Absurd" Effect

The defendant also urges that construing Section 2332 to extend to theaters of armed

conflict or military occupations would have an "absurd" effect of subjecting legitimate military

combatants to the penal sanctions of a belligerent enemy nation. See Motion at 17. But

Congress included a safeguard against such possible misuses of Section 2332. Specifically,

Section 2332 requires the Attorney General (or a designated subordinate), as a prerequisite to

undertaking any criminal prosecution under the statute, to certify that the act subject to

prosecution is related to an act of terrorism rather than legitimate combat, i.e. that the act at issue

_____

[6] Citing 18 U.S.C. § 2441, the defendant asserts that the provision demonstrates that when Congress wished to reach war-related offenses, it knew how to say so. See Motion at 21. But Section 2441 was intended by Congress to reach *only* war-related offenses – specifically, certain enumerated violations of the law of war. Nothing in the language or context of Section 2332 suggests that, when Congress enacted an extraterritorial criminal statute of general applicability, it did not intend the statute to reach offenses committed in a theater of armed conflict or a zone of military occupation. Indeed, the legislation in Congress that eventually resulted in the enactment of 18 U.S.C. § 2332 was introduced largely in response to the tragic 1983 Beirut marine barracks bombing, which killed 241 American military service members deployed overseas. See 131 Cong. Rec. S18,870 (1985) (statement of Sen. Specter, sponsor of the legislation); 132 Cong. Rec. S2355 (1986) (statement of Sen. Specter).

"was intended to coerce, intimidate, or retaliate against a government or a civilian population."

18 U.S.C. § 2332(d).  Thus, Congress quite properly left it for the Attorney General or his

designee to determine, in the first instance, whether the defendant's activities should be immune

from prosecution as legitimate acts of a military combatant.

Moreover, as a second layer of insulation, persons engaged in legitimate acts of military

combat on behalf of a belligerent have always been provided with a panoply of defenses that

foreclose their punishment under Section 2332, or any other federal statute for the commission of

such acts.  As the court observed in  United States v. Lindh, 212 F. Supp. 2d 541, 553 (E.D.Va.

2002), the defense of

> [l]awful combatant immunity, a doctrine rooted in the customary international
> law of war, forbids prosecution of soldiers for their lawful belligerent acts
> committed during the course of armed conflicts against legitimate military
> targets.  Belligerent acts committed in armed conflict by enemy members of
> the armed forces may be punished only as crimes under a belligerent's
> municipal law only to the extent that they violate international humanitarian
> law or are unrelated to the armed conflict."

See also id. at 553 n.19 (collecting authorities); United States v. Pineda, No. CR. 04-232 (TFH),

2006 WL 785287, at *2-*3 (D.D.C. Mar. 28, 2006) (Hogan, J.) (tracing the origins of the defense

of lawful combatant immunity and finding that the Geneva Convention Relative to the Treatment

of Prisoners of War "prohibits prisoners of war from being prosecuted for lawful acts of war");

William Winthrop, Military Law and Precedents 791 (rev. 1920) ("We have seen that the status of

war justifies no violence against a prisoner of war as such, and subjects him to no penal

consequences for the mere fact that he is an enemy.").

Likewise, it is the law of this circuit – which has adopted established principles of

American military law – that a legitimate military combatant can assert as an affirmative defense

that an otherwise criminal act was conducted in compliance with military orders.  See United States v. Yunis, 924 F.2d 1086, 1097 (D.C. Cir. 1991) (collecting cases); see also Manual for Courts-Martial United States, R.C.M. 916(d) at page II-111 (rev. 2002).  Accordingly, in enacting Section 2332, Congress had no reason to fear that the statute would improperly "reach into the military arena" (Motion at 17), or otherwise result in the punishment of lawful combatants, and thus did not silently limit Section 2332 to offenses embraced by Article 64 of the Geneva Civilian Convention.  Thus, in addition to the certification requirement of Section 2332(d), recognized defenses relating to lawful combatancy and obedience to military orders, which the defendant is perfectly free to assert and attempt to establish as a bar to his prosecution, foreclose the "absurd" effect of which the defendant complains.[7]

C.    Congress Intended to Proscribe Violent Acts By Unlawful
      Combatants Against U.S. Military Personnel in Armed Conflict Abroad

The defendant further maintains that "nothing in the legislative history [of Section 2332] envisions its application to the military arena or otherwise to foreign land under the occupation of [the] U.S. military."  Motion at 17.  Essentially, the defendant is relying upon the lack of explicit reference in the legislative history of the statute to the context of U.S. military occupation of foreign land.  But as the Supreme Court explained in Harrison v. PPG Industries, Inc., 446 U.S. 578, 592 (1980), "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute.  In ascertaining the meaning of a statute, a court cannot, in the manner of

_____

[7]  We also note that 18 U.S.C. § 2332a(a), using a weapon of mass destruction against a national of the United States (Count 2), contains an express exception for lawful combatancy. Such use is a crime only when committed "without lawful authority."

Sherlock Holmes, pursue the theory of the dog that did not bark." <u>See also</u> <u>Standefer v. United</u>

<u>States</u>, 447 U.S. 10, 20 n.12 (1980) (an omission in the legislative history may not nullify the

plain meaning of the statute). Moreover, while nothing in Section 2332's legislative history

expressly addresses the statute's applicability to persons committing acts of terrorism in territory

covered by the Geneva Civilian Convention, the history does demonstrate that Congress intended

that the statute afford broad protections to United States nationals abroad from terrorist attacks.

Thus, as the House Conference Report on the bill that included the precursor to Section 2332

(formerly 18 U.S.C. § 2331) explained,

> the [legislation] establishes extraterritorial jurisdiction over serious violent attacks
> by terrorists upon U.S. nationals.  Presently, Federal law prohibits extraterritorial
> murder of and assaults upon only certain high ranking U.S. officials, diplomats,
> and law enforcement officers.  Chapter 113A of title 18, U.S.C., will extend
> coverage to *any* terrorist murder or manslaughter of and serious physical assault on
> *any* U.S. national.

H.R. Conf. Rep. No. 99-783 (1986), <u>as</u> <u>reprinted</u> <u>in</u> 1986 U.S.C.C.A.N. 1926, 1960 (emphasis

added).  Significantly, the Conference Committee Report also explained the circumstances to

which the proposed legislation was not intended to apply.  It noted that "[t]he committee of

conference does not intend that chapter 113A reach nonterrorist violence inflicted upon American

victims.  Simple barroom brawls or normal street crime, for example, are not intended to be

covered by this provision." <u>Id.</u>

   Thus, it is apparent from the House Conference Report that, in enacting the statute,

Congress intended it to embrace *any* act of extraterritorial terrorism, involving murder,

manslaughter, assault (or attempts or conspiracies to commit the foregoing offenses) against *any*

United States national.  The contemplated legislation therefore embraced violent acts by persons

19

not qualifying as legitimate military combatants against United States military personnel engaged in armed conflict abroad. Even more telling, although the Conference Report explained the types of extraterritorial criminal activity that the statute was not intended to reach, acts of terrorism committed by non-combatants in a theater of an armed conflict or a zone of military occupation were not included among them. Thus, nothing in Section 2332's legislative history (or any of the other Title 18 offenses at issue here) supports the defendant's contention that the Statute's broad language should not be given its full force and effect.[8]

### III.    THE DEFENDANT HAD ADEQUATE NOTICE OF THE STATUTORY OFFENSES WITH WHICH HE IS CHARGED

Finally, the defendant maintains in his Motion at 23-24 that because generally understood principles of law governing military occupations, and the orders issued by the CPA implementing those principles, failed to refer to U.S. domestic law, the defendant lacked adequate notice that he was subject to U.S. jurisdiction. But, as we have explained above, nothing in either the Geneva Civilian Convention nor its implementing rules suggests that the defendant is immune from prosecution for violations of United States law that have extraterritorial effect.[9]

---

[8] Defendant also argues that his prosecution for violating U.S. law contravenes Article 49 of the Geneva Civilian Convention, prohibiting the "deportation[] of protected persons from occupied territory to the territory of the Occupying Power." Motion at 22-23. But the defendant was a resident of the Netherlands, was arrested in the Netherlands, and was extradited pursuant to lawful process from the Netherlands to the United States. Thus, the United States did not "deport" him from Iraq, and accordingly, neither the language nor the concerns of Article 49 are implicated. Moreover, it is somewhat curious that the defendant makes this argument – and all of the other arguments in his motion – for application of Iraqi penal law to his offenses because the defendant seems to ignore the relief for which his motion appears aimed: his trial under Iraqi law *in Iraq*. The United States thus seeks clarification from the defendant as to whether he is seeking to be transferred to Iraq for trial on his offenses.

[9] We note that Article 65 of the Geneva Civilian Convention requires the penal provisions enacted by the occupying power to be "published and brought to the knowledge of the

Moreover, as the defendant virtually concedes, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). Nothing about the Title 18 statutes at issue leave any doubt about whether murdering, or conspiring to murder a national of the United States while that person is abroad and for reasons related to terrorism, constitutes a violation of the law subject to prosecution in U.S. courts. And the defendant has not even attempted to demonstrate how any of the offenses with which the defendant has been charged fail to place one on notice of the conduct that is prohibited.

## **CONCLUSION**

The defendant's motion to dismiss is nothing more than a red herring that fails for several reasons as a matter of law. First, the Geneva Civilian Convention neither applies to the defendant nor affords him any enforceable rights. Thus, the defendants reference, interpretation, and use of the Convention to preclude enforcement of the Title 18 offenses at issue is without foundation. Second, the Title 18 offenses with which the defendant has been charged apply extraterritorially, including in locations subject to military occupation, are properly brought in this action, and are in accordance with the Geneva Civilian Convention. Third, the defendant had adequate notice under

---

inhabitants [of the occupied territory] in their own language" before coming into force. Geneva Civilian Convention, art. 65, 6 U.S.T. at 3558, 75 U.N.T.S. at 328. That requirement, however, applies to regulations referred to in Article 64 promulgated by the occupying power as necessary to fulfill its obligations under the Convention, maintain orderly government in the territory, and ensure the security of the occupying power. It does not require that the occupying power list the provisions of its municipal law that, by virtue of their extraterritorial reach, may apply to persons found in occupied territories.

the Due Process Clause of the statutory offenses with which he has been charged to have violated.

Accordingly, and for all the foregoing reasons, defendant's Motion to Dismiss should be denied.

Respectfully submitted,

JEFFREY TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498610

By:     /s/
GREGG A. MAISEL
Assistant United States Attorney
D.C. Bar No. 447902
National Security Section
555 Fourth Street NW, Room 11-453
Washington, DC 20530
(202) 514-7746
Gregg.Maisel@usdoj.gov

RACHEL CARLSON LIEBER
Assistant United States Attorney
D.C. Bar No. 456491
National Security Section
555 Fourth Street NW, Room 11-909
Washington, DC 20530
(202) 353-8055
Rachel.Lieber@usdoj.gov

DAVID I. MILLER
Trial Attorney
N.Y. Bar No. 2959369
Counterterrorism Section
U.S. Department of Justice
10th & Constitution Avenue, N.W.
Washington, D.C. 20530
(202) 353-2440
David.Miller@usdoj.gov

CAROLINE D. KRASS
Special Assistant United States Attorney
D.C. Bar No. 453506
National Security Section
555 Fourth Street NW, Room 11-860
Washington, DC 20530
(202) 514-5623
Caroline.Krass2@usdoj.gov

JOHN F. DE PUE
Trial Attorney
Pa. Bar No. 5021
Counterterrorism Section
U.S. Department of Justice
10th & Constitution Avenue, N.W.
Washington, D.C. 20530
(202) 616-0725
John.De.Pue@usdoj.gov[10]

Dated: July 10, 2008

---

[10]    The undersigned counsel wish to thank Connie Wu, J.D. candidate 2010, Harvard Law School, Dena Roth, J.D. candidate 2010, Georgetown University Law Center, Eric Sandberg-Zakian, J.D. candidate 2010, Yale Law School, and Hagan Scotten, J.D. candidate 2010, Harvard Law School, for their assistance in the legal research and cite-checking of this brief.