IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : CR. NO. 05-337 (PLF) |
| | : |
| WESAM AL-DELAEMA, | : |
| | : |
| Defendant. | : |

## REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS

The defendant, Wesam al-Delaema [Delaema], submits this reply to the Government's opposition to his *Motion to Dismiss the Indictment*.

In its *Opposition*, the government advances two principal arguments in response to Mr. Delaema's *Motion*. The first is procedural - the government claims that Mr. Delaema lacks standing to raise issues of jurisdiction based on the provisions of *The Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War*, August 12, 1949, 6 U.S.T. 3516, U.N.T.S. No. 973 [*Geneva IV*]. *Id*., at 5-11. The second is substantive - in the government's view jurisdiction is found in the plain language of the statutes underlying the charges in the Indictment.[1]  *Id*., at 12-16. The remainder of the *Opposition* attempts to rebut arguments in the defendant's *Motion*.

Because the *Opposition* begins with what is, in effect, a standing issue, this reply will address this contention first.

---

[1] The discussion in Mr. Delaema's *Motion*, and herein, primarily focuses on 18 U.S.C. § 2332, the lead count in the indictment. Mr. Delaema's argument applies to all counts as he contends that Congress did not intend that the provisions of Title 18 apply in a foreign country under military occupation of U.S. forces.

## I. The Government's Argument that Mr. Delaema Cannot Raise a Claim under the Vienna Convention is Irrelevant

The government first argues that Mr. Delaema cannot invoke the provisions of *Geneva IV*, reasoning that the Convention is not a self-executing treaty that confers individual rights. Rather, the government contends that the only enforcement mechanism for violation of the Geneva Conventions is diplomatic objection by a party to the treaty. *Opposition*, at 9.

The government's argument misses the point. Mr. Delaema's argument does not depend on assertion of an individual right under *Geneva IV*. Rather, he is saying that in light of the provisions of *Geneva IV* and the other factors he discusses, there is no indication that Congress intended that the provisions of Title 18 apply extraterritorially in foreign countries under military occupation. If Congress did not confer jurisdiction, then the district courts have no power to adjudicate the controversy. *Gonzales v. Crosby*, 545 U.S. 525, 534 (2005)("absence of jurisdiction altogether deprives a federal court of the power to adjudicate the rights of the parties."). Indeed, because a court has no power to act in the absence of jurisdiction, its actions are void *ab initio* irrespective of whether a party objects to the lack of jurisdiction. *United States v. Delgado-Garcia*, 374 F.3d 1337, 1341 (D.C. Cir. 2004)("a claim of lack of subject-matter jurisdiction 'because it involves a court's power to hear a case, can never be forfeited or waived.'" (citation omitted)). The government cannot confer non-existent jurisdiction by attempting to recast the issue in terms of whether *Geneva IV* is a self-executing treaty. If the Congress did not intend to confer jurisdiction in the district courts for violations of Title 18 in foreign lands under military occupation, this case must be dismissed.

That said, Mr. Delaema does not concede that he is precluded from asserting any rights he

may have under *Geneva IV*. The government cites cases in support of its assertion that the Geneva Conventions of 1949 do not create private rights of enforcement, the latest being *Hamdi v. Rumsfeld*, 316 F.3d 450, 468-69 (4th Cir. 2003), rev'd on other grounds 124 S. Ct. 2633 (2004). In reversing the Fourth Circuit, the Supreme Court did not reach this issue. In a later Guantanamo case, the Court noted but left open the question. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2793-95 (2006). In so doing, however, *Hamdan* quoted language from the Commentary to the Geneva Convention suggesting that individuals may seek enforcement of its provisions.

> "But see, *e.g.,* 4 Int'l Comm. of Red Cross, Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War 21 (1958) (hereinafter GCIV Commentary) (the 1949 Geneva Conventions were written "first and foremost to protect individuals, and not to serve State interests"); GCIII Commentary 91 ("It was not ... until the Conventions of 1949 ... that the existence of 'rights' conferred in prisoners of war was affirmed.").

126 S.Ct. at 2794, n. 57. Because the Geneva Conventions were clearly designed to protect otherwise powerless individuals from the expansive and often abused powers of the state in wartime (whether combatants under *Geneva III* or civilians in occupied territory under *Geneva IV*), the view that these rights may be individually enforced is the sounder one and the one more consistent with the purposes of the Conventions. It has long been held that "[T]reaties must receive a fair interpretation according to the intention of the contracting parties, and so as to carry out their manifest purpose." *Wright v. Henkel*, 190 U.S. 40, 57 (1903). And "where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *U.S. v. Stuart*, 489 U.S. 353, 368 (1989), quoting *Bacardi Corp. of America v. Domenech*, 311 U.S. 150, 163 (1940). Indeed, as discussed below, in another context, in its *Opposition* the government actually

suggests that an individual can raise a claim under the Geneva Conventions when it argues that its interpretation of § 2332 is not absurd because a defendant can always raise the defenses of combatant immunity and obedience to military orders, as the contour of each defense is circumscribed by the provisions of *Geneva III*.

But, like the Supreme Court in *Hamdi* and *Hamdan*, this Court need not reach the issue. If Congress did not intend to confer jurisdiction, it is irrelevant whether a defendant can otherwise rely on or individually enforce the provisions of the Geneva Convention.

## II.  The Government's "Plain Language" Argument

The government's principal substantive argument is that the "plain language" of § 2332, for example,  does not limit its application to "areas in which the United States is not engaged in armed conflict or in which the Geneva Civilian Convention does not extend its protections." *Opposition*, at 12-13.

§ 2332 is actually silent on this issue, so there is no "plain language" defining jurisdiction to which the government can definitively point.  The government's attempt to read the lack of any jurisdictional reference as "plain language" cannot be conclusive in light of the myriad factors suggesting that the criminal provisions of Title 18 were never intended to apply in foreign countries under military occupation.   And even if silence can reasonably be interpreted as "plain language," as Mr. Delaema has noted, courts are reluctant to interpret statutes literally where the result is a patently unintended application of the statute. *Motion*, at 16-18.

The government proffers two reasons why a literal, non-contextual reading of § 2332 does not lead to the absurd interpretation that legitimate military combatants would facially be subject to prosecution under § 2332 in direct contravention of *Geneva III*.   First, without

explanation or analysis, the government summarily states that such a result is countered by the statutory certification requirement that the act be "related to an act of terrorism rather than legitimate combat." *Opposition*, at 16. But, this is not the language of the required certification. The actual required certification is that the act "was intended to coerce, intimidate, or retaliate against a government or a civilian population." *See* 18 U.S.C. § 2332(d). Legitimate acts of war, otherwise protected by the lawful combatant provisions of *Geneva III*, almost by definition, fall squarely within this language of § 2332(d), as wartime combat is precisely intended to coerce the government of the opposing forces to surrender and/or intended to retaliate against actions undertaken by the opposing forces. Thus, the presumably unappealable certification of § 2332(d) facially provides no protection to lawful combatants. The § 2332(d) certification, read literally and interpreted without reference to context (as the government asks the Court to read § 2332(a)), leaves the certification meaningless as applied to legitimate combatants. Although not acknowledging it, what the government is actually arguing on this point is that to avoid an absurd reading of the statute, § 2332(a) must be read in light of *Geneva III*, while at the same time it resists the consistent logical conclusion that it must also be read in light of the occupation provisions of *Geneva IV*.

      Second, the government argues that an absurd interpretation is avoided by the availability of the defenses of combatant immunity or obedience to military orders. As to the former, the defense of combatant immunity arises from the protections of *Geneva III* and thus is an attempt to recast the first argument in different clothing. As to the latter, the defense of military orders is an affirmative defense for which the defendant bears the burden of proof. *United States v. Yunis*, 924 F.2d 1086, 1089-90 (D.C. Cir. 1990). Thus, the government's argument would facially

permit prosecution of any wartime combatant under § 2332 unless he could affirmatively prove at trial that he met the four prong test necessary to establish he is a lawful combatant under *Geneva III*. *Id.*, at 1097-98. Surely, *Geneva III* does not require lawful enemy combatants to run such a gauntlet.

Further, as referenced above, *Yunis* held that the affirmative defense of obedience to military orders can only be asserted consistent with the provisions of Article 4 of *Geneva III*. 924 F.2d at 1098. Thus, the government's reference to two possible defenses to overly broad application of § 2332, both of which are interpreted in light of the provisions of *Geneva III*, offers further support for Mr. Delaema's position that the scope of Title 18 must be considered in light of the Geneva Conventions.[2]

### III. The Government Cites No Prior Case or Authority in Support of Its Theory that the District Courts of this Country Have Jurisdiction Over Offenses Allegedly Committed in Foreign Lands Under Military Occupation by the Armed Forces of the United States

From the Mexican War in first half of the 19th century to the Spanish-American War at the conclusion of that century through the post-World War occupations of Japan and Germany and continuing through military intervention in Haiti in 1994, the United States has engaged in numerous belligerent military occupations of foreign countries, at times for significant periods. *See* OXFORD COMPANION TO AMERICAN MILITARY HISTORY 125-126 (1999). Yet, Congress has never amended § 7 of Title 18 to include foreign land under occupation of U.S. military forces as part of the special territorial jurisdiction of the United States, despite the fact

---

[2]*Yunis* involved the extraterritorial applicability of the air piracy and hostage-taking statutes to the hijacking of an aircraft in Beirut. It does not support jurisdiction in this case, as Lebanon was not under belligerent military occupation of U.S. forces at the time of the hijacking.

that § 7 does define certain foreign lands as being within that jurisdiction. For example, subsection 9 of § 7 includes "the premises of United States diplomatic, consular, military or other United States Government missions in foreign States" and buildings and land used for purposes of those missions or entities, within the special territorial jurisdiction of the U.S. But, the Congress has not gone so far as to extent this jurisdiction to other parts of foreign lands under occupation by U.S. military forces.

The failure to extend such jurisdiction evidences a deliberate intent by the Congress not to generally extend jurisdiction of Title 18 offenses to foreign territory under military occupation of U.S. troops, which it knew was already subject to international occupation law. This conclusion is buttressed by the concluding paragraph of this subsection, which provides that "nothing [herein] shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts." In extending jurisdiction under § 7 of Title 18 to limited parts of foreign lands, Congress did not go further, as it knew that such an expansion would be inconsistent both with the jurisdiction envisioned by *Geneva III* and the historical practice that offenses against the public order in foreign countries under military occupation of U.S. troops are subject to occupation law rather than domestic civil law of the United States. *See Motion*, at 21-22 (Statement in House Report accompanying War Crimes Act of 1996).[3]

Mr. Delaema acknowledges that the term "extraterritorial jurisdiction" refers to

---

[3] While § 2441 is an example of Congress' directly stating when it intends to address offenses related to war, *id.*, it does not reflect an intention to extend jurisdiction to offenses occurring during military occupation of foreign lands. Military occupation commences at the conclusion of active hostilities. Thus, § 2441, criminalizing war crimes under Title 18, does not apply to such occupations because offenses prosecuted as war crimes must occur during active hostilities. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2778-79 (2004) (war crime must be committed during the actual conflict).

jurisdiction outside that defined in §§ 5 and 7 of Title 18.[4]  Significantly, however, despite the existence of numerous belligerent military occupations of foreign lands by United States armed forces throughout its history, the government fails to cite a single case where a defendant in a foreign country under military occupation of the United States has ever been prosecuted in the district courts of the United States for a violation of Title 18.

Yet another reason suggests that Congress did not intend that the provisions of Title 18 offenses would apply in foreign countries under U.S. military occupation - Congress has never amended the Code to allow the military to engage in law enforcement activity that would be necessary to investigate and prosecute violations of Title 18 in foreign land under military control.

Violations of the criminal code of the United States are investigated and prosecuted by civilian law enforcement agencies.  The offenses charged in the indictment here are normally investigated by the FBI.  The FBI operates in foreign countries through legal attaches which liaison with foreign law enforcement agencies and operate in foreign countries with the consent and at the pleasure of the respective foreign governments.[5]  As was the case here, in a situation involving the belligerent occupation of a foreign country by U.S. military forces, there is no foreign government with which the FBI can liaison.  Thus, the FBI or any civilian law

---

[4]18 U.S.C. § 5 defines the jurisdiction of the "United States" in the "territorial sense," while, as noted above, § 7 refers to the statutorily defined "special maritime and territorial jurisdiction" of the United States.

[5]*See* Testimony of Thomas V. Fuentes, Assistant Director, Office of International Operations, Federal Bureau of Investigation, Statements Before the Subcommittee on Border, Maritime and Global Counterterrorism House Homeland Security Committee, http:.fbi.gov.congress/congress07/fuentes100407.html (visited 7-17-08).

enforcement agency investigating a violation of Title 18 would have to obtain the assistance and consent of the U.S. military to operate in the zone of military occupation. Congress was aware, however, that 18 U.S.C. § 1385, known as the Posse Comitatus Act, generally prohibits the use of the U.S. military in civilian law enforcement. Specifically, § 1385 provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title, or imprisoned not more than two years, or both.

Congress has, in fact, authorized a very circumscribed use of the military in civilian law enforcement. In § 374 of Title 10, Congress has given the Secretary of Defense the authority to make certain equipment and personnel to operate the equipment available to civilian law enforcement agencies. When initially passed in 1981, even this carefully delimited assistance was limited to drug offenses. Congress later expanded the offenses to which such assistance may be provided to include counter-terrorism operations. *See* 10 U.S.C. § 374. But Congress has never enlarged the *type* of assistance that may be provided by the military in civilian law enforcement. Nowhere has Congress authorized the military to participate in the investigation and prosecution of the laws of the United States.

"The purposes of th[e] [Posse Comitatus] Act is to uphold the American tradition of restricting military intrusions into civilian affairs, except where Congress has recognized a special need for military assistance in law enforcement." *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1999). While the remedy for violation is up for discussion, the Act has been construed strictly in terms of what constitutes a violation. Thus, in *United States v. Johnson*, 410 F.3d 137, 146-149 (4th Cir. 2005), it was held that military personnel cannot even perform blood

tests for civilian law enforcement purposes. The Court noted that although 10 U.S.C. § 371 permits the military to make available its equipment in certain investigations, it does not permit the involvement of military personnel even to the limited extent of performing routine blood alcohol tests.

The significance of this is that Congress was well aware that U.S. law prohibited the military from participating in the investigation and prosecution of Title 18 criminal offenses, including offenses committed in foreign countries occupied by the U.S. military. Because there is no recognized foreign government to give the FBI authorization and assistance, it can only operate in an area under U.S. military occupation with the approval and assistance of the U.S. military. Congress has never authorized such involvement by the U.S. military in civilian law enforcement and was undoubtedly aware that it would run counter to § 1385. Congress knew that the military investigates and prosecutes violations of martial law or those laws of the occupied country which had not been repealed, as these are incidents of military occupation. But, with no U.S. civilian law enforcement agency possessing the ability or authority to investigate alleged violations of Title 18 in foreign countries under military occupation of the United States without the assistance and involvement of the military, Congress could not have intended that the provisions of Title 18 would apply.

This point is even further highlighted by § 2332e, which permits the Attorney General to ask the Secretary of Defense to provide assistance under § 382 of Title 10 in support of Department of Justice activities relating to the enforcement of § 2332a during "an emergency situation involving a weapon of mass destruction," indicating that Congress was well aware of the limitations of the Posse Comitatus Act. Despite this limitation, Congress only authorized

such assistance for one particular statute in Chapter 113B of Title 18 and limited that assistance to emergency situations and to the type of assistance authorized by the Posse Comitatus Act. Aware of, and sensitive to, the limitations of that Act, Congress could hardly have intended the statutes in Chapter 113B, or for that matter, any other provision of Title 18, to apply in foreign lands under of military occupation of the Armed Forces of the United States where the civilian law enforcement agencies charged with investigating and prosecuting such offenses could only operate with the permission and approval of the United States military.

Although in the context of habeas corpus rather than the reach of statutes, the Supreme Court recently noted that "practical considerations weigh[] heavily" in determining the extraterritorial reach of U.S. law. *Boumedienne v. Bush*, - - S. Ct. - -, 2008 WL 2369629, at *25 (2008). *Boumedienne* approvingly cited prior Supreme Court cases holding that, for example, whether a constitutional provision has extraterritorial effect, "depends upon the 'particular circumstances, the practical necessities, and the possible alternatives which Congress had before it.'" [citation omitted]. *Id*., at * 24. While the holding of *Boumedienne* does not directly bear on the issue here, it is reasonable to infer that Congress would be cognizant of, and seriously weigh, these same concerns before precipitously extending jurisdiction of Title 18 to foreign lands under military occupation, especially in light of its own knowledge of the contrary historical practice. In addition to the problem of how such offenses would be investigated absent military involvement, other practical concerns would be presented. For instance, the prosecution of such cases in the civil courts of this country could well involve the production of military witnesses, potentially disrupting on-going military operations in the occupied zone, a concern not present when the offenses are prosecuted by military commission or local courts operating in the zone.

11

*See Hamdan*, 126 S.Ct. at 2770 (noting government's argument that "the efficient operation of the Armed Forces are best served if the military justice system acts without regular interference from civilian courts.)"

**IV. Miscellaneous Additional Arguments in the Government's Opposition**

In his *Motion*, Mr. Delaema notes that application of its domestic law in areas of military occupation would permit the occupier to use its local law as a pretext to deport the local population in violation of one of the principal protections afforded by *Geneva III*. *Motion*, at 22-23. The government claims the concern of the Geneva Convention against deportation of civilian populations does not apply because Mr. Delaema was arrested in the Netherlands and thus not deported from Iraq. *Opposition*, at 20, n. 8. But again, the government misdirects the issue. In his *Motion*, Mr. Delaema pointed out that the attempted application of an occupying power's domestic law could serve as a vehicle for deporting the local population in contravention of one of the principal protections which *Geneva IV* attempts to accord to the occupied population. The point was that this was another reason suggesting that Congress did not intend that the domestic law of the United States would be applicable in foreign countries occupied by U.S. troops, as such an interpretation would undercut this country's ratification of *Geneva IV*. Whether or not this concern is actually present in a particular case is not the point.

In another footnote, the government recites that § 2332 was passed in response to the 1983 bombing of the marine barracks in Beirut and suggests that this supports its argument that Congress intended the statute to reach zones of military occupation. *Opposition*, at 16, n. 6. The government's contention is, however, undercut by the fact that Lebanon was neither under martial law or otherwise subject to belligerent military occupation by the military forces of the

12

United States.  In 1993, Lebanon was under the sovereignty of its own elected government.  The U.S. Marines were deployed to Lebanon at the request of the Lebanese government as part of a multinational peacekeeping effort.  Indeed, in its official request for the peacekeeping force, "[T]he Government of Lebanon, which requested U.S. participation in the MNF, stipulated that the Marines would be required only for a limited period of time and that the Lebanese government would take all necessary measures to ensure the protection of the American forces' personnel."  *See* Kasperski & Crockett, U.S. Involvement in Lebanon 1982-1984: An Analysis of Failures to Determine National Interests and Apply the Elements of Power, Joint Forces Staff College (March 2004), *citing* Department of State Bulletin (November 1982).[6]

    Mr. Delaema does not resist the conclusion that in enacting § 2332 Congress intended to reach certain offenses against U.S. nationals in foreign countries.  But even if the bombing of the marine barracks in Beirut inspired § 2332, this in no way suggests that Congress intended to invoke Title 18 jurisdiction in the district courts for attacks in foreign countries under U.S. military occupation.  In the former situation, legislation was necessary as the United States had no ability to bring the perpetrators to justice.  In the latter, Congress was aware that the perpetrators of attacks against occupying U.S. troops or nationals had long been subject to the jurisdiction of military commissions or other tribunals established by the occupying forces.[7]

---

    [6]found at: http://www.jfsc.ndu.edu/current_students/documents_policies/jca_cca_awsp/US_involvement_ Lebanon_4-7-04.doc (visited -21-08).

    [7]The government begins its *Opposition* with the somewhat confusing argument that *Geneva IV* does not apply because in a mistaken view of the defense's interpretation of the Convention, its provisions and protections would expire "at the very latest - on June 29, 2005." *Opposition*, at 5-6.  Thus, the government reasons that the Convention would not apply to him

**V. Conclusion**

As discussed in both Mr. Delaema's *Motion* and this *Reply* several reasons support his contention that Congress has never authorized jurisdiction over Title 18 offenses committed in foreign lands under military occupation of the United States:

> The application of the domestic criminal law of the United States to offenses in foreign countries under military occupation of U.S. troops would contravene the provisions and purposes of *Geneva IV*. *Motion*, at 6-16; *Reply*, at 10-11.
>
> There is no suggestion in the legislative history that Congress intended the Title 18 statutes at issue in this case would apply to offenses committed in foreign countries under U.S. military occupation. *Motion*, at 16-18.
>
> Rules governing the construction of treaties and Congressional statutes support the conclusion that Congress did not intend to confer jurisdiction in the district courts where *Geneva IV*, previously ratified by the Congress, already addressed the jurisdiction of offenses committed in foreign countries under military occupation. *Motion*, at 18-22.
>
> The literal, non-contextual interpretation of § 2332 urged by the government would lead to the absurd result that legitimate combatants otherwise protected by the *Geneva Conventions* could routinely face criminal prosecution in the domestic courts of parties to the armed conflict for killing soldiers in lawful combat. *Motion*, at 16-18; *Reply*, at 4-6.
>
> Despite a long history of military occupation of foreign countries by U.S. troops, there has been no case cited where offenses committed in occupied foreign lands have been prosecuted in the domestic courts of this country rather than through tribunals or commissions established by the occupier. *Motion*, at 21-22; *Reply*, at 6-8.

---

because he was not transferred to the custody of the U.S. authorities until January 2007. Again, the government misconstrues the issue, which is the facts presented by a particular case, but whether Congress ever intended to establish jurisdiction over the offense in the first place. As an aside, Mr. Delaema notes that the government's interpretation of the one year provision is also incorrect, as the time limitation runs from termination of the active hostilities not from the end of the actual occupation. The purpose of the one year limitation is to encourage reasonably prompt termination of hostile occupations of foreign countries.

Despite the fact that Congress has specifically provided for jurisdiction for Title 18 offenses over parts of foreign lands, it has never expanded that jurisdiction to include foreign countries under military occupation of U.S. forces. *Reply*, at 6-8.

Further, Congress has never lifted the restrictions on the involvement of the military in law enforcement functions, which would be a necessary incident to investigation and prosecution of offenses in foreign lands under U.S. military occupation and control. *Reply*, at 8-10.

For these reasons, this Court should enter an order dismissing the indictment.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____"/s/"_____
Robert L. Tucker
Assistant Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, DC   20004
(202) 208-7500