**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CR. NO. 05-337 (PLF)** |
| | : | |
| **WESAM AL-DELAEMA,** | : | |
| | : | |
| **Defendant.** | : | |

---

## REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT ONE AND TO STRIKE ALLEGATIONS OF COUNTS FOUR AND FIVE

The defendant, Wesam al-Delaema [Delaema] submits this reply to the government's opposition to his *Motion to Dismiss Count One and to Strike Related Allegations from Counts Four and Five* [*Motion*].

The thrust of Mr. Delaema's *Motion* is that the unusual mechanism established by 18 U.S.C. § 2332(d), whereby the Attorney General simply certifies that the offense was committed with the Congressionally-mandated intent, is unconstitutional. Stripped to its essence, the government's response is straight-forward. Citing legislative history indicating that Congress did not intend that the finding required by § 2332 be considered an element of the offense, the government argues that the finding is nothing more than a permissive directive from Congress as to how the Attorney General should exercise his discretion under the statute.

The parties agree that Congress chose to not to require the prosecution to prove beyond a reasonable doubt the finding required by § 2332(d).[1] They disagree as to whether the

---

[1]Thus, the government's reliance on the structure of § 2332, namely the separate treatment accorded by subsections (a) & (d), as evidencing Congress' intent that the subsection

Constitution permits that choice.

Beginning with *McMillan v. Pennsylvania*, 477 U.S. 79, 98-103 (1986), and continuing through its invalidation of certain provisions of the federal sentencing guidelines, the Supreme Court has grappled with the interplay of the legislature's authority to define and punish criminal conduct and the constitutional role assigned to juries as fact-finders. *See also Jones v. United States*, 526 U.S. 227 (1999); *United States v. Gaudin*, 515 U.S. 506 (1995); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); *Ring v. Arizona*, 536 U.S. 584 (2002); *United States v. Booker*, 543 U.S. 220 (2005).[2]  In *McMillan*, Justice Stevens discussed, at length, the due process limitations on the legislature's ability to relieve the government's burden of proving the factual bases of criminal conduct.

> Nothing. . . authorizes a State to decide for itself which of the ingredients of the prohibited transaction are "elements" that it must prove beyond a reasonable doubt at trial. . . . It would demean the importance of the reasonable-doubt standard– indeed, it would demean the Constitution itself–if the substance of the standard could be avoided by nothing more than a legislative declaration that prohibited conduct is not an "element" of a crime. . . Appropriate respect for the rule of *In re Winship* requires that there be some constitutional limits on the power of a State to define the elements of criminal offenses.

*Id.*, at 98, 102-103 (J. Stevens, dissenting).[3]

---

(d) findings not be treated as elements, *see Opposition*, at 11,13, is not disputed.

[2]The Court had earlier addressed related issues such as the constitutional basis of the reasonable doubt standard, *In re Winship*, 397 U.S. 358 (1970), the distinction for purposes of allocating the burden between elements of the offense, *Mullaney v. Wilbur*, 421 U.S. 684 (1975) and affirmative defenses, *Patterson v. New York*, 432 U.S. 197 (1977), and the constitutionality burden-shifting devices, whether statutory in origin, *Tot v. United States*, 319 U.S. 463 (1943), or the result of jury instructions. *Sandstrom v. Montana*, 442 U.S. 510 (1979).

[3]In a footnote, the government complains that Mr. Delaema offers no explanation of his assertion that the Second Circuit's opinion in *United States v. Yousef*, 395 F.3d 76 (2d Cir. 2005), has been undermined by the subsequent Supreme Court decisions in *Blakely* and *Booker*.

The legislative history cited by the government suggests that this particular certification, which has no analogue anywhere else in Title 18,[4] was adopted at the suggestion of the Departments of State and Justice for the purpose of doing an end run around proof that would have otherwise been required in the original draft of the bill. Thus, the government sets out the original version of the bill, *id*., at 3, n.3, requiring that the killing or attempted killing be "in an act of international terrorism," and recites the testimony of a State Department Legal Advisor suggesting that this language, as it then existed, could "raise evidentiary and constitutional problems that could unduly complicate prosecutions under this legislation." *Id*., at 3. As recounted by the government, in response to these concerns, Congress removed this language and instead substituted the § 2332(d) certification requirement. *Id*., at 4.

This legislative history suggests that the government knew at the very outset that there

---

*Opposition*, at 11, n. 10. In addition to reinforcing the principles animating *Apprendi*, *Blakely* and *Booker* have seriously eroded *McMillan*, which was a 5-4 decision. In his dissent in *McMillan*, Justice Stevens, also presciently noted that "[I]t is not at all inconceivable, however, to fear that a State might subject those individuals convicted of engaging in antisocial conduct to further punishment for aggravating conduct not proved beyond a reasonable doubt." *Id*., at 102. This was indeed the approach taken by the United States Sentencing Commission, when one year after *McMillan*, they promulgated the sentencing guidelines. In striking down the Commission's approach, and a similar one taken by the State of Washington, the views expressed by Justice Stevens in *McMillan* evolved into those of the majority in *Blakely* and *Booker*. The continued vitality of *McMillan* had actually earlier been called into question in *Apprendi*, with the dissenters contending that the majority was, in effect, overruling *McMillan*. 530 U.S. at 533 ("Accordingly, it is incumbent on the Court not only to admit that it is overruling *McMillan*. . ."). In response, the majority implicitly acknowledged the inconsistency of *Appendi* and *McMillan*, "reserv[ing] for another day the question whether *stare decisis* considerations preclude reconsideration of its narrower holding." *Id*., at 487, n. 13; *see also Patterson v. New York,* 432 U.S. at 210 ("there are obviously constitutional limits beyond which the State may not go").

[4]The government attempts to suggest otherwise, citing the certifications of 18 U.S.C. §§ 245, 247,1119 and 5032. *Opposition*, at 6. But, as Mr. Delaema has previously pointed out, these certifications are a far different animal than that of § 2332(d). *See Motion*, at 6.

were potential problems with this certification.  Moreover, it demonstrates that Congress initially

anticipated, like it previously had in similar statutes, *see* 18 U.S.C. § 1203, that the

finding would be an element of the offense.  When Congress later enacted § 2331 it defined the

term "international terrorism" for purposes of Chapter 113B (Terrorism) of the Code in terms

very similar to the § 2332(d) certification.  *See* 18 U.S.C. § 2331(1)(B).  In fact, the term

"international terrorism" contained in Senate Bill 1429 cited by the government was defined in

terms of violent acts occurring outside the United States and "intended to intimidate or coerce a

civilian population [or] to influence the policy of a government by intimidation or coercion."[5]

Thus, the term "international terrorism" as it appeared in Senator Spector's initial bill, required

the government to actually prove almost precisely the finding required by § 2332(d).  Rather than

directly appear as an element of the offense, this requirement was simply transferred to what

ultimately became § 2332(d) and dressed in different clothing at the request of the Attorney

General.

       While it was certainly advantageous for the Department of Justice to suggest to the

Congress an alternative device that would presumably satisfy Congressional concerns while at

the same time alleviate the prosecutors' burden of proof and avoid "unduly complicat[ing]

prosecutions," the constitutionality of such proof-reducing measures is not measured by the

convenience afforded the prosecution.  *See Tot v. United States*, 319 U.S. 463, 469-470  (1943)

(statute creating presumption in unlawful receipt of firearm prosecution that firearm had traveled

in interstate commerce violates due process despite the fact that such presumption is

---

[5]Subsection (c) of this bill defined "international terrorism" by reference to Title 50, Section 1801(c), which contained the above definition.  *See* S. Res. 1429, 99th Cong. (1985) (enacted).

"convenient" for the prosecution and facilitates it burden of proof); *United States v. Santos*, 128 S.Ct. 2020, 2028 (2008)(rejecting government's argument that its interpretation of federal money-laundering statute would make it "easier to prosecute" such offenses and thereby be consistent with Congress' intention to facilitate money laundering prosecutions.).

The issue presented is whether the certification procedure complies with the Constitution, not whether it enables the prosecution to more easily carry its burden of proof. As Mr. Delaema has noted, the fact that Congress intended that the § 2332(d) finding not be treated as an element, thus relieving the government of its burden of proof, is not conclusive of the constitutionality of the approach. *Motion*, at 17 (noting that the legislatures in *Apprendi* and *Booker* obviously intended that the findings not be treated as elements subject to the reasonable doubt standard).

Implicitly acknowledging that it must prove the required mental state beyond a reasonable doubt, the thrust of the government's response is that the § 2332(d) finding is not a *mens rea* but instead a description of the actor's motive, which in its view it need not prove. *Opposition*, at 6-9. In so arguing, the government ignores the plain language of § 2332(d), which requires that the offense was "*intended* to coerce, intimidate, or retaliate against a government or civilian population." (Emphasis added).

Neither does the government fare any better with the cases it cites in support of its theory that when Congress used the word "intended," it actually meant motive rather than intent. *Id.*, at 9. Indeed, the government quotes language from *Sutro Bros. & Co. v. Indemnity Ins. Co.*, 264 F. Supp. 273, 288 (S.D.N.Y. 1967), defining intent as "the purpose to use a particular means to effect such result." *Id.* Contrary to the government's reliance on this forty year-old district

court case, the language of § 2332(d) actually directly fits its definition of "intent," requiring that the offense was, in the language of *Sutro Bros.*, "the means to effect the result of" coercing, intimidating or retaliating against a government or civilian population.

In another effort to avoid the *mens rea* characterization of § 2332(d), the government views as "significant" its unsupported characterization that § 2332(d) does not require that the *defendant* intended to commit the crime to coerce, intimidate or retaliate. *Opposition*, at 9. In so arguing, it is not clear who the government thinks is supposed to have this state of mind, if not the offender. In any event the government's view is not supported by the language of § 2332(d), which requires that the "offense described in this section" be committed with the described state of mind. The "offenses" are described in subsections (a) [substantive] and (b) [attempt and conspiracy], both of which refer to "whoever" commits the prohibited act. Thus, the "offense" referenced in subsection (d) is committed by the person charged under subsection (a) or (b) and it is that person's state of mind that is at issue, not that of some undefined third person to whom the Attorney General in his unfettered and un-reviewable discretion can apparently ascribe such a state of mind.

The government also argues that § 2332(d) cannot reflect a required *mens rea* because the intent required is that for homicide and conspiracy to commit homicide, as defined in § 1111. *Opposition*, at 6-8. Mr. Delaema agrees that before he can be convicted the government must prove he had the state of mind required for homicide and conspiracy, but the fallacy in the government's reasoning is its underlying assumption that this is the *only* required *mens rea*. Federal crimes often have more than one required *mens rea*. *See* 18 U.S.C. § 545 ("Whoever knowingly, willfully, with intent to defraud. . .); § 954 ("Whoever. . . willfully and knowingly. . .

6

[with] knowledge or reason to believe . . or intent to influence. . .").

In his *Motion*, Mr. Delaema contrasted the certification at issue here with that of 18 U.S.C. § 1119, that was upheld in *United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003). *Motion*, at 3-5.  As Mr. Delaema pointed out the § 1119 certification is qualitatively far different from that of § 2332(d).  The former requires the Attorney General to certify that a foreign country has no legal power to compel the appearance of an offender who has fled that country, a determination requiring examination and interpretation of international law and treaties.  The latter involves a determination of the facts relating to an offense.  *Wharton* recognized as much when it characterized the "complicated determination of fact and law" underlying the § 1119 certification.  The government's observation that the  Attorney General may consider inadmissible evidence as well as that of intelligence agencies [verified or not] in making the § 2332(d) certification hardly alleviates the constitutional concerns.  *Opposition*, at 14.   The government then reasons that this unfettered flexibility of the Attorney General demonstrates that the § 2332(d) certification is, like *Wharton*'s characterization of the § 1119 certification, a "combination of fact, policy and prosecutorial discretion. . . " *Id*.   But it takes little discrimination to ascertain the radically different nature of these two certifications.  Further, the government's "just trust us" argument has no logical boundaries.  Presumably, *in every case* the prosecution considers all evidence and intelligence, admissible or not, in determining whether to proceed with a prosecution.  The fact that a prosecutor determines to file a case has never been understood to relieve him or her of the burden of proof.

As noted above, from *Gaudin* to *Apprendi* through *Blakely* and *Booker*, the Supreme Court has looked askance at procedures which assign fact-finding to entities other than a jury.

And, contrary to the government's suggestion, *see Opposition* at 11, this reluctance to approve
re-designation of the fact-finding function has not been limited to sentencing concerns.  For
example in  *United States v. Gaudin*, 515 U.S. 506 (1995), the Court found that a procedure
where the trial judge simply instructed jury that false statements were material violated due
process.  The scheme envisioned by § 2332(d) is even more constitutionally offensive.   In
*Gaudin*, at least, a neutral judge determined the issue of  materiality.  And it is worth noting that
the rationale for establishing a jury bypass was stronger there than here, as the issue of the
materiality of the false statements to a matter within the jurisdiction of a federal agency is
actually one where the court (or even a prosecutor) would presumably have more knowledge or
insight than a jury.  As it does here, *Opposition* at 14, in *Gaudin* the government argued that the
materiality question was not appropriate for the jury because it presented a mixed question of law
and fact. This assertion was directly rejected by the Court: "[T]he application-of-legal-standard-
to-fact sort of question. . ., commonly called a mixed question of law and fact," has typically
been resolved by juries." *Id*., at 512.

The government argues that the reasoning of *Apprendi* does not apply to § 2332(d)
because it does not increase the maximum sentence for the offense.  *Opposition*, at 11.   Mr.
Delaema's argument does not depend on and is not related to the imposition of sentence.  He
cites the *Appendi* line of cases as illustrative of the same principles underlying the Supreme
Court's numerous decisions invalidating procedures which undercut the prosecution's burden of
proof.  *See Motion*, at 16-18.  In a functional sense, however, like the presumption cases such as
*Tot* and the non-jury assignment cases such as *Gaudin*, the § 2332(d) certification is even more
beneficial to the government and harmful to the defendant than those found in the sentencing

cases, in that the former line of cases actually facilitate the threshold determination of guilt.

In criminalizing various acts intended to coerce, intimidate or retaliate against governments or civilian populations, Congress has not treated this requirement consistently. As Mr. Delaema pointed out in his *Motion*, the hostage-taking statute, 18 U.S.C. § 1203, directly includes this language in the substantive definition of the offense. In 18 U.S.C. § 2332f (b), prohibiting certain bombings of public facilities, similar language is labeled "jurisdictional." In his *Motion*, Mr. Delaema alternatively argued that even if the finding required by § 2332(d) is considered a jurisdictional requirement rather than an element of *mens rea*, the statute's delegation of its determination to the Attorney General is an unconstitutional violation of separation of powers. *Motion*, at 9-12.

In response, the government relies on this circuit's decision in *In Re Sealed Case*, 131 F.3d 208 (D.C. Cir. 1997*)*, holding that certification under 18 U.S.C. § 5032 of "a substantial federal interest" before a juvenile can be prosecuted in federal court is judicially non-reviewable and thus not an unconstitutional violation of separation of powers. *Opposition*, at 14-17. As Mr. Delaema noted in his *Motion*, the standard-less juvenile certification of a "substantial federal interest," which may involve a myriad of distinct factual and policy determinations of the kind involved in any decision to prosecute, is far different from the specific finding set out in § 2332(d). *See Motion*, at 5-6. Further, a close reading of *In re Sealed Case* shows that the court went to lengths to distinguish the Supreme Court's decision in *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995), holding that the Attorney General's "scope of employment" certification under the Westfall Act is subject to judicial review. In the view of *In re Sealed Case*, the critical difference was that the *respondeat superior* certification at issue in *Gutierrez de*

9

*Martinez* was "historically a question of law within the provenance of the courts." 131 F.3d at 213-214. Likewise, the § 2332(d) finding of whether the offense was intended to "coerce, intimidate or retaliate" is one that has been historically assigned to the trier-of-fact (e.g. see § 1203), not merely delegated to the un-reviewable discretion of the Attorney General. Thus, the § 2332(d) finding is much closer to *Gutierrez de Martinez* than to *In re Sealed Case*. And, the axiomatic constitutional principle undergirding the Court's decision in *Gutierrez de Martinez* is equally applicable to the Attorney General's certification here - simply put: "[n]o man is allowed to be a judge in his own cause." 515 U.S. at 428, quoting *The Federalist No. 10*, at 79 (J. Madison).

The government's position that the § 2332(d) certification should be treated as nothing more than a direction from Congress to limit prosecution of violent acts against Americans overseas to certain types of offenses is also undercut by other recent Supreme Court decisions. For example, in *United States v. Lopez*, 514 U.S. 549, 562 (1995), the Court struck down the Guns-Free School Zone Act, noting that it "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce and thereby limit its reach to a discrete set of firearm possessions"). Like the situation here involving violent crimes against Americans overseas, *Lopez* assumed that Congress did not intend to prosecute all cases involving the general subject matter - firearms possession in the designated area - but only those directly affecting interstate commerce. In striking down the statute, the Court noted that the absence of the interstate jurisdictional element unconstitutionally jettisoned the necessary "case-by-case" inquiry into jurisdiction. Nowhere did the Court suggest that the Attorney General could simply unilaterally make the jurisdictional

10

"interstate commerce" determination or that his decision to prosecute implied that he had made such a determination.  Utilizing the same reasoning, the Court later struck down the Violence Against Women Act in *United States v. Morrison*, 529 U.S. 598, 611-612 (2000), noting that the Act contained no "jurisdictional element" establishing that its provisions were related to regulation of interstate commerce.  S*ee also Scarborough v. United States*, 431 U.S. 563 (1977) (resolving circuit split concerning degree of evidence necessary to establish "jurisdictional element" of interstate commerce in firearms prosecution); *United States v. Cardoza*, 129 F.3d 6, 11 (1st Cir. 1997) (*Lopez* did not alter government's burden of proof on "jurisdictional elements" in criminal case).

As noted above, the government's reasoning has no ascertainable limits.  If the Attorney General can constitutionally certify the § 2332(d) finding, which the government asserts is merely a Congressional directive that he make certain prescribed factual determinations before invoking the court's jurisdiction, there is no logical reason why the Congress could not simply delegate to the prosecution the unilateral and non-reviewable determination of whether an offense, for example, affected interstate commerce.

In conclusion, Mr. Delaema contends that the finding required by § 2332(d) is a substantive element of the offense which must be proved beyond a reasonable doubt.  But even if viewed as more akin to a jurisdictional element, its delegation of the required finding to the unilateral un-reviewable determination of the Executive violates separation-of-powers.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____"/s/"_____
Robert L. Tucker
Assistant Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, DC   20004
(202) 208-7500